PLANET HOLLYWOOD (REGION IV), INC., a Minnesota corporation, et al., Plaintiffs,

v.

HOLLYWOOD CASINO CORPORATION, a Delaware corporation, et al., Defendants.

No. 96 C 4660.

United States District Court,
N.D. Illinois,
Eastern Division.

Dec. 3, 1999.

Arthur H. Seidel, Stephen J. Meyers, Michael F. Snyder, Robert A. McKinley, Seidel, Gonda, Lavorgna & Monaco, P.C., Philadelphia, PA, James K. Borcia, Jacqueline A. Criswell, Tressler, Soderstrom, Maloney & Priess, Chicago, IL, for Hollywood Casino Corp., et al.

**FINDINGS OF FACT AND CONCLU-SIONS OF LAW PURSUANT TO FEDERAL RULE OF CIVIL PRO-CEDURE 52**

SCHENKIER, United States Magistrate Judge.

### Introduction

As a nation, we long have extolled the virtues of free and vigorous competition, and frequently have cited our devotion to competition as a principal reason for our nation's unparalleled economic success. At the same time, we hold no less dear the right of individuals and corporations to control and use their own property, including intellectual property such as trademarks. Protection of trademark rights has been a part of our common law since the inception of this nation and has been expressed in federal legislation dating back to 1870.

However, the boundaries of these respective rights of competition and protection often are not clear, and often come into conflict. Is one party merely seeking to compete freely and fairly, or is it attempting to unfairly usurp the intellectual property of another? Is one party merely attempting to protect its legitimate right to control and use its intellectual property, or is it seeking to unfairly expand its intellectual property rights beyond their proper scope? Questions such as these typically lie at the core of intellectual property litigation, and this lawsuit is no exception.

On July 29, 1996, Planet Hollywood (Region IV), Inc. and Planet Hollywood International, Inc. (collectively, "Planet Hollywood") initiated this lawsuit against Hollywood Casino Corporation and related corporations and individuals (collectively, "Hollywood Casino"). Hollywood Casino operates casinos in Aurora, Illinois and Tunica, Mississippi, and is in the process of establishing a third casino in Shreveport, Louisiana. As now amended, Planet Hollywood's complaint alleges that Hollywood Casino is guilty of false designation of origin and trade dress infringement, in violation of the Lanham Act, 15 U.S.C. § 1125 and common law (Count I); has infringed Planet Hollywood's design marks, in violation of the Lanham Act, 15 U.S.C. § 1114 and the common law (Count II); has violated the Lanham Act, 15 U.S.C. § 1125(c) and the Illinois Anti–Dilution Act, 765 ILCS 1035/15, by diluting the distinctive quality of Planet Hollywood's design marks (Count III); has

committed the common law tort of unfair competition (Count IV); and has violated the Illinois Deceptive Business Practices Act, 815 ILCS 505/1, *et seq.* (Count V). In addition, Planet Hollywood seeks a declaratory judgment that Planet Hollywood would not infringe any trademark rights of Hollywood Casino were Planet Hollywood to use its design mark for casinos or hotels, an injunction barring defendants from asserting a claim of infringement or unfair competition based on Planet Hollywood's future use of its design mark for those purposes, and an order canceling all of Hollywood Casino's registered trademarks for casino services (Count VI).

Hollywood Casino has responded by denying any infringement, asserting an array of affirmative defenses attacking the scope and validity of Planet Hollywood's trademarks and trade dress, and pleading its own counterclaim for infringement and declaratory relief against Planet Hollywood (and, to boot, joining two senior Planet Hollywood officers as parties to that claim). Hollywood Casino's counterclaim, as amended, asserts that by placing certain of its restaurants in buildings that also house casino operations run by others, Planet Hollywood already has infringed Hollywood Casino's trademark and trade name and committed false designation of origin in violation of the Lanham Act, 15 U.S.C. §§ 1114, 1125(a), and 1126 (Counts I and II); has committed common law unfair competition (Count III); has diluted Hollywood Casino's trademark and trade name in violation of the Lanham Act, 15 U.S.C. § 1125(c), and the Illinois Anti-Dilution Act, 765 ILCS 1035/15 (Count IV); and has violated the Illinois Consumer Fraud and Deceptive Business Practices Act, 815 ILCS 505/2 (Count V) and the Nevada Deceptive Business Trade Practices Act, N.R.S. 598.0915(1)-(3) (Count VIII). Hollywood Casino alleges that Planet Hollywood has unjustly enriched itself by virtue of those alleged violations (Count VI), and pleads a separate count

for damages allegedly due and owing for the violations of law alleged in Counts I through VI in connection with the Planet Hollywood restaurant located at Caesar's Tahoe in Stateline, Nevada (Count VII).

Hollywood Casino's amended counterclaim also asserts a declaratory judgment count based on Planet Hollywood's possible future use of its mark for casino services. Hollywood Casino claims that if Planet Hollywood in fact embarks upon the use of its trademark name for casino services, this would constitute trademark and trade name infringement and dilution of the Hollywood Casino mark in violation of the Lanham Act and applicable state statutes, common law unfair competition, deceptive trade practices in violation of applicable state statutes, and unjust enrichment. As a mirror image to Planet Hollywood's declaratory judgment claim, Hollywood Casino seeks not only that declaration but, in addition, a declaration that Hollywood Casino's marks are valid and neither generic nor descriptive, and an injunction barring Planet Hollywood from using its mark in the future for casino services (Count IX).

This case originally came before the Court on five summary judgment motions filed by the parties, which raised a number of issues concerning the validity and alleged infringement of Planet Hollywood's trademark and trade dress, and Hollywood Casino's trademark.[1] During a pretrial conference on June 1, 1999, the Court denied all summary judgment motions as moot, in view of an agreement by the parties to convert the motions for summary judgment into a bench trial on the papers, pursuant to Federal Rule of Civil Procedure 52 (doc. # 148–1). At the June 1 pretrial conference, the Court also ruled that the trial of this matter would be bifurcated, and the Rule 52 proceeding that is the subject of this opinion would only address issues of liability; that ruling was

---

1. On March 3, 1998, all parties to this action voluntarily consented under 28 U.S.C. § 636(c) to have a magistrate judge conduct

all proceedings in this case, including the entry of final judgment.

further confirmed in a subsequent order dated June 7, 1999 (doc. # 149–1).

The parties agreed that the declarations, documents and other evidentiary materials submitted in connection with the summary judgment motions would constitute the evidentiary record for the Court to consider in this Rule 52 proceeding, that the fact statements submitted in connection with the summary judgment motions would be treated as proposed findings of fact, and that the summary judgment briefs would be considered as trial briefs. At the parties' request, the Court also accepted certain supplementations to that record. Each party submitted additional exhibits, the admissibility of which was ruled on at a pretrial conference held on June 25, 1999 (doc. # 156–1). At Hollywood Casino's request, and with the agreement of all parties, the Court also conducted site visits of the Hard Rock Café and Planet Hollywood restaurants located in Chicago, Illinois on July 1, 1999, and of the Hollywood Casino located in Aurora, Illinois on July 8, 1999. By agreement of the parties, those site visits were conducted without the presence of counsel or the parties, and without the dates of the visits being disclosed to the employees of the respective facilities. In addition, at the request of Hollywood Casino, the Court convened an evidentiary proceeding for a four-day period from July 19 through 22, 1999, at which time in-court testimony was received from four witnesses called by Hollywood Casino. Planet Hollywood also examined each of the witnesses, but elected to call no witnesses affirmatively.

The Court then heard closing argument from each side on July 26, 1999, and allowed the parties to submit additional proposed findings of fact to take into account the full evidentiary record, including what had transpired during the evidentiary hearing. Those findings of fact were submitted on August 17, 1999: Hollywood Casino submitted 403 proposed findings of fact, spanning 79 pages; Planet Hollywood submitted 257 proposed findings of fact, spanning 52 pages (not surprisingly, those proposed findings substantially overlapped with the fact statements previously submitted on summary judgment).

During closing argument, the Court raised, *sua sponte*, the issue of subject matter jurisdiction of the parties' respective declaratory judgment counts: that is, whether Planet Hollywood has sufficiently progressed with concrete steps to use its name for a casino so as to create a justiciable controversy at this time. Planet Hollywood argued that the Court possessed subject matter jurisdiction, and Hollywood Casino did not argue to the contrary. Neither side addressed that issue further in the proposed findings submitted on August 17, 1999. However, after the submission of proposed findings, Hollywood Casino moved to dismiss all declaratory judgment claims in the Amended Complaint and Amended Counterclaim for lack of subject matter jurisdiction (doc. # 179–1). Planet Hollywood opposes the motion, but asserts that if it is granted, attorneys' fees and costs should be assessed against Hollywood Casino under 28 U.S.C. § 1927 for vexatiously litigating the declaratory judgment issues for several years, and thus saddling Planet Hollywood with unnecessary litigation expenses.

Since the filing of these motions, the case has taken a few more twists and turns. *First*, on October 12, 1999, Planet Hollywood (Region IV) and Planet Hollywood International, Inc. filed petitions in the bankruptcy court in Delaware seeking protection under Chapter 11 of the Bankruptcy Code. Although that filing triggered an automatic stay of all plenary litigation against Planet Hollywood and thus normally would have barred further consideration of the Amended Counterclaim (but not Planet Hollywood's Amended Complaint) at this time, Planet Hollywood and Hollywood Casino jointly asked the bankruptcy court to lift the stay for purposes of this lawsuit, a request that was granted on November 19, 1999. The pending bankruptcy action, therefore, does not affect this Court's authority to address the entire case before it. However, the

parties have argued about the impact of this bankruptcy filing—and certain comments attributed to one of the individual plaintiffs about it—on the Court's consideration as to whether there is a sufficiently concrete case or controversy to vest jurisdiction over the declaratory judgment actions, and the parties have submitted further written argument on that issue.

*Second,* on October 21, 1999, Hollywood Casino filed a motion under Fed.R.Civ.P. 15(b) to further amend its Amended Counterclaim to conform to the evidence (doc. # 181–1). In substance, that motion seeks to excise Counts I–VIII from Hollywood Casino's Amended Counterclaim—that is, all claims asserting violations based on Planet Hollywood's past and current uses of its marks. Planet Hollywood resists that motion, and that matter also is presently before the Court.

The Court has carefully considered the evidence and arguments submitted by the parties in this Rule 52 proceeding. The Court's rulings are as follows:

1. Hollywood Casino's motion to dismiss the declaratory judgment claims for lack of subject matter jurisdiction (doc. # 179–1) is granted. The Court therefore dismisses without prejudice Count VI of the Amended Complaint and Count IX of the Amended Counterclaim. Planet Hollywood's request for an assessment of fees and costs against Hollywood Casino under 28 U.S.C. § 1927 is denied.

2. Final judgment is hereby entered for defendants, and against plaintiffs, on Counts I through V of the Amended Complaint (which are all remaining claims in the Amended Complaint after

dismissal of the declaratory judgment claim in Count VI).

3. Hollywood Casino's motion to conform the pleadings to the proof by deleting Counts I through VIII of the Amended Counterclaim (doc. # 181–1) is denied. Turning to the merits of those claims, final judgment is hereby entered for the counterdefendants, and against the counterplaintiffs, on Counts I through VIII of the Amended Counterclaim (which are all the remaining claims in the Amended Counterclaim after dismissal of the declaratory judgment claim in Count IX).

Set forth below are the findings of fact and conclusions of law that form the basis for the Court's rulings, as required by Rule 52(a). To the extent that any finding of fact constitutes a conclusion of law, the Court hereby adopts it as such, and to the extent that any conclusion of law constitutes in whole or in part a finding of fact, the Court adopts it as such. *See Miller v. Fenton,* 474 U.S. 104, 113–14, 106 S.Ct. 445, 88 L.Ed.2d 405 (1985) (discussing the methodology for distinguishing questions of fact from questions of law). The various subheadings that appear throughout this opinion are not themselves findings or conclusions, but are merely inserted for the convenience of the reader.[2]

## FINDINGS OF FACT

### I. THE GENESIS OF THE PLANET HOLLYWOOD CONCEPT.

1. Plaintiff/Counterdefendant Planet Hollywood (Region IV), Inc. ("PH–Region IV") is a Minnesota corporation, with its principal place of business in Orlando, Florida. PH–Region IV currently owns the rights in the alleged "Planet Holly-

---

**2.** References to the evidentiary materials from which the Court's findings are drawn will be in accordance with the following conventions: (1) references to testimony offered at the evidentiary hearing on July 19–22, 1999 and the closing argument on July 26, 1999 will be preceded by "Trial Tr."; (2) references to other transcripts will be preceded by the date of the proceeding and the reference "Tr."; (3) references to exhibits that were separately

marked by Hollywood Casino and Planet Hollywood at the evidentiary hearing will be preceded "HC Tr. Ex.:" or "PH Tr. Ex."; (4) references to other evidentiary materials submitted by Planet Hollywood will be preceded by the reference "PH App."; and (5) references to other evidentiary materials submitted by Hollywood Casino will be preceded by the reference "HC Ex."

wood" trademarks and trade dress that are the subject matter of the Amended Complaint. Plaintiff/Counterdefendant Planet Hollywood International, Inc. ("PHI"), a Delaware corporation with its principal place of business in Orlando, Florida, is the parent of PH–Region IV.

2. Counterdefendant Keith Barish is a former Chairman of the Board and principal shareholder of PHI. In late 1988 or 1989, Mr. Barish began to develop the concept of a restaurant that would pay tribute to Hollywood by featuring memorabilia, merchandise and movie footage. The initial name that Mr. Barish considered for this concept was "Café Hollywood."

3. Counterdefendant Robert Earl is the Chief Executive Officer of PHI, a member of its Board of Directors, and one of its principal shareholders. He is also the Chief Executive Officer of PH–Region IV. Mr. Earl's responsibilities have involved the day-to-day management of the Planet Hollywood operations. By contrast, Mr. Barish's responsibility has principally been to preside at PHI's board meetings; he has not been involved in day-to-day operations (*Id.*).

4. Mr. Earl first met with Mr. Barish concerning the then "Café Hollywood" concept in about 1989. Beginning early in the development of this concept, Messrs. Barish and Earl envisioned the enterprise as not being limited solely to restaurants, but as potentially expanding into a variety of entertainment and leisure services. The Court finds credible the testimony of Mr. Earl that the decision to change the name of the concept from "Café Hollywood" to "Planet Hollywood" reflected that intent to apply the concept to a variety of entertainment functions (Trial Tr. 799–801).

5. The first Planet Hollywood restaurant opened in New York City, New York, on or about October 21, 1991. As of August 1998, there were eighty-eight Planet Hollywood restaurants located in thirty-five countries on virtually every continent. Thirty-three of those restaurants were located in the United States. Four of the restaurants in the United States are located in hotels which also house separate casino operations: Harrah's Casino Hotel in Reno, Nevada; Caesar's Palace Resort in Las Vegas, Nevada; and Caesar's Casino Hotels in Lake Tahoe, Nevada, and Atlantic City, New Jersey.

6. In addition, Planet Hollywood has offered a number of goods and services under the Planet Hollywood trademarks or trade dress other than restaurant services, including night club and bar services, movie screenings, and the sale of apparel and toys. As of 1998, Planet Hollywood also had a hotel under construction in New York City. However, Planet Hollywood has never offered casino services under its name; nor does Planet Hollywood presently have any concrete plans to do so.

## II. PLANET HOLLYWOOD'S TRADEMARKS.

7. From the beginning of its operations in 1991, Planet Hollywood has used trademarks and service marks comprised of the words "Planet Hollywood," both standing alone and superimposed over a stylized star and globe symbol. Those trademarks and service marks have been duly registered with the United States Patent and Trademark Office as follows:

| Mark | Registration No. | Registration Date | Services/Goods |
|------|------------------|-------------------|----------------|
| "Planet Hollywood" (word mark only) **PLANET HOLLYWOOD** | 1,776,944 | 06/15/93 | Jewelry, namely decorative tie pins of non-precious metal; clothing, namely tee-shirts, shirts, sweatshirts, polo shirts, sport shirts, shorts, jackets, caps, bolo ties; restaurant, bar, night club and restaurant takeout services (first use in commerce 10/22/91). |
| "Planet Hollywood" (curved, stylized word mark) | 1,788,712 | 08/17/93 | Jewelry, namely decorative tie pins and lapel pins of non-precious metal (first use in commerce 10/22/91); printed matter, namely menus, stationery, notecards and postcards (first use in commerce 10/22/91); clothing, namely tee shirts, shirts, sweatshirts, polo shirts, sport shirts, shorts, jackets, caps and bolo ties (first use in commerce 10/22/91); toys, namely plush stuffed animals (first use in commerce 11/20/92); entertainment services, namely conducting exhibition services in the nature of festivals and movie screenings, the presentation of live and recorded music and film exhibitions (first use in commerce 10/22/91); restaurant, bar, night club and restaurant takeout services (first use in commerce 10/22/91). |

"Planet Hollywood" 1,798,442 10/12/93 Jewelry, namely decorative tie pins and (curved, stylized lapel pins of non-precious metal (first wood mark super- use in commerce 10/22/91); printed imposed over globe matter, namely menus, stationery, and star symbol) notecards and postcards (first use in commerce 10/22/91); clothing, namely tee shirts, shirts, sweat shirts, polo shirts, sport shirts, shorts, jackets, caps and bolo ties (first use in commerce 10/22/91); toys, namely plush stuffed animals (first use in commerce 11/20/92); entertainment services, namely, conducting exhibition services in the nature of festivals and movie screenings, the presentation of live and recorded music and film exhibitions (first use in commerce 10/22/91); restaurant, bar, night club and restaurant takeout services (first use in commerce 10/22/91).

"Planet Hollywood" 1,839,216 06/14/94 Metal key chains (first use in commerce (curved, stylized 10/21/91); watches (first use in wood mark super- commerce 10/0/92). imposed over globe and star symbol)

| | | | |
|---|---|---|---|
| "Planet Hollywood" (word mark only)<br><br>**PLANET HOLLYWOOD** | 1,890,377 | 04/18/95 | Lapel pins of non-precious metal (first use in commerce 10/22/91); stationery, notecards and writing paper (first use in commerce 2/1/93); toys, namely plush stuffed animals (first use in commerce 11/20/22); conduction of exhibition services in the nature of festivals and movie screenings (first use in commerce 10/22/91). |
| "Planet Hollywood" (curved, stylized wood mark super-imposed over globe and star symbol) | 1,918,766 | 09/12/95 | Sunglasses (first use in commerce 08/0/93). |

(PH App. Vol. 1. Ex. 4 A).

8. As to each of these registered marks, Planet Hollywood has disclaimed any "exclusive right to use 'Hollywood,' apart from the mark as shown." In addition, Planet Hollywood has admitted that particular colors or color combinations are not an element of the registered marks.[3]

9. There is no dispute that the Planet Hollywood trademarks are extremely well known, both the stand-alone word marks and the word marks superimposed over the globe and star symbol (hereinafter referred to as Planet Hollywood's "globe mark"). The record is replete with statements attesting to the extraordinary notoriety that has attached to the Planet Hollywood marks. For example, Mr. Barish attributed to the Chairman of Coca Cola the observation that Planet Hollywood "is

---

**3.** Planet Hollywood has sought and obtained other more recent registrations for "Planet Hollywood Hotel," issued May 11, 1999; "Planet Hollywood Resort," issued December 10, 1998; and "Planet Hollywood Online," issued June 14, 1999 (HC Tr. Ex. 212). The latter application disclaimed the phrase "Hollywood Online"; the other two did not disclaim the word "Hollywood."

**834**

the most famous and well-known brand created in the last thirty years"—an assessment with which Mr. Barish wholeheartedly agreed. While not going quite so far, a number of representatives of the defendants likewise have acknowledged that the Planet Hollywood mark is "well known" (Trial Tr. at 200); "well-recognized" (PH App. Vol. 2 Ex. 8 (Riviera–Soto Dep.) at 35), and "widely known" (PH App. Vol. 2, Ex. 12 (Thompson Dep.) at 114). Testimony by non-parties confirms this assessment (see, e.g., PH App. Vol. 2 Ex. 9, at 74; Ex. 10, at 103; Ex. 11, at 24). Indeed, defendants have admitted in their proposed findings that "[t]he Planet Hollywood mark is extremely famous" (Defendants' and Counterclaim–Plaintiffs' Proposed Findings of Fact in Support of Infringement, at 3, ¶ 14). Based on this and other substantial evidence offered during this proceeding, the Court finds that the Planet Hollywood trademarks identified in Finding No.7, above, are famous marks throughout the United States, and have substantial strength in identifying the source of goods and services provided.

10. However, the Court finds that Planet Hollywood has not proven the contention—found in its proposed findings— that the word "Planet" is the dominant component of the mark. The Court has considered Mr. Earl's testimony that the word "Planet" is dominant, as well as the evidence that Planet Hollywood is sometimes called "The Planet." However, there is other evidence indicating that the word "Planet" is no more dominant in the mark than the word "Hollywood." While Planet Hollywood has generally disclaimed the exclusive right to the word "Hollywood," it has not done so with respect to the marks as shown. While Planet Hollywood's globe mark does convey a "planetary" message, it does so in conjunction with "Hollywood," a word that also is emblazoned across the globe. The stars on the Planet Hollywood mark are consistent with both a planetary and a Hollywood theme. And, the Court notes that Planet Hollywood's current attempt to downplay

the importance of the word "Hollywood" in its mark is in tension with Planet Hollywood's earlier statement, in opposing summary judgment, that the word "Hollywood" is a "significant element[ ] of Planet Hollywood's design mark" (Planet Hollywood's Memorandum in Opposition to Hollywood Casino's Motion for Summary Judgment on Planet Hollywood's Design Mark Infringement, 9/14/98, at 11). This evidence suggests the words "Planet" and "Hollywood" have comparable emphasis in the marks.

11. Moreover, there is also evidence indicating that the word "Hollywood" is the dominant part of the mark. For example, the word "Hollywood" is the only word that has survived as the name evolved from "Café Hollywood" to "Planet Hollywood." Planet Hollywood has acknowledged that "Planet Hollywood" was intended to be the definitive tribute to Hollywood, and as a result, it was deemed essential to include the word "Hollywood" in the name. In a suit against an alleged infringer named "Planet Hoboken," Planet Hollywood agreed as part of a settlement that the establishment could go by the name "The Planet" (Trial Tr. 849; HC Tr. Ex. 500)—which would tend to suggest that Planet Hollywood does not consider "Planet" to be the dominant component of its mark. In sum, the Court finds that the evidence does not support a finding that "Planet" is the dominant component of the mark (whether that word is equal or subordinate to the word "Hollywood" as a component of the marks is a question the Court need not and does not decide).

## III. PLANET HOLLYWOOD'S TRADE DRESS.

12. The Planet Hollywood restaurants are a part of what has been referred to by some as the "eatertainment" industry, which is made up of themed restaurants that provide both food and an entertaining environment. Restaurants in the "eatertainment" industry include Planet Hollywood, The Hard Rock Café, Rainforest

Café, Harley–Davidson Café and Country Star Café.

13. Based on the Court's site visit to Hard Rock Café and Planet Hollywood in Chicago, as well as the Court's review of videotapes submitted by Hollywood Casino displaying the interiors of many of these other restaurants, the Court finds that Planet Hollywood has developed a look and feel, or "total image," that distinguishes Planet Hollywood establishments from others in the eatertainment industry.[4] The Court finds that the following combination of elements make up this distinctive image of Planet Hollywood restaurants.

## A. *An Emphasis on Celebrity Ownership.*

14. One of the defining characteristics of Planet Hollywood restaurants is the strong presence of, and association with, the three leading celebrity investors in the enterprise: Arnold Schwarzenegger, Silvester Stallone and Bruce Willis. There is no dispute that Planet Hollywood benefits from its association with those three individuals, whose action movies are among the most popular in the world (as measured by box office receipts). Indeed, Hollywood Casino itself submitted a proposed finding of fact acknowledging this point (Hollywood Casino Proposed Findings of Fact in Support of Infringement, at 3, ¶ 17). The presence of those three celebrity owners is conveyed not only by their personal appearances at various Planet Hollywood restaurants and functions, but in the decor of Planet Hollywood restaurants. Planet Hollywood tends to cluster together displays and memorabilia of all three of the lead celebrity owners near the entrances to their restaurants. Thus, immediately upon entering Planet Hollywood restaurants, the consumer sees displays of posters and memorabilia from these individuals emphasizing their association with Planet Hollywood. In addition, those celebrity owners are highlighted in the Hollywood Hills dioramas that are found in all Planet Hollywood restaurants (*see* Finding No. 18, *infra*).

15. While Planet Hollywood's distinctive image also includes other elements, which the Court will describe below, the Court finds that this association with Messrs. Schwarzenegger, Stallone and Willis, and the emphasis of those celebrities in the decor of the Planet Hollywood restaurants, is the single most important element contributing to the Planet Hollywood image.

## B. *Display of Hollywood Memorabilia.*

16. The Court finds that the display of memorabilia from famous Hollywood movies is also an important part of the distinctive look and feel of Planet Hollywood restaurants. Although there is a focus on the action movies involving the three lead celebrity owners, the Court finds that the overall image of Planet Hollywood is not limited to the presentation of memorabilia from those movies: Planet Hollywood presents memorabilia from Hollywood movies spanning a variety of genres and generations. However, contrary to Planet Hollywood's assertion, the Court finds that the fact that the memorabilia is displayed in plexiglass display cases is not a distinctive part of Planet Hollywood's presentation of memorabilia. The Court is mindful of Mr. Earl's testimony that he devised the idea of a "clear modern look" for the display cases to make them distinctive to Planet Hollywood (Trial Tr. 768–769). However, as Mr. Earl further conceded, the use of display cases employing plexiglass is not unique, and may be found in many places—such as the Smithsonian Institute (Trial Tr. 771–72). Based on a consideration of all the evidence presented, including the Court's site visits to Planet Hollywood and Hollywood Casino, the Court finds that the design of the display cases is not sufficiently unique, or suffi-

---

4. The Seventh Circuit recently has reaffirmed that " '[t]rade dress' refers to the total image of a product...," *Syndicate Sales, Inc. v.* *Hampshire Paper Corp.,* 192 F.3d 633, 52 U.S.P.Q.2d 1035, 1037 (7th Cir.1999) (citations omitted).

ciently identifiable to Planet Hollywood, to be a distinctive part of the Planet Hollywood image.[5]

### C. *The Use of Video Clips.*

17. Planet Hollywood restaurants use monitors to display video clips of movies and earlier Planet Hollywood restaurant openings. Those video clips contain a limited amount of material, and then recycle and continuously repeat throughout the hours of Planet Hollywood's operations. The same video clips are used at all Planet Hollywood restaurants at any given time (although they are, of course, changed over time). Thus, individuals in Planet Hollywood restaurants in Chicago, New York and Orlando at a particular point in time would see the same video clips being displayed. The Court finds that this presentation of video clips is part of the distinctive look and feel of Planet Hollywood restaurants.

### D. *The Display of Dioramas Featuring the Hollywood Hills.*

18. All Planet Hollywood restaurants prominently display a diorama of the Hollywood Hills. Some of the items depicted in the diorama may vary from one Planet Hollywood restaurant to the next, but certain stylized elements remain constant: such as, cutouts of the three lead celebrity owners (as well as other celebrities) prominently displayed, and a depiction of city lights of Hollywood as viewed from a balcony that uses fiber optics to recreate the lighting. The Court finds that those dioramas, which further underscore the celebrity ownership of Planet Hollywood, con-

tribute to the distinctive image of Planet Hollywood restaurants.

### E. *Themed Rooms.*

19. Planet Hollywood restaurants typically have a series of three distinct rooms, each of which has a different theme: Hollywood Hills, science fiction, and adventure. While some Planet Hollywood restaurants also may have additional rooms that promote other themes that resonate with customers in a particular location (*e.g.,* a "gangster room" in Chicago), all Planet Hollywood restaurants have as their lead concepts rooms promoting the same three themes. The Court finds that those theme rooms are part of the distinctive image of the Planet Hollywood restaurants, which Planet Hollywood uses to distinguish itself from other theme restaurants.

### F. *The Planet Hollywood Marks.*

20. Planet Hollywood restaurants conspicuously display the famous Planet Hollywood registered trademarks identified above. The admittedly famous marks help to uniquely identify the Planet Hollywood restaurants and are a distinctive part of the image conveyed by Planet Hollywood.[6]

### G. *Celebrity Handprints.*

21. All Planet Hollywood restaurants feature a display of celebrity handprints, located just outside the front door. The handprints are obtained from a variety of celebrities (not just the owners), and the same sets of handprints are displayed in

---

**5.** In pretrial submissions and at trial, Planet Hollywood asserted that its *plexiglass* display cases were unique. Even in its proposed findings, Planet Hollywood asserted that what was unique were the display cases "made of plexiglass in their entirety (except for the mounting)" (Planet Hollywood's Proposed Finding of Fact, at 33, ¶ 165). However, elsewhere in the same proposed findings, Planet Hollywood subtly shifted its position to assert that what is allegedly unique is its "distinctive clear display cases" (Planet Hollywood's Proposed Findings of Fact, at 6, ¶ 25(2)). Perhaps this shift is the result of the uncontra-

dicted trial testimony that the majority of Hollywood Casino's display cases use glass other than plexiglass (Trial Tr. 54–55, 377–78). In any event, the Court's finding that the Planet Hollywood display cases is unaltered by whether the transparent material used is glass, plexiglass, or something else.

**6.** The Court sees no reason that a trademark cannot be a part of a company's trade dress as well. *See, e.g., Hershey Foods Corp. v. Mars, Inc.,* 998 F.Supp. 500, 513–14 (M.D.Pa. 1998) (treating logo as part of trade dress.).

the same manner at Planet Hollywood restaurants. The Court is aware that other enterprises also use celebrity handprints: Grauman's Theater in California is famous for it, and indeed, located just a few blocks from the Planet Hollywood location in Chicago is a sporting goods store that also displays on the exterior walls celebrity handprints (albeit mainly from sports figures). However, the Court finds that the manner of presentation of the handprints by Planet Hollywood, and the consistent use of this presentation across Planet Hollywood restaurants, is one element of the distinctive look and feel that is associated with Planet Hollywood restaurants.

## H. *Art Deco Look.*

22. Planet Hollywood has attempted to create an "art deco" look, which it describes as "reminiscent of Southern California and the Beverly Hills Hotel, with an emphasis on the colors pink, green, with shades of blue and purple, and palm trees throughout" (Planet Hollywood's Proposed Findings of Fact, at 7, ¶¶ 25(7)(8)). Hollywood Casino has quarreled with Planet Hollywood's attempt to label the Planet Hollywood decor as "art deco." However, Samuel G. Bocchicchio, Hollywood Casino's Vice President of Design and the person responsible for all creative design for the Hollywood Casino facilities, acknowledged that there is no single form that art deco takes: "[W]hen you say to define art deco, you can define it, but [what] it means to an artist, it's a different look, different to different artists" (Trial Tr. 357). Based on the Court's review of the evidence, including its visit to the Planet Hollywood restaurant in Chicago, the Court finds that the decor fits with the definition proposed by Planet Hollywood. Furthermore, the Court finds that this decor, in combination with the other elements set forth above, is part of the look and feel of Planet Hollywood restaurants that makes them distinctive.

## I. *Items Not Included In Planet Hollywood's Trade Dress.*

23. There are certain additional items that Planet Hollywood claims as part of its trade dress, which the Court finds are not part of the distinctive image of Planet Hollywood restaurants:

a. **Hollywood Icons.** Planet Hollywood asserts that its trade dress includes "the use of Hollywood icons brought to life in an attempt to make patrons feel that they have stepped right into the movies" (Planet Hollywood's Proposed Findings of Fact, at 7, ¶ 25(3)). At most, this statement is an attempt to encapsulize the image that is created by the elements of trade dress described above. The Court finds that this statement is far too amorphous to identify a separate element of Planet Hollywood's distinctive image.

b. **The Sale of Retail Merchandise.** Planet Hollywood asserts as a part of its trade dress "the sale of retail merchandise including 'Hollywood' merchandise and merchandise bearing the word 'Planet Hollywood' logo, sold in a studio store" (Planet Hollywood's Proposed Findings of Fact at 7, ¶ 25(6)). The fact that the Planet Hollywood marks are prominently displayed in the store helps identify the facility as "Planet Hollywood"—but that is due to the appearance of the marks, and not from the fact of merchandise being sold. The evidence presented shows that it is typical for "eatertainment" restaurants (such as, for example, Hard Rock Café) to sell merchandise in a store that is adjacent to the restaurant. The Court finds that neither the manner of selling the retail merchandise, nor the fact that it is "Hollywood" merchandise, is sufficiently distinctive or unique to distinguish Planet Hollywood.

c. **Hawaiian Shirts.** Planet Hollywood asserts as a part of its trade dress "the sale and use of Hawaiian-type JAM shirts using black, pinks and yellows" (Planet Hollywood's Proposed Findings of Fact, at 7, ¶ 25(12)). Those shirts were designed by one of the celebrity owners, Mr. Schwarzenegger, who frequently

wears the shirt during personal appearances promoting Planet Hollywood. However, suffice it to say that Hawaiian-style shirts using those colors are not uncommon. Planet Hollywood has not offered evidence sufficient to establish that the Hawaiian shirts using that color scheme are unique to Planet Hollywood, or are uniquely associated by consumers with Planet Hollywood. The Court finds that those shirts are not part of Planet Hollywood's trade dress.[7]

24. The Court's findings that the items described in Finding Nos. 14–22 above constitute elements of the distinctive look and feel of Planet Hollywood restaurants are limited by two considerations in particular. *First*, the Court does not find that any single element, alone, constitutes Planet Hollywood's trade dress. While certain of these elements (for example, the celebrity ownership) are plainly more important than others in creating the distinctive image of Planet Hollywood, it is the combination of all of those elements together that the Court finds creates the distinctive look and feel of Planet Hollywood restaurants—a point that Planet Hollywood concedes (Trial Tr. 792). *Second*, the Court emphasizes that it does not generally find that any and all types of presentations of "video clips," or "Hollywood memorabilia," or an "art deco look reminiscent of Southern California," or "dioramas featuring the Hollywood Hills" are unique to Planet Hollywood. Those are broad labels, which are a shorthand way to describe the visual and mental image created by the *specific manner* in which Planet Hollywood restaurants have implemented those elements. Plainly, a number of those broadly described elements could be, have been, and are now implemented by others in ways different than the manner of implementation chosen by Planet Hollywood. Planet Hollywood

concedes as much: Planet Hollywood asserts, for example, that its trade dress is not merely in the fact that Planet Hollywood displays Hollywood memorabilia, but rather in the type of memorabilia and the manner of its display. Thus, the Court's findings as to the elements that make up the distinctive Planet Hollywood image are limited to the specific manner in which Planet Hollywood has implemented those combination of elements.

25. Unlike the case with Planet Hollywood's marks, which Hollywood Casino concedes are famous, Hollywood Casino disputes that Planet Hollywood's trade dress is even protectable at all, much less famous. Hollywood Casino points to statements made by Planet Hollywood in an earlier lawsuit with Hard Rock Café as establishing that the elements Planet Hollywood now claims as its trade dress are not, in fact, unique to Planet Hollywood or protectable. As noted above, the Hard Rock Café is a part of the "eatertainment" industry. Several years before this lawsuit, the owners of the Hard Rock Café filed suit against Planet Hollywood in federal court in California alleging, among other things, that Planet Hollywood's display of themed memorabilia infringed Hard Rock Café's trade dress. In defending that lawsuit, Planet Hollywood asserted that the Hard Rock "motif" was not entitled to trade dress protection because it was functional, was not inherently distinctive, and had no secondary meaning. In aid of that defense, Planet Hollywood argued that "the successful concept of combining an entertainment-themed restaurant in a museum-like setting is functional and therefore cannot be permanently appropriated for the exclusive use of any single competitor" (HC Ex.: Seidel Dec., Ex. 5, at 4–5). Planet Hollywood

---

**7.** In addition, there are other items that Planet Hollywood claimed as part of its trade dress during the trial of this matter constituted a part of its trade dress that Planet Hollywood no longer includes as elements of its asserted trade dress: specifically, an upside down swimming pool over the bar near the front of the restaurant, zebra-patterned table-cloths, galactic star blue carpeting, filling the Planet Hollywood facilities "to the brim" with memorabilia, the Planet Hollywood menu, and screening of first-run movies and other special events (*see* Planet Hollywood's Proposed Findings of Fact, at 6–7, ¶¶ 25–26; Planet Hollywood's Response to Hollywood Casino Corporation's Interrogatory No. 2(a)).

argued that "[f]unctional elements that are part of 'the actual benefit that the customer wishes to purchase' are not limited to only the item actually purchased, but include the atmosphere that the customer enjoys with a meal" (*Id.,* Ex. 5, at 10–11). Planet Hollywood asserted that "it would not be possible to retain the basic appeal of an entertainment industry oriented restaurant without utilizing memorabilia" (*Id.,* Ex. 5 at 9), and that "[t]he glamour of the entertainment industry, the feature of Planet Hollywood that Morton objects to, is lawfully available for copying because of the customer's interest in and desire for that feature in a particular class of restaurants" (*Id.,* Ex. 5 at 11).

26. The Court takes judicial notice that Planet Hollywood's motion to dismiss the trade dress infringement claim was denied in *Morton v. Rank America, Inc.,* 812 F.Supp. 1062 (C.D.Cal.1993). Thus, Planet Hollywood's trade dress arguments did not persuade that court to dismiss the case. Before there was any final ruling on the merits of the trade dress infringement claim by Hard Rock or on Planet Hollywood's defenses, the parties entered into a settlement agreement resolving that litigation. Neither party has offered into evidence a copy of the settlement agreement or proof of its terms, and the Court will not infer that the settlement agreement contains any admissions or other statements that would indicate that either party prevailed on the trade dress argument. On the evidence submitted, the Court does not find that Planet Hollywood prevailed in the Hard Rock litigation.

27. Hollywood Casino also argues that the items Planet Hollywood claims for its trade dress are used by many restaurants in the "eatertainment" business. There is no dispute that restaurants other than Planet Hollywood display entertainment-related memorabilia in a themed decor, and that such restaurants existed prior to Planet Hollywood (Trial Tr. 565–66). In its proposed findings of fact, Hollywood Casino has provided a chart identifying nine other "well known eatertainment industry restaurants" (including the Hard Rock Café), many of which feature, as does Planet Hollywood, loud music, video displays, merchandise bearing logos, and memorabilia (Defendants' and Counterclaim Plaintiffs' Proposed Findings of Fact in Support of Non–Infringement, at 17–18, ¶ 70).

28. The Court has considered the evidence on this subject, including the videos submitted by Hollywood Casino showing the interiors of those other restaurants. The Court finds that the look and feel of Planet Hollywood is distinct from the look and feel created by these other restaurants, which typically promote themes other than "Hollywood" (such as country, rock music, blues, or sports). The Court finds that although those other restaurants share with Planet Hollywood certain elements that can be generally labeled as "loud music, video displays, merchandise bearing logos, and memorabilia," those other restaurants do not implement the elements in the same way as does Planet Hollywood. In addition, the Court finds that Planet Hollywood claims (and, in fact, Planet Hollywood restaurants possess) certain distinctive elements that are not in evidence at the other restaurants cited by Hollywood Casino: such as, the Planet Hollywood marks, the association with the celebrity owners Schwarzenegger, Stallone and Willis, and the distinctive Hollywood Hills diorama. The Court finds that the fact that those other restaurants possess elements that meet the same broad general description as certain elements of Planet Hollywood's image does not eliminate or diminish the ability of the specific combination of elements implemented by Planet Hollywood from serving as a designator of source.

29. The Court finds that the Planet Hollywood trade dress (as found by this Court) is a strong signifier of source. Planet Hollywood has offered no surveys or other studies to attempt to establish the strength of its trade dress. However, the evidence shows that the plaintiffs have engaged in extensive marketing and promotional activities to create consumer rec-

ognition both of the Planet Hollywood trademark and the distinctive elements of Planet Hollywood's appearance. Since 1991, Planet Hollywood has spent more than $45 million on marketing and promotion (although some of that has been for promotion outside the United States). Various elements of Planet Hollywood's distinctive look and feel have received substantial press coverage (such as the celebrity ownership), as a result of Planet Hollywood's connection to the Hollywood movie industry. In 1997, defendants sold more than $195 million in merchandise bearing the Planet Hollywood marks, which was nearly forty percent of the annual direct gross revenues from the Planet Hollywood establishments. This level of sales persuades the Court both that the Planet Hollywood marks (which are admittedly famous, and are a part of its trade dress) have wide circulation among the consuming public, and that a large number of people have visited the Planet Hollywood restaurants throughout the country and thus have been exposed to the distinctive elements of their appearance.

## IV. THE DEFENDANTS/COUNTER-PLAINTIFFS.

30. Hollywood Casino Corporation is a Delaware corporation, with its principal place of business in Dallas, Texas. Hollywood Casino owns and operates two gaming facilities, which are also parties to the Amended Complaint and Amended Counterclaim: Hollywood Casino Aurora, Inc., an Illinois corporation with its principal place of business in Aurora, Illinois, and Hollywood Casino Tunica, Inc., a Mississippi corporation with its principal place of business in Robinsonville, Mississippi. A third casino operation is currently under construction in Shreveport, Louisiana.

31. Until recently, Hollywood Casino also owned and operated the Sands Hotel and Casino (the "Sands") in Atlantic City, New Jersey, by and through a separate wholly-owned subsidiary or division of Pratt Hotel Corporation. Edward T. Pratt, III, who is a defendant but not a counterclaim plaintiff, is a principal, president and chief executive officer of all three of the Hollywood Casino corporations involved in this lawsuit. Greate Bay Casino Corporation ("Greate Bay"), a Delaware corporation with its principal place of business in Dallas, Texas, is also a defendant and a counterclaim plaintiff. Greate Bay is the parent of Greate Bay Hotel and Casino, Inc., which presently owns and operates the Sands. During the 1980s and up until December 18, 1996, the Pratt Hotel Corporation owned and operated the Sands. Effective January 1, 1997, the Pratt Hotel Corporation changed its name to Greate Bay.

32. At all relevant times, the Pratt family has owned or directly controlled Hollywood Casino Corporation, Pratt Hotel Corporation, Greate Bay Casino Corporation, Hollywood Casino–Aurora, Inc., and Hollywood Casino–Tunica, Inc.

33. The Hollywood Casino facility in Aurora, Illinois, opened on June 17, 1993, although it was publicly dedicated one month earlier. The Hollywood Casino in Tunica opened in August 1994. Tunica and Chicago are the third and fourth largest gaming markets in the country, respectively (behind Las Vegas and Atlantic City). It is conceded that the opening of the Hollywood Casino in Aurora marked the first actual use of the term "Hollywood Casino" by defendants for the operation of a casino (Trial Tr. 187).

## V. HOLLYWOOD CASINO'S MARKS.

34. Hollywood Casino Corporation owns the following federal trademark registrations for the use of the term "Hollywood Casino":

| Mark | Registration No. | Registration Date | Services/Goods |
|---|---|---|---|
| "Hollywood Casino" (stylized word mark) | 1,849,650 | 08/09/94 | Casino services (first use in commerce 06/17/93). |

| Mark | Registration No. | Registration Date | Services/Goods |
|---|---|---|---|
| "Hollywood Casino" (word mark) | 1,851,759 | 08/30/94 | Casino services (first use in commerce 06/17/93). |

**HOLLYWOOD CASINO**

842

| | | | |
|---|---|---|---|
| "Hollywood Casino" (word mark") | 1,903,858 | 07/04/95 | Hotel services (first use in commerce 09/09/94). |

**HOLLYWOOD CASINO**

| | | | |
|---|---|---|---|
| "Hollywood Casino" (stylized word mark) | 1,949,319 | 01/16/96 | Hotel services (first use in commerce 09/09/94). |

| | | | |
|---|---|---|---|
| "Hollywood Casino" (stylized word mark with "film strip" background) | 2,256,306 | 06/29/99 | Casinos; restaurant and bar services; hotel services (first use in commerce 07/29/96). |

"Hollywood Casino" 2,256,307 06/29/99 Casinos; restaurant and bar
(stylized word mark services; hotel services (first use
with "film strip" in commerce 07/31/96).
background)

35. None of these six registrations asserts any color component as a protected element of the marks. In addition, each of these registrations specifically disclaims any exclusive right to use the word "casino" apart from the trademark as shown.

36. When Hollywood Casino opened the Aurora facility in June 1993, the only stylized version of the word "Hollywood Casino" that was used is the one registered as No. '650, which appears as follows:

This version of the Hollywood Casino mark bears no resemblance to any of the Planet Hollywood marks. Thereafter, Hollywood Casino began using a different stylized version of the same word mark, which is registered as No. '319 and which appears as follows:

This version of the Hollywood Casino mark bears no resemblance to any of the Planet Hollywood marks. At some point thereafter (the date is not clear), Hollywood Casino began using an unregistered version of this word mark, which was encircled with stars and which appears as follows:

The testimony established that the development of this latter stylized version was intended to give the mark a "more Hollywood" appearance (e.g., PH App. Vol. 4, Ex. 33 at 115). This version, which was used principally on merchandise sold by Hollywood Casino, does not bear any resemblance to any of the Planet Hollywood marks.

37. In 1996, Hollywood Casino began using another presentation of the Hollywood Casino mark, which is registered under number '306 and which appears as follows:

This particular mark (which will be referred to as the "film strip mark") is widely used by the Hollywood Casino on brochures, direct marketing, billboards, and within the casinos themselves. Although the testimony did not reveal when this mark was first used, the trademark registration identifies July 29, 1996 as the date of its first use in commerce (see Finding No. 34). Hollywood Casino currently uses both the film strip mark and the word mark (without background graphics).

38. The Court finds that there are a number of differences between the trademark names "Planet Hollywood" and "Hollywood Casino." Although the two names share the word "Hollywood," that word appears in a different sequence in each of the marks. The name "Planet Hollywood" has five syllables, and the name "Hollywood Casino" has six. When viewed, the word marks do not look the same (the differences in the words used are further emphasized by the use of different fonts and type styles). When spoken, the word marks do not rhyme or otherwise sound the same. The Court finds that the word marks are sufficiently different that consumers confronting the name "Hollywood Casino" in the marketplace would not likely be confused, or associate that name with Planet Hollywood.

39. The Court also finds that there are substantial differences between the Planet Hollywood mark that features the stylized globe, and the Hollywood Casino film strip mark:

A. The Planet Hollywood mark consists of a globe designed to replicate the Planet Earth, with a number of five-pointed stars embedded in it and one five-pointed star shooting from it. By contrast, although the backdrop of the Hollywood Casino film strip mark is circular, it is in no way suggestive of the Planet

Earth. And, while there has been substantial dispute about whether the circular back drop of the Hollywood Casino logo is a sphere or a flat disk, the Court finds credible the testimony of Mr. Bocchicchio that it was intended to—and does—portray a flat disk (Trial Tr. 394–95).[8] The Court believes that this interpretation is supported not only by the way the word "casino" casts a shadow over the circular backdrop (suggesting lack of multiple dimension in the circle), but also by the border around the entire perimeter of the circle which, to the Court's eye, suggests that the circle is flat—as is a disk.

B. Moreover, unlike the case with the Planet Hollywood globe mark, there are no stars embedded in the disk on the Hollywood Casino film strip mark, and no stars shooting from it. Planet Hollywood characterizes the eight-pointed stylized figure that dots the "i" in the word "Casino" as a star, while Hollywood Casino calls it "scintillation" (which Webster defines as a sparkle or flash of light). Whatever the proper characterization, the Court finds that the eight-sided object on the Hollywood Casino mark clearly is intended as punctuation, and does not resemble the five-pointed star that is shooting from the globe in the Planet Hollywood mark.

C. In the Hollywood Casino film strip mark, the word "Hollywood" is superimposed over a depiction of a strip of film, which itself is superimposed on top of the circular background. The Planet Hollywood mark uses nothing similar to this film strip. Indeed, prior to adopting its stylized globe mark, Planet Hollywood reviewed a number of designs, one of which used a strip of film (HC Ex.: Seidel Dec., Ex. 12, 142–43). Planet Hollywood did not adopt that particular design.

D. The type style used for the words on the respective marks is different, as is the placement of the words on the backdrops. In the Planet Hollywood mark both words appear in capital letters, one word on top of the other. The words appear on the lower center portion of the globe with the first letters of each word aligned vertically, and with the word "Hollywood" thus extending beyond the word "Planet." By contrast, in the Hollywood Casino film strip mark, the word "Hollywood" appears in all capital letters, but in a different style type than used in the Planet Hollywood mark. The word "Casino" appears in a stylized script, with only the first letter capitalized. Unlike the Planet Hollywood mark, in which the word "Hollywood" extends to the right of the word "Planet," the word "Casino" in the Hollywood Casino mark is centered directly under the word "Hollywood."

E. In addition, while Planet Hollywood disclaims that color is a part of the logo, the Court notes that the samples of the Planet Hollywood mark that have been offered into evidence all use a globe of a sky blue color, with the words Planet Hollywood in the red letters with white borders. The Hollywood Casino film strip mark does not use those same red and blue colors (*Compare* HC Tr. Ex.: 318A *with* HC Tr. Ex. 318D).

40. The Court notes that Planet Hollywood has offered no survey or other consumer evidence to indicate any actual confusion when people see the Hollywood Casino film strip mark. Based on the evidence submitted, the Court finds that the marks used by Hollywood Casino are not so similar as to be likely to create in the mind of consumers confusion with the

---

**8.** A globe is defined as "something spherical or rounded;" a "spherical representation of the earth." *Merriam Webster's Collegiate Dictionary,* 10th Edition, at 496. A "sphere" is defined as a globe or, more generally, as a "globular body" or a ball (*Id.* at 1131). A "circle" is defined as a ring (*id.* at 207), and a "disk" is defined as "the seemingly flat figure of a celestial body" or a "thin circular object" (*Id.* at 334). The Court notes that Hollywood Casino's graphic manual (with an issuance date prior to this lawsuit) refers to the background design as a "circle" (HC Tr. Ex. 130, at § 2.030) which is consistent with the definition of a disk.

Planet Hollywood marks, or any association between Hollywood Casino and Planet Hollywood.

41. Planet Hollywood also has asserted that Hollywood Casino has used a variation of the film strip mark, in which a five-pointed star appears immediately above it, as shown below:

(Planet Hollywood Proposed Findings of Fact, at 18–19, ¶ 80). The Court finds that the above graphic does not accurately represent Hollywood Casino's use of the film strip mark. In its print advertising, Hollywood Casino typically uses a border shell that includes depiction of lights with a star at the top. In a few of those ads, the film strip mark appears directly under the star (*e.g.*, HC Tr. Ex. 128, at H007130). The depiction by Planet Hollywood crops out the rest of the border shell, and thus does not convey the mark as it is seen by consumers who read those ads. Moreover, the Court finds that even in the inaccurate manner portrayed by Planet Hollywood, the film strip mark with the star over it is distinct from the Planet Hollywood globe mark in virtually all of the ways described in Finding No. 39, *supra*, and would not be likely to create confusion or an association with Planet Hollywood.

42. The Court also finds that Planet Hollywood has failed to establish that in adopting the film strip mark, it was the intent of Hollywood Casino to create a mark confusingly similar to that of Planet Hollywood. In making that finding, the Court is mindful of the August 3, 1995 memorandum from Richard Knight (then the executive vice president for operations of Hollywood Casino Corporation), in which he referenced two sample tee shirts, one with the then current Hollywood Casino logo and the other with an older Hollywood Casino logo design that was being "revamped with the addition of a circular design ala Planet Hollywood" (PH App. Vol. 5, Ex. 35dd). No evidence has been offered as to the appearance of the particular proposed "revamped" mark to which Mr. Knight referred (Trial Tr. 895), or how it compares to the film strip mark actually adopted by Hollywood Casino. The Court has considered Mr. Knight's testimony that he was not involved in the creation of that revamped design and did not know where it came from; that his statement was a reflection of the use of a circular background; and that he could have just as easily said "ala Hard Rock" as "ala Planet Hollywood" (PH App. Vol. 4, Ex. 33, at 118, 143–44). In this latter regard, the Court notes that in fact a number of restaurants other than Planet Hollywood do use circular backdrops for their logos (*see, e.g.*, Trial Ex. 318B; Trial Tr. 735). The Court has also considered the testimony of Mr. Bocchicchio, who designed the film strip mark, that he wanted to create a look that represented the Hollywood industry, and after attempting several variations, arrived at this depiction which used the film strip and the flat disk which was intended to represent the end of a film canister (Trial Tr. 394).

43. The Court finds credible Mr. Bocchicchio's explanation of how he derived the Hollywood Casino film strip mark. Thus, the Court finds not only that the film strip mark is not confusingly similar to the Planet Hollywood mark, but also that it was not Hollywood Casino's intent to create a mark that was confusingly similar to the Planet Hollywood mark.

## VI. THE NATURE OF THE CASINOS OPERATED BY HOLLYWOOD CASINO.

44. The casinos operated by Hollywood Casinos in Aurora and Tunica are both "dockside" casinos, as is necessary due to applicable laws in Mississippi and Illinois that allow casino gambling to take place only on structures resting on water. Hollywood Casino is in the process of developing a third location, this one in Shreveport, Louisiana, which will also be a dockside casino. However, the fact that these are dockside locations does not affect the games offered by these casinos, which are not materially different from the complement of games offered by land-based full service casinos.

45. A "full service" casino is one that offers games of chance that are banked by the house. Full service casinos offer a complete range of casino games, including roulette, craps, slot machines and black jack. The evidence establishes that the Hollywood Casinos in Aurora and Tunica fit the definition of "full service" casinos.

## VII. THE LEVEL OF SOPHISTICATION OF CASINO CUSTOMERS.

46. Saul Leonard, an expert witness retained by Hollywood Casino with certain expertise in the hospitality and gaming industries, testified that "[a]ny time any person makes a determination to go to a casino or any similar type of facility, they have provided a reasonable amount of care as to the reason why they are going there, especially if they have an alternative between that facility and another one" (PH App. Vol. 2, Ex. 18, at 64–65). The Court finds that this testimony is supported by other evidence and is credible.

47. Mr. Leonard also opined that the typical casino customer does not "risk[ ] a great deal of money on the gambling budget" (Trial Tr. 626). However, the evidence established that with respect to casinos in the greater Chicago area (which would include Hollywood Casino in Aurora), the casino's average "win per admission"—or put another way, the average amount lost by each patron who gambles— is $58.40 (Tr. Ex. 201, at 47). That figure is higher for individuals who frequent casinos in Las Vegas and Atlantic City (Trial Tr. 677–78). The Court finds that this kind of expenditure, which does not include any amounts spent for food, beverage or merchandise purchases, indicates that patrons of a casino have made a purposeful (and not impulsive) decision to spend their entertainment dollars on a casino visit. Indeed, during closing argument, counsel for Hollywood Casino admitted that individuals who frequent casinos are making deliberate and not impulsive purchases: "They know which casino they are going to and why they want to go there" (Trial Tr. 919).

48. Hollywood Casino has argued (and offered opinion testimony) that many individuals who frequent casinos are not sophisticated about the nuances of gambling itself (*see* Hollywood Casino's Proposed Findings of Fact in Support of Infringement, at 23–24, ¶¶ 134–136). There has been no evidence to controvert the opinion testimony offered by Hollywood Casino on this point, which the Court finds credible. However, the Court finds that any lack of sophistication that casino patrons have about *how* to gamble (*e.g.*, whether the odds favor standing pat or taking another card in a particular game of Blackjack) does not establish a lack of "sophistication" (or purposefulness) about deciding *whether* or *where* to gamble. The Court finds that individuals who frequent casinos are likely to have made a purposeful decision to do so—a point which Hollywood Casino concedes (Trial Tr. 919). That decision becomes no less rational or purposeful mere-

ly because the person making it may not be skillful in the art of gambling.

## VIII. THE SERVICES OFFERED BY THE PARTIES.

49. Planet Hollywood restaurants offer both food and bar services, as well as the retail sale of merchandise. Although none of the Planet Hollywood restaurants themselves offer any casino services at the present time, Planet Hollywood operates four restaurants in hotels that independently house casinos: Harrah's Casino Hotel in Reno, Nevada; Caesar's Casino Hotel in Lake Tahoe (Stateline), Nevada; Caesar's Casino Hotel in Atlantic City, New Jersey; and Caesar's Palace Resort in Las Vegas, Nevada. No other Planet Hollywood restaurants in the United States—including the ones closest to the Hollywood Casinos in Aurora or Tunica—are located in facilities that also offer casino services.

50. In addition to offering full-service casinos, the Hollywood Casinos in Aurora and Tunica each have several restaurants. At the Aurora facility, Hollywood Casino offers two "fine dining" restaurants: Café Harlow and Fairbanks Steak House. The price for a meal at these restaurants averages $40 or more. These restaurants feature memorabilia from the Golden Era of Hollywood and include displays from actors of that era, including the individuals from whom the names of the restaurants are taken: Douglas Fairbanks and Jean Harlow.

51. The Hollywood Casino in Aurora also has two more casual, lower priced restaurants. One is the Epic Hollywood Buffet, which offers "all-you-can-eat buffets" for one fixed price. The Epic Hollywood Buffet conveys an art deco and Hollywood movie theme, which the Court finds shares a number of characteristics that had been planned for the food court that was to be part of the failed Sands project in the late 1980s. The remaining restaurant at the Aurora facility is named "Louie Dombrowski's," and is a restaurant that offers "diner" fare in a setting that attempts to convey a 1950s theme.[9]

52. Hollywood Casino has offered undisputed testimony that food and beverage service is a necessary complement to any gaming operation. The Court finds that testimony credible. No doubt it is the goal of any casino operation to maximize the amount of time—and money—that patrons will spend gambling at the facility. It is common sense that offering restaurant and bar services, which allow patrons to eat and drink without leaving the facility, will tend to encourage longer stays at the casino, and more betting.

53. Planet Hollywood has offered no evidence that the restaurants at the Hollywood Casinos in Aurora or Tunica compete in any way with the Planet Hollywood restaurants. There is no dispute that Hollywood Casinos' restaurants, like Planet Hollywood's restaurants, are available to persons of any age. But Planet Hollywood concedes that people principally visit a Hollywood Casino in order to gamble, and that the "principal draw for the restaurants certainly has to be their gamblers" (Trial Tr. 890). Planet Hollywood has offered no evidence that there is significant patronage (or indeed, any patronage at all) of Hollywood Casino restaurants by individuals who are not otherwise coming to the facility for gambling purposes. From the opening of the Hollywood Casino in Aurora in June 1993 through August 1998, Hollywood Casino derived more than twelve times the amount of revenue from casino services as it did from the sale of food and beverage; similarly, from the opening of the Tunica facility in August 1994 through August 1998, Hollywood Casino derived seven times the amount of revenue from casino services as it did from the sale of food and beverage. People plainly are coming to Hollywood Casino

---

9. At Aurora, these restaurants all are located as the land-based portion of the facility, and not in the gaming areas. In the gaming areas, there are also "fast food stands" where candy and fast food may be purchased.

principally to gamble, and not because they are choosing to patronize a Hollywood Casino restaurant rather than a Planet Hollywood or some other restaurant. The Court finds that the restaurant and bar services offered by Hollywood Casino are ancillary to the overriding purpose for which the casinos exist: that is, to offer games of chance.

54. Further support for the proposition that Hollywood Casino's restaurants do not compete with Planet Hollywood is found in testimony by Planet Hollywood witnesses. Elizabeth Harrington, Planet Hollywood's brand positioning expert, testified that the choice a consumer makes to go to a gambling facility is different than the choice of going out to a restaurant: "I'm going to go out to eat or I'm going to go to a Casino. So there is [no] confusion based on Planet Hollywood as it currently exists as a restaurant versus Hollywood Casino as a gambling establishment" (HC Ex.: Seidel Dec., Ex. 8, at 67).[10] Moreover, in testimony in a prior lawsuit, Mr. Earl acknowledged that casinos and restaurants are different channels of business (HC Ex.: Seidel Dec., Ex. 11, 6002383–84).

55. The location and nature of the Planet Hollywood restaurants and the Hollywood Casino restaurants further confirms that they do not compete with one another. Before Planet Hollywood closed its Chicagoland restaurants, the Hollywood Casino in Aurora was located nearly 43 miles from the nearest Planet Hollywood restaurant; the Tunica, Mississippi facility is currently located nearly 246 miles from the nearest Planet Hollywood restaurant in Nashville, Tennessee. While some of the food and beverage offered at the Hollywood Casino restaurants is of the same type offered by Planet Hollywood, the restaurants themselves are markedly different in various respects. To begin with, the names of the Hollywood Casino restaurants all differ from the name "Planet Hollywood" (the Epic Hollywood Buffet shares one word of the Planet Hollywood name, but is not otherwise similar). Planet Hollywood has offered no evidence that someone eating at the Epic Hollywood Buffet, or Louie Dombrowski, or Harlow, or Fairbanks would likely be confused into thinking they were associated with Planet Hollywood. Moreover, the food offerings at the Harlow and Fairbanks restaurants are significantly more expensive than those at Planet Hollywood; the 1950s diner theme of the Louie Dombrowski restaurant is decidedly different than the theme offered at Planet Hollywood restaurants; and the Epic Hollywood Buffet offers an "all-you-can-eat buffet" that is not available at Planet Hollywood restaurants. Planet Hollywood has offered no evidence that in making a choice concerning where to eat, consumers in Chicago, for example, would consider as an alternative to the Planet Hollywood restaurants downtown or in Gurnee, Illinois, the restaurants offered at Hollywood Casino in Aurora (which is 43 or more miles away) or in Tunica (which is some 246 miles away from the nearest Planet Hollywood in Nashville).

56. The Court therefore finds that the Hollywood Casinos in Aurora and Tunica do not compete with Planet Hollywood restaurants.

---

10. Planet Hollywood urges that Ms. Harrington's testimony should be disregarded on this point, because in giving it Ms. Harrington assumed that the Hollywood Casinos had no restaurants. Indeed, Ms. Harrington was asked to make an assumption at one point in her testimony (See HC Ex.: Seidel Dec., Ex. 8, at 70). However, Ms. Harrington's statement about lack of confusion was made before she was asked to make that assumption. Indeed, she repeated her answer before being presented with that assumption: Ms. Harrington testified that she agreed with Mr. Leonard "there is probably no confusion between Hollywood Casino and Planet Hollywood restaurants as they exist today, because one is a casino and the other is a restaurant" (*Id.* at 68). The Court does not believe it credible that in giving those answers an expert such as Ms. Harrington would assume that casinos, which would like patrons to stay as long as possible, would not offer *any* restaurant or bar services whatsoever.

## IX. THE STRENGTH OF THE HOLLYWOOD CASINO NAME.

57. Hollywood Casino has made a substantial financial investment in the development of its casinos. The cost of each of the facilities in Aurora and Tunica is in excess of $100 million, and the planned casino in Shreveport will have a cost of approximately $230 million. In addition, during the five years after its opening in 1993, Hollywood Casino in Aurora spent approximately $124 million in what it characterizes as "marketing expenses." However, the vast majority of that amount is attributable to the cost of "comps" (providing free benefits to gamblers) and special events. Approximately $20 million of this amount is attributable to direct mail, print, electronic and billboard advertising. Similarly, during the first four years after it opened, the Hollywood Casino in Tunica spent approximately $60 million in what it characterizes as "advertising"; again, the vast majority of that sum was attributable to special events. Still, not an insubstantial amount—$13.6 million—was attributable to direct mail, electronic and billboard advertising.

58. Hollywood Casino has offered no direct consumer testimony or survey evidence to attempt to establish the geographic scope and strength of recognition of the Hollywood Casino name. Nor has Hollywood Casino offered any evidence as to the level of recognition of the name "Hollywood Casino" apart from its graphic marks: in particular, the film strip mark (Trial Tr. 928–29). Rather, Hollywood Casino seeks to establish that its mark is strong by relying principally on newspaper articles, the listing of Hollywood Casino in the "1998 America Casino Guide" (Trial Exhibit 207), the existence of telephone calls from all 50 states to Hollywood Casino in Aurora since it opened, and testimony by Messrs. Pratt and Leonard. The Court finds that the evidence offered by Hollywood Casino has not established that the name "Hollywood Casino" has a high level of recognition outside the Chicago and Tunica regions.

59. Based on the evidence submitted, the Court finds that the Hollywood Casinos principally focus on drawing from local and regional markets. Hollywood Casino's internal manual states that the Aurora facility "draw[s] from the Chicagoland area," and does not indicate any other source of patronage (PH Amended App. Vol. 9, Ex. 63, at 020). Mr. Leonard likewise testified that the market for the Aurora facility is local or regional, and extends to consumers within a couple hours drive from the Aurora location (PH App. Vol. 2, Ex.18, at 140–41). Mr. Knight testified that the Aurora facility has a regional market that principally draws from the Chicagoland and Northern Illinois area, and that the Hollywood Casino in Tunica likewise draws primarily from a regional market (PH App. Vol. 2, Ex. 15, at 54–56). And, during closing argument, Hollywood Casino's counsel conceded that those casinos are patronized principally from people in the Chicago and Tunica areas, respectively (Trial Tr. 916–17).[11]

60. Consistent with this testimony, the weight of the evidence also establishes that Hollywood Casino's principal advertising has been local rather than national. That is true both for the Aurora location and the Tunica facility (although the area of Tunica's advertising is beginning to expand, advertising on a national scale has not been discussed). Moreover, the 1996 report on the gaming industry authored by Mr. Leonard characterized Tunica as becoming "[a] major regional gaming center [ ]" (HC Tr. Ex. 201 at 44)—not a national center.

61. The Court has considered Hollywood Casino's testimony that it advertises

11. While Hollywood Casino offered evidence that the majority of individuals patronizing *all* casinos in Tunica are from outside Mississippi (HC Ex.: Leonard Opp. Dec. ¶¶ 12–13), the evidence was not directly linked to patronage of the Hollywood Casino in Tunica *specifically*. Moreover, that evidence indicated the out-of-state patronage of casinos in Tunica largely comes from the Southeast, and it is thus regional at best—not national.

and promotes on a national basis. Hollywood Casino offered evidence that it sends two million pieces of mail annually to people in all fifty states, and maintains a computer data base identifying approximately 1.4 million customers who have visited its two casinos. However, Hollywood Casino offered no evidence as to how many of those mailings are to persons outside the states (or immediately surrounding states) in which the Aurora and Tunica casinos are located, and likewise offered no evidence as to how many of the 1.4 million customers in the computer database are from states outside those areas. The Court has also considered the fact that Hollywood Casino facilities appear in the 1998 American Casino Guide, which is available throughout the country. But the Court finds that the mere presence of the Hollywood Casinos in the American Casino Guide is not particularly compelling evidence that their operations are well known and recognized by consumers throughout the country. That Guide includes a number of very small operations—such as "Chicken Ranch Bingo" in Jamestown, California (HC Tr. Ex. 207, at 148), which offers only video machines and bingo—which Hollywood Casino would surely concede are not national in scope or consumer recognition.

62. The Court also has considered Hollywood Casino's evidence of telephone calls made to the Hollywood Casino "800 number" for selected one-month periods in 1993, 1994, 1995, 1996 and 1997 (HC Tr. Ex. 23). Hollywood Casino offered this evidence to show the volume of calls received from different states throughout the country. The information for 1995 has not been helpful for this purpose, since Hollywood Casino did not provide the state of origin for the phone calls. For the time periods selected in 1993, 1994, and 1997, moreover, the great preponderance of calls came from within the State of Illinois: 96 percent in 1993, 97.8 percent on 1994, and 72 percent in 1997. In addition, in 1997, while there were calls from all 50 states, nearly 82 percent of the calls came from states within 300 miles of the Aurora location.[12] The Court finds that this evidence does not support the defendants' assertion that the name "Hollywood Casino" has a pervasive nationwide presence. To begin with, this evidence shows only telephone calls to Hollywood Casino and not patronage of the casino; there is no indication of how many calls were received in error, or by the same individuals on repeat calls. Moreover, the great preponderance of calls in the last year that was measured (1997) came from inside Illinois or within states located within 300 miles of the Aurora casino—as was the case when the casino opened in 1993. This evidence supports the Court's finding that any recognition of Hollywood Casino's name is strongest within Illinois and the adjacent areas, and significantly diminishes as the distance from the casino increases.

63. The Court also has considered Mr. Leonard's testimony that Hollywood Casino has achieved a national level of recognition. However, the Court does not find that opinion persuasive. Certain of the support Mr. Leonard cited (such as the Guide listing the Hollywood Casinos) has already been found by the Court to be flawed. Moreover, Mr. Leonard's opinion is not based on any consumer studies or survey evidence, and it is, in fact, at odds with his deposition testimony that the market for the Aurora facility is local or regional (PH App. Vol. 2, Ex. 18 at 140–41).

64. The Court has also considered the circumstances involving other companies using the words "Hollywood" and "Casino" in names for casinos operated at great distance from Aurora or Tunica:

---

**12.** For the one month period measured in 1996, the data were dramatically different: only 31 percent of the calls for that period were from within Illinois, although slightly more than 63 percent still were from a location within 300 miles of the Casino. Hollywood Casino offered no evidence to explain this disparity, or why a greater preponderance of calls were received from within Illinois in 1997 than in 1996.

A. In July 1993, Hollywood Casino filed a lawsuit against the Debbie Reynolds Hotel & Casino, Inc. in California ("Debbie Reynolds"), alleging that Debbie Reynolds infringed the Hollywood Casino mark by using the name "Debbie Reynolds Hollywood Hotel/Casino/Movie Muscum" for a business that included casino services. As part of the settlement of that lawsuit in December 1993, Debbie Reynolds agreed to change the name of the hotel and casino to "Debbie Reynolds Hotel/Casino and Hollywood Movie Museum" (HC Tr. Ex. 25, ¶¶ 2, 6). While the settlement allowed Debbie Reynolds to continue to display the word "Hollywood" prominently inside the casino and on exterior signage, as a result of the settlement the words "Hollywood" and "Casino" could not appear in the same sequence as used by Hollywood Casino in its mark. Debbie Reynolds is currently bankrupt and out of business. Hollywood Casino concedes that there were no instances of actual confusion between Hollywood Casino and Debbie Reynolds, either before or after the lawsuit and settlement (Trial Tr. 136).

B. In January 1994, Hollywood Casino sued the MGM Grand Hotel, alleging that its Las Vegas hotel/casino and theme park in Las Vegas infringed the Hollywood Casino mark by using of a neon sign on the interior of the building that displayed the word "Hollywood" to designate an area of the casino. In February 1994, Hollywood Casino entered into a settlement agreement in which the parties agreed, among other things, that the MGM Grand could continue to use the sign so long as it was limited to describing the portion of a casino that was a portion of the larger facility (such as a hotel) (HC Tr. Ex. 26). Hollywood Casino admits it is not aware of any instances of actual confusion between the MGM Grand and Hollywood Casino, either before or after the lawsuit and settlement (Trial Tr. 137).

C. In October 1994, Hollywood Casino filed a lawsuit against Hollywood Park, Inc. and Hollywood Park Operating Co. in California ("Hollywood Park"), claiming that Hollywood Park had committed infringement by "aggressively advertising, marketing and promoting their casino under the mark 'Hollywood Park Casino' which is confusingly similar to plaintiffs' Hollywood Casino marks" (PH App. Vol. 1, Ex. 4, Ex. I at ¶ 1). In August 1995, the parties entered into a settlement agreement which permitted Hollywood Park to describe and promote its casino as "Hollywood Park Casino," so long as there was differentiation in the type style between the words "Hollywood Park" and "Casino," and separation between the words "Hollywood" and "Casino" (HC Tr. Ex. 27). Hollywood Casino acknowledges that it is aware of no actual confusion that has occurred between "Hollywood Park Casino" and "Hollywood Casino," either before or after the lawsuit and settlement (Trial Tr. 142).[13]

D. Since July 1996, an Indian tribe has operated a casino in New Mexico under the name "San Filipe's Casino Hollywood" (Trial Tr. 289). Although Hollywood Casino threatened a lawsuit against the Indian tribe alleging infringement, Hollywood Casino has not filed a lawsuit on the ground that the tribe has refused to waive sovereign immunity and that a lawsuit would thus be futile. As a result, the Indian tribe continues to operate the casino under the name "San Filipe's Casino Hollywood" (PH App. Vol. 2, Ex. 21). No evidence has been offered of any actual confusion between that casino and any casinos operated by Hollywood Casino.

E. There is also an Internet casino with offshore ownership, which is accessible from the United States, named "Golden Hollywood Casino." The registrant of the site is Advance Media Group ("AGM") located in Santo Domingo; but the site can

---

13. At trial, Hollywood Casino argued that Hollywood Park Casino is not truly a "casino" because it offers only limited games and does not involve betting against the house. The Court notes that in its lawsuit against Hollywood Park, Hollywood Casino alleged that Hollywood Park was a "casino," and further alleged that Hollywood Park Casino directly competes with Hollywood Casino (PH App. 1, Ex. 4, Ex. 1, ¶ 17).

be accessed by a link to another Internet address which is registered to a company in Louisiana (Trial Tr. 314–17). Hollywood Casino has sent a cease and desist letter to AGM, but has not sent such a letter to the Louisiana entity and has not yet filed any legal actions. No evidence has been offered of any incidence of actual confusion between Hollywood Casino and Golden Hollywood Casino.

65. The Court finds that the evidence concerning Hollywood Casino's actions with respect to these other entities that operate casinos under the name "Hollywood" demonstrates that Hollywood Casino has taken reasonable efforts to try to protect its interest in the name "Hollywood Casino." In none of the lawsuit settlements did Hollywood Casino accede to a casino operating under the name "Hollywood Casino," in which those two words appear together, in that sequence, without intervening words. The Court finds that none of the settlements demonstrates that Hollywood Casino believes, or has admitted, that a casino operating under the name "Planet Hollywood Casino" would not create a likelihood of confusion. Moreover, the fact that defendants have not filed lawsuits against every entity operating a casino under a name that includes the word "Hollywood" does not persuade the Court that Hollywood Casino has been lax in those efforts to protect its name. As Planet Hollywood's counsel conceded and as the Court agrees, Hollywood Casino is not required to sue each and every Casino using the name "Hollywood" in its name in order to demonstrate its diligence.

66. However, the Court also finds that the absence of any actual confusion between Hollywood Casino and those other casinos located in California, Nevada, New Mexico or on the Internet does provide further support for the Court's finding that Hollywood Casino's mark has not achieved widespread recognition throughout the country. Based on its review of all the evidence, the Court finds that defendants have failed to show that the Hollywood Casino marks have a nationwide presence or level of recognition.[14]

## X. THE DEFENDANTS' PRIOR EXPERIENCES WITH DEVELOPING OR PRESENTING HOLLYWOOD THEMES.

67. The first use of the Hollywood Casino name in connection with casinos oc-

---

14. Planet Hollywood has argued that the mark "Hollywood Casino" is not protectable at all, whether locally or nationally, because it is generic or at best merely descriptive. For example, Planet Hollywood has offered evidence that a number of businesses in the hotel and entertainment industry use the word "Hollywood" as part of their trade names; that there are a number of federal and state registered trademarks, and pending federal applications for trademarks, in the field of hotel and entertainment services that contain the word "Hollywood;" and that Mr. Pratt has testified that the word "Hollywood" is a "very generic term" (PH App. Vol. 2, Ex. 7 at 131). However, none of the cited businesses—whether a casino or some other entertainment related business—use only the two words "Hollywood Casino," appearing in that order and without any words preceding or following them.

Planet Hollywood also has pointed to the dictionary definitions of the words "Hollywood" (defined as "relating to, produced by, or characteristic of the American motion-picture industry, especially as centered in Los Angeles, California and vicinity"), and "casino" (defined as "a room or building for gambling") (PH Am.App. Vol. 9, Ex. 62B, ¶¶ 1–2). The Court is mindful that "[d]issecting marks often leads to error," because words "which could not individually become a trademark may become one when taken together." *Union Carbide Corp. v. Ever–Ready, Inc.*, 531 F.2d 366, 379 (7th Cir.), *cert. denied*, 429 U.S. 830, 97 S.Ct. 91, 50 L.Ed.2d 94 (1976). However, examination of the meanings of individual words is appropriate where the composite terms " 'are nothing more than the sum of their parts.' " *Mil–Mar Shoe Co., Inc. v. Shonac Corp.*, 75 F.3d 1153, 1161 (7th Cir.1996), *quoting Liquid Controls, Corp. v. Liquid Control Corp.*, 802 F.2d 934, 938 (7th Cir.1986). Because of other rulings made in this opinion, the Court need not decide whether Planet Hollywood's evidence is sufficient to overcome the presumption of protectability that the Hollywood Casino marks enjoy due to the decision of the Patent and Trademark Office ("PTO") to issue registrations for those marks.

curred in June 1993. There was no continuous display of Hollywood memorabilia by a Pratt-operated hotel or casino until the Hollywood Casino in Aurora was opened in June 1993.

68. The Sands, which until recently was owned by Hollywood Casino (*see* Finding No. 31), has never had a Hollywood theme or trade dress. Rather, the Sands has a Carribean Island theme. The Sands has never displayed any permanent outside signage or logo bearing the Hollywood Casino name, or any other Hollywood theme or name. The theme at the Sands expanded slightly in about 1995, when the Sands Epic Buffet Restaurant incorporated displays from certain epic movies (such as Ben Hur, Spartacus, and The Ten Commandments). However, this change did not convert the overall motif of the Sands into one of a Hollywood theme. While the Sands had plans to make that change, those plans were put on hold because of the Sands' Chapter 11 Bankruptcy filing.

69. Hollywood Casino has nonetheless devoted substantial energy to attempting to establish that its trade dress is entitled to a date of protection substantially earlier than June 1993—and, in particular, predating Planet Hollywood's emergence on the scene in October 1991.[15] Hollywood Casino has attempted to support this assertion with evidence concerning certain temporary memorabilia displays at the Sands in the late 1980s ("100 Years of Hollywood" in 1987 and the "Universal Studios Exhibit" in 1988), and the attempt by the Pratt family to establish a Hollywood-themed casino in Atlantic City between approximately 1988 and 1990. The Court discusses below its findings with respect to those various activities.[16]

## A. *"100 Years of Hollywood."*

70. During approximately the summer of 1987, the Sands displayed a "100 Years of Hollywood" exhibit. This exhibit was not owned by the Sands, but was being displayed at a number of venues as part of a nationwide tour. The exhibit featured costumes and other memorabilia mainly from the era known as the "Golden Age of Hollywood" (covering the period roughly from the 1920s through the 1940s). This was the first time that Hollywood memorabilia had been displayed at the Sands. The Pratts were interested in customer reaction to a Hollywood-themed exhibit using memorabilia because they were considering development of a Hollywood-themed casino in Atlantic City, and they wanted to gauge consumer reaction to a Hollywood memorabilia theme before plunging ahead full tilt into such a development.

71. The 100 Years of Hollywood exhibit was dismantled and removed from the Sands in the early Fall of 1987. It was never again displayed at the Sands or at the Hollywood Casinos either in Aurora or Tunica. In creating the memorabilia displays and overall decor of Hollywood Casinos in Aurora and Tunica, the defendants did not draw from any experience gained in connection with the 100 Years of Hollywood exhibit.[17]

---

**15.** Hollywood Casino makes this priority argument only with respect to its trade dress, and not its trademarks (Trial Tr. 956).

**16.** Hollywood Casino also offered evidence that in the 1980s Sylvester Stallone was involved in certain limited projects with the Sands: Tiger Eye Boxing, Inc., a boxing-related venture, and a food stand named "Sly's Buyers" in the Sands food court. The Court finds that those ventures (which long predated Mr. Stallone's involvement with Planet Hollywood) do not establish that the Sands implemented a "Hollywood" theme in the 1980s.

**17.** Mr. Bocchicchio so testified in his deposition (PH App. Vol. 5, Ex. 36, at 92). Some of Mr. Bocchicchio's trial testimony is arguably inconsistent with that statement in his deposition, although during cross-examination he was not confronted with the precise statement cited by the Court above (*see* Trial Tr. 464–66). To the extent that Mr. Bocchicchio's trial testimony is that defendants drew from the experience with the 100 Hundred Years of Hollywood exhibit in designing the casinos in Aurora and Tunica, the Court discounts that testimony and chooses to credit Mr. Bocchicchio's deposition testimony.

## B. *The Universal Studios Exhibit.*

72. After the 100 Hundred Years of Hollywood exhibit, Hollywood memorabilia were not displayed at the Sands until the arrival of the Universal Studios exhibit, which was on display from about June 1988 through the Fall of that year. The Universal Studios exhibit was a display of some twenty pieces of movie props and memorabilia from movies such "Jaws," "Psycho," "Airport," "Conan," "Somewhere In Time," "The Mask," and from television shows including "Miami Vice" and "Battlestar Gallactica." After that display was removed in the Fall of 1988, it was never again displayed at the Sands, and none of the memorabilia from that display has ever been used at either Hollywood Casino location. The only other display of Hollywood memorabilia at the Sands between 1988 and 1995 occurred for a brief time in the early 1990s, when certain costumes worn by Cher were displayed in conjunction with her performance at the hotel.

73. Although the specific exhibits and decor from the Universal Studios Exhibit have not been replicated at the Hollywood Casinos in Aurora or Tunica, the Court finds credible Mr. Bocchicchio's testimony that the display was a stepping stone in the Pratt family's plan to develop a Hollywood-themed casino, which would combine an art deco theme with the use of authentic Hollywood memorabilia (Trial Tr. 374–75; HC Ex: App. Vol. 3 to Seidel Opp. Dec. (Bocchicchio Dep. 95–97, 100–01)). The Universal Studios exhibit conveyed a Hollywood theme, replete with palm trees, klieg lights, props suspended in air, and the "Hollywood Hills" sign. The techniques used to display memorabilia at the Universal Studios exhibit—using clear display cases with placards showing the origin of the memorabilia, movie posters, and video monitors showing clips of the movies from which the memorabilia was borrowed—are some of the same techniques used today by the Hollywood Casinos in Aurora and Tunica. The Universal Studios exhibit also helped Hollywood Casino establish connections for sources of memorabilia.

74. The Pratt family considered the Universal Studios Exhibit well-received by the public (based on increased foot traffic at the Sands and on conversations management had with customers), and concluded that the public viewed the exhibit as "interesting and appealing" (Trial Tr. 39–41). The Court finds that the display of the Universal Studios exhibit at the Sands is credible evidence that supports the assertion that the Pratt family wished to establish a Hollywood-themed casino for a number of years prior to June 1993. But the Court finds that the temporary display of the Universal Studios exhibit (like the 100 Years of Hollywood exhibit) was insufficient to create a public association between the Sands and a casino having a Hollywood theme and displaying authentic movie memorabilia.

## C. *A Hollywood–Themed Hotel and Casino in Atlantic City.*

75. During the second half of the 1980s, the Pratt family began to develop the concept for a new hotel and casino in Atlantic City that would have an attractive theme. As the Court has found, one of the goals of the Sands management in the 100 Hundred Years of Hollywood and Universal Studios exhibitions in 1987 and 1988 was to "try out" a Hollywood memorabilia theme and to determine its attractiveness to consumers.

76. On March 29, 1988, the Sands issued a press release announcing plans to establish a "Hollywood Hotel and Casino" in Atlantic City (HC Tr. Ex. 7). Thereafter, the Sands prepared a draft joint venture investment proposal, dated January 5, 1989, for a project to develop the "Sands Hollywood Hotel and Casino" (HC Trial Ex. 5–1, at 1). Hollywood Casino did not offer evidence establishing to whom this draft proposal was circulated, or whether it was ever put into final (as opposed to draft) form.

77. The draft proposal stated that the new hotel and casino would have a "unique design to make it distinguishable" from

other Atlantic City casinos and hotels, and that the exterior and interior would convey "an interpretation of the art deco style of the 1930s with a Hollywood motif" (HC Trial Ex. 5–2, at 3). The draft proposal explained that the facility would have a movie-themed casino area, a separate area that would display continually changing exhibits of Hollywood memorabilia, themed restaurants, a food court with a film production motif, a piano bar named "Harlow's" and various lounges (HC Trial Ex. 5–3). The draft proposal further stated that this theme had been "carefully selected," and "successfully test marketed on a small scale at the Sands" (HC Trial Exhibit 5–1)—which appears to be a reference to the 100 Years of Hollywood and Universal Studios exhibitions. The draft proposal also contained pictures of a scale model of the exterior of the contemplated building that the Sands commissioned, which carried through with the planned art deco look (HC Tr. Ex. 5–2; *see also* Trial Tr. 30–31 and HC Trial Ex. 6, 11). The scale model included a sphere located near the top of the building as a part of its exterior design (*see* Trial Exs. 5–1 and 6).

78. On April 22, 1988, the Sands sought registration of the service mark "Hollywood Hotel Casino/Atlantic City" (HC Tr. Ex. 1). That mark contained a stylized marquee with the word "Hollywood" prominently centered in a Broadway font, with the words "Hotel Casino/Atlantic City" centered under that word in much smaller and less prominent type. That trademark issued on January 24, 1989. Thereafter, on October 12, 1993, Hollywood Casino filed an application for cancellation of the registration, which was granted on January 10, 1995. It is undisputed that the reason for this cancellation was that there had been no use of that mark in commerce. The Court finds that this canceled mark bears no resemblance to any of the current Hollywood Casino marks.

79. The Sands' plan for a Hollywood-themed casino in Atlantic City never reached fruition. As a result of opposition by Donald Trump and ensuing litigation, the Sands was unable to proceed with its Hollywood-themed casino in Atlantic City. The undisputed testimony is that the Sands spent some $50 million in attempting to establish a Hollywood-themed casino in Atlantic City, which included plans, specifications, design documents and other costs.

80. When it appeared that the planned casino in Atlantic City might be blocked, the Pratts began to look elsewhere for a place to establish a casino. In 1989 and 1990, Pratt Hotel Corporation pursued a possible site in Laughlin, Nevada, and between 1990 and 1992 pursued possible locations in Mississippi. In 1991, the Pratt Hotel Corporation obtained marketing information about Chicago as a possible casino location. In September 1992, Hollywood Casino Corporation commissioned a survey to determine consumer reaction to the name "Hollywood Casino" as opposed to the name "Sands Hollywood Casino," and determined that the reaction to the name "Hollywood Casino" standing alone was sufficiently positive to allow defendants to go forth with the casino under that name.

81. The Court finds that despite the substantial expenditure of money and time by the Sands, there was never the creation of a public association either between the name "Hollywood Casino" and the particulars of the "Hollywood" image that the hotel and casino would have conveyed. The Court has reviewed the numerous press articles submitted by the defendants which reported on the efforts by the Sands to establish its Hollywood themed hotel and casino in Atlantic City in the late 1980s (and, in particular, reported on the battle with Donald Trump in connection with those efforts). Those articles rarely referred to the name of the hotel and casino under consideration as "Hollywood Casino": the articles referred to it variously as the "Sands/Hollywood Casino Hotel"; the "Sands/Hollywood Casino"; the "Sands Hollywood," and the "Hollywood Hotel and Casino" (*see, e.g.,* HC Trial Ex. 10, at 19844, 19838, 19851 and 24737). The mod-

el commissioned by the Sands displayed in bold type on the marquee the single word "Hollywood," without the word casino appearing anywhere on it; the only other word appearing on the exterior of the building in the models was the word "Sands" (see Trial Ex. 5–2). Moreover, the trademark that the Sands obtained for the planned venture was for the mark "Hollywood Hotel Casino/Atlantic City" (HC Tr. Ex. 1), not for the words "Hollywood Casino" as they appear in the later trademarks that Hollywood Casino sought and obtained. Indeed, the trial testimony indicated it was not until the 1992 survey that the Pratts decided to use the name "Hollywood Casino" standing alone.

82. While the draft joint venture investment proposal provided a general description of the theme and decor of the planned casino and hotel, the Court finds that few of the news articles provided even that general description—and they certainly did not go into detail about the particulars of the look that the interior of the hotel and casino would possess. The Court further finds that even had the draft joint venture proposal been publicly circulated (and there is no proof that it ever was), the description contained in that document was insufficient to create a particularized vision of what the interior of the facility would look like. Thus, while the Sands' effort to establish a Hollywood-themed casino and hotel in Atlantic City shows that the Pratt family had attempted to establish a Hollywood-themed casino well before June 1993, the Court finds that this evidence fails to establish that there was created in the public mind an association between the name "Hollywood Casino" and a specific Hollywood-themed trade dress prior to June 1993, when Hollywood Casino opened the casino in Aurora.

## XI. THE APPEARANCE AND DECOR OF HOLLYWOOD CASINO.

83. The Hollywood Casino in Aurora is located at the bank of the Fox River. The exterior of the structure is quite different than the model for the hotel and casino envisioned for Atlantic City by the Sands (compare, e.g., HC Trial Ex. 20 with HC Trial Ex. 5–2). The model structure for Atlantic City was vertical in its orientation, emphasized blue and red coloring, and prominently displayed the single word "Hollywood" in several locations on the exterior. By contrast, the Hollywood Casino in Aurora is more horizontal, and has the trademark name "Hollywood Casino" as well as the graphic mark prominently displayed in several locations—neither of which was included in the model structure for the Sands.

84. At the top of the exterior of the Hollywood Casino in Aurora sits a large glass-topped atrium that allows natural light to pass into the facility. The words "Hollywood Casino" appear at the base of the atrium top, as viewed from the vantage point of the Fox River. While Planet Hollywood seeks to characterize this atrium as a "globe," in an attempt to establish similarity to the Planet Hollywood globe mark, the Court finds that this glass top atrium is not a globe. Rather, it is hemispherical in shape and, contrary to Planet Hollywood's assertion, the Court finds that it is not the most prominent feature on the exterior of the Aurora facility when viewed from the vantage point of the River. It is no more prominent than the Hollywood Casino river boats that appear on either side of the atrium. The Court also notes that this hemispherical dome is less similar in appearance to the globe that is a part of the Planet Hollywood globe mark than are the globes that sit atop certain Hard Rock Cafés—at least one of which is emblazoned with the phrase "Save the Planet" (see HC Tr. Ex. 327).

85. Unlike the scale model for the Sands development in Atlantic City but like the Hollywood Casino in Aurora, the Hollywood Casino located in Tunica is also a horizontally-oriented structure. One side of the building has the word "Hollywood" superimposed over a back drop of the Hollywood Hills, which Hollywood Casino uses through a license arrangement with the Chamber of Commerce in Holly-

wood, California. On another side of the structure the stylized word mark "Hollywood Casino" appears prominently. None of this signage contains the word "Planet," and the Court finds that none of it resembles the word or stylized trademarks of Planet Hollywood. The "Hollywood Hills" background that appears at the Tunica facility has no figures in it, or any other elements that comprise the Planet Hollywood dioramas of the Hollywood Hills. The exterior coloring of the Tunica facility bears some resemblance to the coloring of the awning of the Planet Hollywood in New York City (*compare* PH App. 6, Ex. 41A (Tunica facility) *with* HC Ex: Seidel Dec. Ex. 36 (incorporating Earl Dep. Ex. 7) (Planet Hollywood awning in New York City)), but is by no means identical to it.

86. Mr. Bocchicchio was responsible for all interior design for the Hollywood Casinos in Aurora and Tunica, which are intended to convey an art deco look. With respect to the facility in Aurora, Mr. Bocchicchio took advantage of Hollywood Casino's proximity to the Paramount Theater, an historic building with an art deco design that was recently restored by the City of Aurora. The Court finds that the use of art deco in the Aurora and Tunica facilities is consistent with the general intent of the Pratts in the late 1980s to convey an art deco theme in the Sands hotel and casino project that was blocked by Donald Trump.

87. The Court has considered the appearance of the Hollywood Casino facilities with specific reference to the items that plaintiffs claim comprise the Planet Hollywood trade dress. The Court's findings on that score are as follows.

A. *Emphasis on Celebrity Owners.*

88. As the Court has found (Findings Nos. 14–15 *supra*), one of the main elements that gives Planet Hollywood its distinctive image is the strong emphasis on the lead celebrity owners, Arnold Schwarzenegger, Sylvester Stallone, and Bruce Willis. Those three individuals are the main personalities that Planet Hollywood uses for promotion, and there is an expectation that at least one of those three individuals will attend each Planet Hollywood opening. Plaintiffs do not claim that Hollywood Casino has misappropriated Planet Hollywood's celebrity ownership (6/25/99 Tr. 22), and indeed, the Court finds that Hollywood Casino does not promote any particular celebrity sponsorship or association. Although Hollywood Casino once developed lists of potential celebrity sponsors or owners, none of the Planet Hollywood's celebrity owners were on that list; and, in any event, Hollywood Casino never followed through and obtained or promoted any celebrities as owners.

89. Moreover, the Court finds that the displays of memorabilia at the Aurora and Tunica facilities do not create a particularized association between Hollywood Casino and the lead celebrity owners of Planet Hollywood: Messrs. Schwarzenegger, Stallone and Willis. Plaintiffs have pointed out that the Aurora and Tunica facilities have more displays featuring memorabilia from movies involving those three individuals than any other single movie star. The movies involving those three celebrities for which there are displays of memorabilia include "Running Man," "Conan the Barbarian," "Red Sonja," "Last Action Hero," "True Lies," "Terminator" and "Eraser" (all involving Mr. Schwarzenegger); "Rocky," "Rambo" and "Judge Dredd" (involving Mr. Stallone); and "Die Hard" (involving Mr. Willis). However, the Court finds that the memorabilia from these movies and the associated reference to the three celebrities are displayed because they come from popular movies or are interesting memorabilia, and not because Hollywood Casino seeks to create a particular association with the Planet Hollywood celebrity owners (in that regard, the Court notes that in the Universal Studio's Exhibit displayed at the Sands in 1988, there was a display from the Arnold Schwarzenegger movie "Conan the Barbarian"—several years before Planet Hollywood opened).

90. The evidence also establishes that memorabilia from movies involving those three celebrities comprise a relatively small percentage of all the memorabilia on display at the facilities: 10 out of 110 displays at Aurora, and six out of 70 displays at Tunica (HC Ex.: Cranmer Dec. ¶¶ 25–28). In light of the fact that those three Planet Hollywood celebrity owners have starred in 19 of the 166 movies that have grossed over $100 million (a reasonable barometer of popular success), the sheer number of exhibits on display at Hollywood Casino from their movies does not reflect a particular emphasis on those celebrities, or create a particular association between Hollywood Casino and those celebrities. Moreover, displaying the memorabilia with photographs and posters identifying the name and likeness of those celebrities is a natural way of identifying the memorabilia, and this manner of display is consistent with the manner in which Hollywood Casino generally displays memorabilia from all movies.

91. The Court appreciates that numbers alone do not always tell the full story, and thus has carefully considered Planet Hollywood's assertion that Hollywood Casino emphasizes Planet Hollywood's celebrity owners by prominently displaying their memorabilia where they can readily be viewed by patrons (see Planet Hollywood's Proposed Findings of Fact, at 29–33, ¶¶ 130–163). However, based on the Court's personal visit to the Hollywood Casino facility in Aurora, the Court finds that those memorabilia are not concentrated in prominent areas of the facility. Based on this and on the evidence submitted concerning the casinos in Aurora and Tunica, the Court finds that the memorabilia from the movies of Messrs. Schwarzenegger, Stallone and Willis are not particularly emphasized over memorabilia from other movies, and that they are not displayed in a way to suggest any particular association between Hollywood Casino and those celebrities.

## B. *The Presentation of the Memorabilia.*

92. Planet Hollywood asserts that Hollywood Casino has "progressively encroached" on Planet Hollywood's trade dress by abandoning a Golden Era of Hollywood motif in favor of a more contemporary "Hollywood" theme akin to that of Planet Hollywood. When it opened in June 1993, the Hollywood Casino facility in Aurora had a motif that emphasized the Golden Era of Hollywood. At that time, there were no displays of memorabilia from movies featuring Messrs. Schwarzenegger, Stallone or Willis; memorabilia displays from their movies were added beginning in 1995 and 1996.

93. However, from the very beginning, the Aurora facility also displayed some memorabilia from more contemporary movies (for example, a catcher's mitt from a Tom Hanks movie). Over time, the Aurora facility began to display a higher volume of contemporary memorabilia. Likewise, when it opened in August 1994, the Hollywood Casino in Tunica did not feature a Golden Era memorabilia theme, but had a broader mix of memorabilia—driven in part by what memorabilia were available to be obtained in the market. When it opened, the Tunica facility had among its large scale memorabilia items from the Schwarzenegger movies "True Lies" and "Terminator."

94. The Court finds credible Mr. Bocchicchio's testimony that this shift away from a predominant emphasis on the Golden Age of Hollywood was the result of a desire to expand the appeal of Hollywood Casino's theme to a broader age range of consumers, many of whom might be unfamiliar with movie stars or memorabilia from the earlier era (Trial Tr. 483). Moreover, the evidence establishes that it is an overstatement for Planet Hollywood to assert that Hollywood Casino "abandoned" an emphasis on memorabilia from older movies. Thirty-five out of the 110 displays at Aurora feature memorabilia from the Golden Era (HC Ex.: Cranmer Reply

Dec., ¶ 8)—more than three times the number of displays at Aurora that feature memorabilia from the movies of Messrs. Schwarzenegger, Stallone and Willis. By contrast, no more than ten percent of Planet Hollywood's memorabilia is from movies predating 1970 (HC Ex.: Seidel Dec. Ex. 15 (Earl Dep., 1/8/98, at 415)). Those numbers are consistent with what the Court observed during its site visits: that there is a noticeable presence of Golden Age movie memorabilia at Hollywood Casino, which contributes to an image that is noticeably different than that conveyed by Planet Hollywood.

95. Planet Hollywood also argues that Hollywood Casino has copied not only the type of memorabilia displayed by Planet Hollywood, but also the manner in which it is displayed. However, the Court finds that Hollywood Casino's manner of displaying memorabilia is not so similar to that of Planet Hollywood that one visiting a Hollywood Casino would likely be confused, or would be likely to believe that there was some association with Planet Hollywood.

96. To begin with, the scale of the presentation in the Hollywood Casinos is much larger than at the Planet Hollywood restaurants. The Planet Hollywood restaurants range from 12,000 to 36,000 square feet in size. By contrast, the Hollywood Casinos in Aurora and Tunica have some 66,000 and 100,000 square feet of space, respectively. As a result of having this additional space, the Hollywood Casinos are able to display larger memorabilia than the Planet Hollywood restaurants: such as, full-sized cars from the "Great Race" and "Untouchables," a life-sized model of the elephant from "Operation Dumbo Drop," the Batmobile car and Batboat, a large scale display from "Alien," a model of the stern of the "Titanic" used in the filming of the movie, and the full-sized jet and helicopter from the Schwarzenegger movie "True Lies."

97. In addition to the different scale of many of the items of memorabilia, there are noticeable differences between the way

that Planet Hollywood and the Hollywood Casinos display the memorabilia. Hollywood Casino uses separate video clips with each item of memorabilia, and the videos relate specifically to the item being displayed. This is a technique which Mr. Bocchicchio used in the Universal Studios exhibit for the Sands in 1988, and which from the outset has been adopted at the Hollywood Casinos. While Planet Hollywood also uses monitors to show video clips, Planet Hollywood—unlike Hollywood Casino—uses multiple monitors to simultaneously show the same video clips, which are not tailored to the specific items of memorabilia being displayed (Trial Tr. 780). The Planet Hollywood videos display the openings of Planet Hollywood restaurants—which is something that Hollywood Casino has never done.

98. Planet Hollywood asserts that the use of clear display cases by Hollywood Casino adopts an element of Planet Hollywood's trade dress (Planet Hollywood's Proposed Findings of Fact, at 6, ¶ 25(2)). As the Court already has found (see Finding No. 16, supra), Planet Hollywood's display cases are not part of its trade dress. Moreover, the Court finds that it would be natural for valuable memorabilia to be displayed in an enclosure that would prevent theft or damage by the public, without unduly impairing the customers' ability to view the memorabilia—which, of course, is the purpose for having the displays in the first place. Thus, it is natural that Hollywood Casino would use glass or plexiglass for the transparent portion of the display case, and Hollywood Casino uses both. In fact, the majority of the Hollywood Casino display cases use glass rather than plexiglass, which is a distinction from Planet Hollywood, which appears to use principally plexiglass. The display cases used by Hollywood Casino tend to have art deco bases and tops; some also have a pewter film-strip border which is patterned after the film strip in the Hollywood Casino mark, which is another distinction from the Planet Hollywood manner of display. In the Court's view, whether the material for

the display cases is plexiglass, glass or some other see-through material is of no moment: Hollywood Casino's display cases are not sufficiently similar to those of Planet Hollywood to create any likelihood of confusion or association.

99. In addition, the Court finds that the mannequins used to display various memorabilia at Planet Hollywood often use the faces of movie stars. By contrast, Hollywood Casino typically uses mannequins that are headless or faceless and that therefore are not designed to—and in fact do not—resemble the faces of Hollywood personalities.[18]

### C. *Dioramas.*

100. The exterior of the Hollywood Casino facility in Tunica has the word "Hollywood" emblazoned across the back drop of a silhouette of the Hollywood Hills. Hollywood Casino has obtained rights to use this depiction of the Hollywood Hills from the Hollywood, California Chamber of Commerce. Moreover, that back drop of the Hollywood Hills does not resemble the dioramas inside Planet Hollywood restaurants and, in the Court's view, is not likely to create any confusion or association between Planet Hollywood and Hollywood Casino.

### D. *Celebrity Handprints.*

101. Although Planet Hollywood has asserted that Hollywood Casino has adopted Planet Hollywood's use of celebrity handprints, the only evidence offered in support of that assertion was a *Chicago Sun Times* article showing the handprints of Jane Russell being cast in cement at the Hollywood Casino in Aurora. However, the uncontradicted trial testimony was that celebrity handprints are not displayed at the Hollywood Casinos in Aurora or Tunica (Trial Tr. 150), and the Court's personal

viewing of the facility in Aurora confirms that to be the fact.

### E. *Themed Areas.*

102. A part of the Planet Hollywood distinctive look is that its restaurants have at least three distinct areas, devoted to the themes of "Hollywood," "adventure," and "science fiction." Hollywood Casino's facilities do not have these same three segmented theme areas.

### F. *The Planet Hollywood Marks.*

103. The Planet Hollywood trademarks are prominently displayed at the Planet Hollywood restaurants. Those marks are not displayed at the Hollywood Casino facilities; rather, Hollywood Casino's marks are displayed. As the Court has already found (Findings Nos. 38–41, *supra*), the Hollywood Casino marks are not sufficiently similar to the Planet Hollywood marks to create a likelihood of confusion.

104. Planet Hollywood has pointed out that one of the restaurants at the Hollywood Casino in Aurora, the Epic Hollywood Buffet, displays a large globe with a ring around it, with the words "Daily Planet" across it (HC Tr. Ex. 133). The Court finds that this globe does not even remotely resemble the Planet Hollywood stylized globe trademark: the "Daily Planet" is the newspaper from the "Superman" cartoon, and the globe appears as part of a mural of the skyline of the fictional city of Metropolis. Suspended from the ceiling in front of this painting is a mannequin wearing an authentic Superman costume. The Court finds credible Mr. Bocchicchio's testimony that this mural was intended to evoke the image of the "Superman" comic strip (Trial Tr. 390), and was not an effort to associate with Planet Hollywood. The Court finds

---

18. In making this finding, the Court has considered Planet Hollywood's argument that a particular display at the Aurora facility contains a mannequin bearing the likeliness of Mr. Schwarzenegger (PH App. Vol. 6, Ex. 39, Ex. 1). Although the photographs accompa-

nying that exhibit identify Mr. Schwarzenegger, the Court does not believe that the mannequin itself would likely be identified with Mr. Schwarzenegger absent the accompanying memorabilia and explanatory material.

that this globe is not likely to be confused or associated with Planet Hollywood.

105. Planet Hollywood also has pointed out that one of the walls inside the Hollywood Casino in Tunica has three globes placed in front of a diorama of the Hollywood Hills, which includes the word "Hollywood" in large type (HC Tr. Ex. 136). The Court finds that those globes do not resemble the Planet Hollywood stylized globe trademark: none of them looks like a globe of the earth, and none has any stars on them or shooting from them. Rather, the spheres are made of stained glass, and reflect colors that are different than the colors of the Planet Hollywood globe mark. The Court finds credible Mr. Bocchicchio's testimony that the inspiration for these spheres was the use of similar types of lighting in theaters during the Golden Age of Hollywood (Trial Tr. 391–92). The Court finds that those spheres do not resemble the Planet Hollywood trademark, or create a risk of likely confusion or association with the Planet Hollywood trademark.

### G. *Art Deco Look.*

106. As the Court has found above (Finding No. 22, *supra*), Planet Hollywood has an art deco look. Based on the evidence presented, the Court finds that the Hollywood Casinos also have an art deco look. However, the Court also finds that the art deco look of the Hollywood Casinos is not confusingly similar to the art deco look of the Planet Hollywood restaurants, and it is not such that a consumer at a Hollywood Casino would believe it was associated with Planet Hollywood.

### H. *Other Alleged Elements of Planet Hollywood's Trade Dress.*

107. The Court also has found that Planet Hollywood's sale of retail merchandise bearing the "word 'Planet Hollywood' mark," sold in a studio store, is not an element of the distinctive look and feel of Planet Hollywood restaurants (Finding No. 23(b), *supra*). The Court further finds that Hollywood Casino's sale of merchandise is not conducted in a manner that is confusingly similar to that of Planet Hollywood. The Hollywood Casinos do not sell Planet Hollywood merchandise, but instead sell items bearing the Hollywood Casino name and/or its own stylized mark.

108. The Court has found that the sale and use of Hawaiian-type JAM shirts is not a part of the distinctive look and feel of Planet Hollywood restaurants (Finding No. 23(c), *supra*). However, the Court does find that the Hawaiian shirts developed for use and sale at Hollywood Casino are substantially similar in appearance to the Hawaiian shirts used by Planet Hollywood. The Court has reviewed exemplars of the shirts, and finds that they share the same dominant background color (black) as well as similar color patterns for the objects that are on the shirts. There are differences between the shirts: for example, the words "Hollywood Casino" appear on one shirt, and "Planet Hollywood" on another; in addition, there are different objects on each shirt. But, the Court finds that a casual view of the shirt—which is the type of view that a consumer is likely to make—likely would result in the similarities between the shirts outweighing the differences. Nonetheless, the Court further finds that even if the Hawaiian shirts were part of Planet Hollywood's trade dress, Hollywood Casino's adoption of the shirts would not likely create confusion given the findings above that Hollywood Casino has not adopted the other elements of the Planet Hollywood trade dress.

109. Moreover, based on the evidence submitted, the Court finds that while the shirts are similar, the Hollywood Casino shirt was not adopted in an effort to duplicate the shirts used by Planet Hollywood, or to create confusion or association with Planet Hollywood. The color scheme of the shirt is not unique. The person who developed the Hawaiian shirt for Hollywood Casino, Mr. Knight, envisioned its use for a summer promotion in 1995. The shirt was not required wear for Hollywood Casino employees, and it has not been consistently used by Hollywood Casino.

Although Mr. Knight developed this idea after he visited a Planet Hollywood in early 1994 and saw the Planet Hollywood shirt being worn, the Court credits Mr. Knight's testimony that the shirt was patterned after a shirt he himself owned.

## I. Hollywood Casino's Intent in Adopting Its Theme and Decor.

110. Mr. Bocchicchio has been responsible for developing and implementing the theme and decor of the Hollywood Casinos in Aurora and Tunica. The Court finds credible Mr. Bocchicchio's testimony that he did not copy the Hollywood Casino interior design from Planet Hollywood.

111. The Court finds that the art deco and memorabilia themes of the Hollywood Casinos in Aurora and Tunica have roots in the theme planned for the failed Sands Casino project in Atlantic City. The contemporaneous documents for the Sands project show that the plan was for the building to reflect inside and out "an interpretation of the art deco style of the 1930s with a Hollywood motif," with a "striking blue and pink facade" (HC Tr. Ex. 5–2, at 3). One of the exhibits offered at trial (HC Trial Ex. 132), a rendering of a planned food court in the Sands project, reflected this intended style. Moreover, a number of elements of the planned food court for the Sands project are similar to the elements that are contained in the Epic Hollywood Buffet in Aurora (HC Tr. Ex. 133).

112. The Court also finds that it was part of the plan for the Sands project in Atlantic City to implement the "Hollywood motif" not only with an art deco style, but also with "continually changing displays of Hollywood memorabilia, movie and TV displays and props" (HC Tr. Ex. 5–3, at 1). The draft joint venture plan for the Sands Hollywood in 1989 contemplated that the type of memorabilia being displayed in the Hollywood theme would not necessarily be limited to any specific time period: "the Hollywood theme was chosen because of its universal appeal to all market segments ..., its flexibility in adapting specific themes to specific target market segments

and its ability to be easily updated" (HC Tr. Ex. 5–2, at 4 (emphasis added)). This is further evidence that Hollywood Casino's use of memorabilia displays, and the evolution from a Golden Age of Hollywood theme to a broader Hollywood theme, were not driven by a desire to copy Planet Hollywood's approach. The fact that the Hollywood Casinos in Aurora and Tunica indeed contain changing and evolving displays of Hollywood memorabilia is consistent with the plan the Pratts sought (but were unable) to implement in the late 1980s—well before the first Planet Hollywood restaurant opened in October 1991.

113. Planet Hollywood has correctly pointed out that prior to the opening of the first Hollywood Casino in Aurora in 1993, a number of high ranking executives of the defendants were familiar with Planet Hollywood restaurants, as well as their theme, motif and use of memorabilia. Mr. Pratt visited the Planet Hollywood restaurant in New York in 1991 and 1992, and the Planet Hollywood restaurants in Atlantic City and Dallas in 1994 and 1995. Mr. Weidner, formerly the president of Pratt Hotel Corporation had visited Planet Hollywood restaurants before the opening of the Hollywood Casino in 1993. In connection with the opening of the Aurora casino, Hollywood Casino also retained a consultant named Thomas Cantone, who had been employed by the Sands in 1980s; more recently, he had been employed by Planet Hollywood between the summer of 1991 and the summer of 1992, where his responsibilities involved obtaining celebrity appearances at the New York Planet Hollywood opening and generally developing awareness of Planet Hollywood. Mr. Bocchicchio did not visit a Planet Hollywood restaurant until September 1993, which was after the opening of the Aurora facility—but he did visit Planet Hollywood restaurants several times thereafter.

114. The Court has not been persuaded that the defendants used their knowledge of Planet Hollywood to emulate its theme and manner of presentation. In drawing

this conclusion, the Court has considered evidence that Planet Hollywood has offered to attempt to establish that Hollywood Casino intended to replicate Planet Hollywood's distinctive image, including the following:

a. Mr. Weidner testified that Hollywood Casino used Planet Hollywood as a "benchmark" (PH App. Vol. 4, Ex. 32, at 118). Mr. Weidner explained that this meant Hollywood Casino was interested in how Planet Hollywood operated, because Planet Hollywood was "a very good and interesting restaurant concept" (*Id.*). The purpose of the "benchmarking" was not to copy Planet Hollywood, but to see if Hollywood Casino could do even better (*Id.*). The Court does not find it unusual (or necessarily suspicious) that Hollywood Casino would be interested in the success of another enterprise that used a Hollywood theme. Without more, the mere fact of "benchmarking" does not lead the Court to a finding of "copying."

b. Planet Hollywood offered evidence that Hollywood Casino had a file folder labeled "Preopening–Planet Hollywood" (PH Amended App. Vol 8, Ex. 60; *see also* Trial Tr. 272–73). However, Planet Hollywood offered no evidence as to what information was included in the file, who kept the file, or why.

c. Hollywood Casino retained Mr. Cantone to take advantage of certain knowledge he obtained while at Planet Hollywood. Mr. Cantone was paid $5,000 a month for his services, and Hollywood Casino wanted Mr. Cantone to create a public relations program similar to what he had done for Planet Hollywood. In addition, consistent with the consulting agreement that called for him to assist in securing movie clips and memorabilia from Hollywood studios and determining the kind of equipment needed for such presentations, Mr. Cantone provided Hollywood Casino with contacts for producers of video clips and sound systems and manufacturers of display cases and sources of memorabilia that were used by Planet Hollywood. However, as Planet Hollywood concedes (Trial Tr. 893), none of that information was proprietary to Planet Hollywood. Hollywood Casino obtains memorabilia from movie studios, auction houses and private collectors, and some of the sources of memorabilia identified by Mr. Cantone were ones that the Pratts had learned about in connection with the Universal Studio's exhibit. Moreover, the Court finds that it is not surprising or suspicious that Hollywood Casino would be interested in contacting companies that manufactured display cases and that prepared video clips in a way that avoided copyright infringement claims.

d. Planet Hollywood also points to Mr. Cantone's preparation of a marketing outline, in which Mr. Cantone suggested that Hollywood Casino incorporate in its operations certain features that Planet Hollywood asserts as part of its trade dress. However, as the Court found, some of those features (the display of video clips and movie memorabilia) reflect ideas that trace back to the failed Sands project and not to Planet Hollywood—and, in any event, are ideas implemented differently at Hollywood Casino than at Planet Hollywood. Other ideas suggested by Mr. Cantone were never adopted by Hollywood Casino, such as the display of celebrity handprints and the presentation of memorabilia by celebrities; or were done only a few times, such as showing movie premiers.

e. Planet Hollywood also asserts that Mr. Cantone helped Hollywood Casino adopt Planet Hollywood's approach to the sale of merchandise. The evidence established that Mr. Cantone urged that the sale of merchandise be a major part of the Hollywood Casino operations, and he projected that the sale of such merchandise could account for 25–40 percent of Hollywood Casino's profits. The evidence also established that Mr. Cantone arranged for Hollywood Casino to interview a Planet Hollywood employee, Barbara Burns, who was knowledgeable about Planet Hollywood's method for selling merchandise,

and that he provided Hollywood Casino with a Planet Hollywood merchandise manual. However, the evidence also established that notwithstanding Mr. Cantone's urgings, Hollywood Casino did not contemplate that the sale of retail merchandise would be a significant part of the operation: and in fact, the sale of retail merchandise accounts for less than one percent of Hollywood Casino's gross revenue, a far cry from what Mr. Cantone envisioned. By contrast, merchandise sales account for 30–40 percent of Planet Hollywood's revenues, net of tax. The evidence also established that Planet Hollywood did not hire Ms. Burns for the very reason that Hollywood Casino did not consider retail to be a major part of the planned operation. And, there is no evidence that Hollywood Casino ever used the Planet Hollywood merchandise manual; to the contrary, Hollywood Casino uses outside firms to administer its merchandising. Planet Hollywood was unable to point to any specific information in that manual which was adopted by Hollywood Casino.

115. In short, the Court finds that many of the things that Mr. Cantone suggested already were part of Hollywood Casino's plans, and that the bulk of the assistance he provided was in the implementation of those preexisting plans. Mr. Cantone did not contribute to the design used by any Hollywood Casino facility; that was the responsibility and work of Mr. Bocchicchio. The Court does believe that Mr. Cantone sought to carve out for himself a more prominent role, and to that end, made many suggestions that were not adopted by Hollywood Casino, and in some instances provided certain information (such as the merchandise manual) that he should not have provided. But the Court finds that the evidence fails to establish that Hollywood Casino used the information provided by Mr. Cantone to adopt or replicate Planet Hollywood's theme or decor.

116. The Court also has considered Mr. Bocchicchio's testimony, in response to a question asking whether he denied incorporating or using in his designs anything in the Planet Hollywood theme decor, that "that's too broad spectrum. We've all used the same lighting effects. We all use videos. We all use all kinds of technical stuff, it's like—it's a very—you can't—I can't pinpoint that. I can't answer that honestly" (Trial Tr. 482). While Planet Hollywood cites this as an admission that Mr. Bocchicchio copied the Planet Hollywood decor, the Court does not interpret the testimony in that fashion. The line of questioning that concluded with that testimony began with Mr. Bocchicchio acknowledging his earlier observation that "Egyptians were really the last people to come up with new ideas" because "they had no other outside influence" (Trial Tr. 480). The Court believes that Mr. Bocchicchio's testimony is nothing more than a statement of his view that we are all influenced in subtle (and sometimes unknowable) ways by what we see and experience. However, to acknowledge that common human condition is a far cry from saying that any general elements that Planet Hollywood and Hollywood Casino have in common (which, as the Court has found, are in any event implemented differently) are the result of intentional copying. The Court declines to draw the inference from Mr. Bocchicchio's testimony that Planet Hollywood urges.

117. Based on the findings set forth above, and after consideration of all the evidence, the Court finds that Hollywood Casino did not intend to copy Planet Hollywood's trade dress.

## XII. ACTUAL CONFUSION.

118. Planet Hollywood has offered no evidence of any instances of confusion by consumers between any Planet Hollywood restaurants and the Hollywood Casino in Aurora, which has operated since June 1993, or in Tunica, which has operated since August 1994. The Planet Hollywood restaurants closest to the Hollywood Casino in Aurora operated in the Chicago area as far back as July 1993. The Planet Hollywood closest to Hollywood Casino in

Tunica has operated in Nashville since June 1996.

119. Planet Hollywood has offered no survey evidence on the question of whether there would likely be any confusion by consumers between Planet Hollywood restaurants and Hollywood Casino's operations in Aurora or Tunica (or the one being constructed in Shreveport).

120. Conversely, Hollywood Casino has offered no evidence that there exists any actual confusion between any Hollywood Casino facilities and the four Planet Hollywood restaurants in Reno, Lake Tahoe, Las Vegas and Atlantic City that are located in hotels that also offer casino services. As with Planet Hollywood, Hollywood Casino has offered no survey evidence indicating any likely confusion between the Hollywood Casinos in Aurora or Tunica and the Planet Hollywood restaurants that are located in hotels with casinos. The Court finds this lack of evidence of actual confusion significant, given that the Planet Hollywood restaurants in Reno and Lake Tahoe are located near the casino gaming floors; casino gaming chips depicting the "Planet Hollywood" mark were distributed; and Planet Hollywood has used its mark on the gaming floor of the Caesar's casinos to advertise its restaurant since 1996, displaying the mark on slot machines, gaming tables and carpeting.

121. The Court also finds that Hollywood Casino has failed to establish that if there was any association between Hollywood Casino and the Planet Hollywood restaurants located within hotels that also house casinos, the association has been detrimental to Hollywood Casino. Hollywood Casino has failed to offer any persuasive evidence that the decline in Planet Hollywood's financial fortunes has resulted in Planet Hollywood obtaining a pervasive negative image among consumers, or that such a negative image has rubbed off on Hollywood Casino. Indeed, Hollywood Casino has conceded that after several years of litigation, "[w]e don't know of any damages" from Planet Hollywood's operation of those restaurants in hotels with casinos (6/1/99 Tr. 46–47). The Court finds that the evidence offered by Hollywood Casino of some newspaper articles referencing criticisms of the quality of the food at Planet Hollywood is insufficient to support a broad finding that any association that might be drawn between Planet Hollywood and Hollywood Casino (or their respective marks) would diminish the reputation of Hollywood Casino, or tarnish its image.

## XIII. PLANET HOLLYWOOD'S EFFORTS TO EXPAND INTO THE CASINO BUSINESS.

122. As the Court has previously found, the individuals who developed Planet Hollywood anticipated from the outset that the Planet Hollywood concept would not be limited to restaurant services. However, the documentary evidence offered at trial by Planet Hollywood did not establish any concrete acts in furtherance of an intent to expand into the casino business prior to March 1994, when Planet Hollywood filed a Federal Intent To Use Application to register the Planet Hollywood marks for casino and hotel services.

123. That application (Serial No. 74–500,307) sought registration of the Planet Hollywood name and the stylized globe mark for use in casino and hotel services. Thereafter, on August 5, 1996, Planet Hollywood filed two additional registrations (Serial Nos. 75–144,536 and 75–144,537), seeking registration of the Planet Hollywood name and globe mark for use in connection with, among other things, gaming chips. As with the prior registrations, Planet Hollywood disclaimed use of the word "Hollywood" apart from the mark as shown in these three applications. All applications were published by the United States Patent and Trademark Office for opposition. The fact that the Office chose to publish these applications reflected that the Office did not find them to be in conflict with any other registered mark (Trademark Manual of Examining Procedure, ¶ 1101). However, Hollywood Casi-

no filed oppositions to those applications; the Patent and Trademark Office has not issued any ruling on the applications, suspending consideration of the applications due to the pendency of civil litigation.

124. The Court has considered Mr. Earl's testimony that prior to 1994 he had engaged in discussions with Bally to change that casino's theme to a "Planet Hollywood" theme (Trial Tr. 798–99, 812–14). The Court credits Mr. Earl's testimony that he envisioned the possibility of a Planet Hollywood casino as early as 1992, and he may have had preliminary discussions with others about that possibility. However, although Mr. Earl said that there must have been documents created in connection with those discussions (Trial Tr. 812–13, 824), Planet Hollywood has offered no documentary evidence of those discussions. The Court finds it credible that Mr. Earl discussed many possible uses of the Planet Hollywood name with many people at various times, including the use for casinos; but Planet Hollywood has failed to show that it moved from talk to action concerning a casino use prior to 1994.

125. Planet Hollywood has acknowledged, and Hollywood Casino does not dispute, that Planet Hollywood has not used its mark for casino services. As the Court previously found, Planet Hollywood has opened several restaurants in casino hotels in Reno, Lake Tahoe and Las Vegas, Nevada and in Atlantic City, New Jersey. However, the evidence establishes that Planet Hollywood has not operated these casinos, and that the casinos at these facilities continue to be operated under the names of Harrah's and Caesar's.

126. However, the Court finds that subsequent to seeking to register its mark for use with casinos in 1994, Planet Hollywood did make concrete efforts to expand into the casino business. In conjunction with ITT Sheraton, the owner of Caesar's Palace, Planet Hollywood announced a planned opening of a Planet Hollywood casino in Las Vegas, Nevada, and held a publicized groundbreaking for the casino in December 1996. There is no dispute that this planned casino would have incorporated the theme implemented by the Planet Hollywood restaurants. However, as Planet Hollywood concedes (Planet Hollywood's Proposed Findings of Fact, at 12, ¶ 54), that planned casino complex fell through due to a hostile takeover of ITT Sheraton and thus was never built. Although the planned opening received wide publicity, Hollywood Casino has offered no evidence of any actual confusion arising from the use of the name "Planet Hollywood" in connection with that planned casino.

127. The Court credits the trial testimony of Mr. Earl that despite the failure of the planned casino with ITT, it remains the desire of Planet Hollywood to use its name in a casino operation: either directly operated by Planet Hollywood, or through the licensing of the Planet Hollywood name. The Court further accepts that Planet Hollywood would like to use its name for a casino operation in Las Vegas or Atlantic City, and would seek to attract gaming customers from across the country. However, Mr. Earl acknowledged at trial that there is "nothing at this point on the drawing board with respect to a casino to be opened by Planet Hollywood," and at this time Planet Hollywood is not "approved by any state authority that has to approve someone to go into the casino business" (Trial Tr. 825). The undisputed testimony established that governmental approval for the operation of the casino is a long and difficult process, with no guarantee of a successful outcome. This evidence alone indicates to the Court that it is far from certain that Planet Hollywood ever would be able to use its name for casinos.

128. The speculative nature of any future use of the Planet Hollywood name for casinos has been further underscored by post-trial developments involving Planet Hollywood's financial situation. In August 1999, Planet Hollywood announced a plan to file for a bankruptcy reorganization. The Court has reviewed the plan generated at that time, and finds that it is silent as

to the question of using the Planet Hollywood name for casinos. Thus, while it is true that nothing in that proposed reorganization plan would preclude Planet Hollywood from opening a casino (or licensing its name to another for use in a casino operation), nothing indicates that such a use is·part of Planet Hollywood's immediate strategy for righting its financial ship.

129. Hollywood Casino has seized on the fact that some of the press coverage of the August 1999 proposed reorganization plan has attributed to Mr. Earl the comment that Planet Hollywood fell on hard times because it embarked on a variety of business concepts that was "too diverse," and that a reorganized Planet Hollywood would focus on the "core" restaurant business (Defs.' Motion to Dismiss Decl. Judgment Claims, 8/17/99, at 3). Hollywood Casino argues this shows that Planet Hollywood has no intention of going into the casino business; Mr. Earl, of course, continues to claim otherwise (Pls.' Opposition to Motion to Dismiss Decl. Judgment Claims, 9/10/99, at Ex. B). The Court finds that taken together, those comments attributed to Mr. Earl and his explanation of them do not establish that a reorganized Planet Hollywood would *never* seek to use its mark for a casino; but they do further confirm that no such use is visible on the horizon. Even prior to the announcement of the planned bankruptcy, Mr. Earl's trial testimony established that Planet Hollywood had "nothing on the drawing board" regarding a casino project. The announcement of a planned bankruptcy petition certainly did not make the prospect for a casino project more imminent than it was before.

130. On October 12, 1999, Planet Hollywood (Region IV), Inc. and Planet Hollywood International, Inc. followed through on the previously-announced plan and filed voluntary petitions in the United States Bankruptcy Court for the District of Delaware, seeking protection under Chapter 11 of the Bankruptcy Code.[19] At the time of that filing, Planet Hollywood closed down a number of its restaurants, including the two restaurants in the Chicago area that were closest to the Hollywood Casino facility in Aurora. In connection with the bankruptcy filing, Mr. Earl has stated that Planet Hollywood hopes to come out of the bankruptcy as of the beginning of the year 2000 with "a new restructured company focused on restaurants, [and] only the restaurants that are profitable" (10/25/99 Tr. 20). The reorganization plan filed in the bankruptcy proceeding cites as one reason for Planet Hollywood's financial decline losses from "major spin-off projects" outside the core restaurant business, and indicates Planet Hollywood's intention to refocus its business around its core operations. Casino licensing is listed as one of a number of "[p]otential areas for expansion," but the plan does not cite casinos as a priority area for expansion or give a time frame for pursuit of expansion into casinos.

131. In addition, certain of Mr. Earl's comments to the press in the wake of that bankruptcy filing once again have provided fodder for the parties' respective arguments concerning the prospects of Planet Hollywood using its mark for a casino operation. The reporter's notes from one such interview indicate that Mr. Earl told him that with respect to a casino, Planet Hollywood has "[n]o plans now, but maybe [in the] future" (Stipulation Regarding Paul Bond, 11/2/99, ¶ 2). Mr. Earl, who apparently has been giving numerous interviews every day, does not recall making that statement, but says that he has told all reporters that while a casino operation is on the agenda, "that is not going to be the number one thing coming out of the box January 1 [2000]" (Stipulation Regarding Paul Bond, 11/2/99, ¶ 3 (*citing* 10/25/99

19. Upon the filing of the bankruptcy petitions, an automatic stay went into effect which would have required this Court to put on hold the litigation of the Amended Counterclaim by Hollywood Casino against Planet Hollywood. However, Planet Hollywood and Hollywood Casino stipulated to the lifting of the automatic stay for purposes of litigating the claims in this case and, accordingly, the bankruptcy court in Delaware lifted the stay for that purpose in an order dated November 19, 1999.

Tr. 20)). Mr. Earl indicates that a Planet Hollywood employee has been assigned to look for a licensing partner, with the intent "to go into gaming as soon as they can find [one]" (*Id.*). Planet Hollywood provided no specifics about what efforts this employee is making to find a licensing partner. However, according to Mr. Earl, Planet Hollywood cannot find such a partner "as long as the cloud caused by this lawsuit is over their head" (*Id.*).

132. The Court finds that Planet Hollywood has failed to establish that its inability to enter into the casino business (either itself or through a licensed partner) is the result of a "cloud" created by this lawsuit. Although Mr. Earl indicated that it was Planet Hollywood's desire to enter into the casino business as far back as early 1992, it took several years for Planet Hollywood to enter into an arrangement with ITT in an attempt to do so. Moreover, the Court observes that this lawsuit already had been filed and was pending at the time that Planet Hollywood and ITT had the groundbreaking for the planned casino in December 1996—the same "cloud" that Planet Hollywood points to now existed at that time, and did not prevent a groundbreaking for a casino. And Planet Hollywood admits that the ITT deal failed due to a hostile takeover of ITT Sheraton, and not as a result of any "cloud" created by this lawsuit.

133. Moreover, the evidence in this case has shown that even in the best of circumstances entering into the casino business is a complex endeavor fraught with uncertainty and risk of failure: as the Sands found out when it failed in its attempt to establish a casino in Atlantic City in the late 1980s, and as Planet Hollywood found out when its planned casino with ITT failed. The Court finds that on this record, it is equally (if not more likely) that any difficulty Planet Hollywood faces in breaking into the casino business is the result of factors apart from the disputes that have given rise to this litigation.

134. The Court further finds that the speculative nature of any future casino operated under the Planet Hollywood name has, in turn, resulted in the parties offering speculative evidence at best concerning what such a casino would be called and whether there would be any likelihood of confusion or association between such a casino and the Hollywood Casinos. Planet Hollywood says it wants the right to call a casino "Planet Hollywood Casino" (the name that would be most objectionable to Hollywood Casino), but also says it does not really know what name it would give to a casino—and denies that patrons would inevitably call such a casino "Planet Hollywood Casino" (Trial Tr. 865–66). Hollywood Casino says *any* use of the word "Hollywood" in the name of a casino operated by Planet Hollywood would violate Hollywood Casino's rights (Trial Tr. 933). But neither side has offered any survey evidence or consumer studies to back up their competing contentions as to whether there would (or would not be) likely confusion or an association in the minds of casino customers between a casino operated by Planet Hollywood and a Hollywood Casino.

135. The Court has considered the opinion testimony offered by Mr. Leonard on behalf of Hollywood Casino, that operation of a casino under the name of "Planet Hollywood" would lead consumers to associate that casino with Hollywood Casino (Trial Tr. 659–60). The Court does not find that opinion persuasive.

136. In reaching his opinion, Mr. Leonard did not conduct any kind of consumer studies, and he did not conduct any interviews with casino customers. Rather, Mr. Leonard based his opinions solely on what he considered to be the similarity of the name "Planet Hollywood Casino" and "Hollywood Casino"—a comparison that we do not know is apt, since we do not know in fact what a casino operated by Planet Hollywood would be named.[20]

---

20. Mr. Leonard opined that even if the title of a hotel and casino were only "Planet Holly-

wood," consumers would inevitably refer to

However, Mr. Leonard acknowledged that he is not an expert in consumer market research, and he has never conducted a survey of consumers in the casino industry. The Court also finds that Mr. Leonard's opinion is not persuasive because it focuses solely on the names, without consideration of other factors that might affect whether any association might be drawn by consumers between the two entities, such as: (a) whether a Planet Hollywood casino would prominently display the Planet Hollywood stylized mark, which Hollywood Casino acknowledges (indeed, urges) is famous and significantly distinct from the Hollywood Casino film strip mark; (b) where the casino would be located (a Planet Hollywood casino near Chicago or Tunica, where recognition of Hollywood Casino is likely to be greatest, might present different issues than a Planet Hollywood casino in Las Vegas, where the Court has found Hollywood Casino does not have nearly the same level of recognition); or (c) the fact that consumers have not associated Planet Hollywood with Hollywood Casino as a result of Planet Hollywood operating restaurants within four different casino operations in Nevada and Atlantic City. With all due respect to Mr. Leonard, who undoubtedly possesses expertise in certain areas, the Court does not believe that Mr. Leonard possesses any special expertise—beyond that of the Court or any other fact finder—on the question of what casino customers might find confusing or what might cause them to associate one entity with another.[21]

## CONCLUSIONS OF LAW

### I. JURISDICTION

1. The Court has subject matter jurisdiction, pursuant to 15 U.S.C. § 1121 and 28 U.S.C. §§ 1331, 1338(a) and (b) and 1367, to decide the claims presented in the Amended Complaint and Amended Coun-

---

the operation as "Planet Hollywood Casino" (Trial Tr. 606–07). There is some support for this notion: some newspapers referred to the failed effort with ITT as "Planet Hollywood Casino"—although some also called it "Planet Hollywood hotel and casino" (HC Tr. Ex. 227). In addition, there is testimony that given the range of Planet Hollywood's different business endeavors, the name of the particular service being offered is frequently tacked onto the Planet Hollywood name—be it "Planet Hollywood restaurant" or "Planet Hollywood ice cream." This lends credence to the proposition that a casino run by Planet Hollywood would be called "Planet Hollywood casino," to distinguish it from other Planet Hollywood lines of business.

However, Planet Hollywood has pointed out that a number of casinos on the Las Vegas strip are known by one name (e.g., "The Mirage") without tacking on the word casino, even though other services (such as hotel and restaurant facilities) are also offered. But neither side has provided survey or consumer evidence to show what consumers would actually think, and the Court finds that the evidence offered does not provide the Court with a sound basis to answer that question.

21. For similar reasons, the Court discounts the testimony of another defense expert, William Thompson, who opined that Planet Hollywood's use of its name for casinos would cause likely confusion among customers (PH App. Vol. 7, Ex. 46, at 15). Mr. Thompson did not conduct interviews with casino customers or assemble any other empirical evidence to support his opinions, relying instead on his "learned impressions," which the Court does not find persuasive.

The Court also notes that Planet Hollywood offered expert testimony through Edward Epstein that the presence of the name "Planet Hollywood" over the entrance to a Planet Hollywood casino would serve to distinguish it from a Hollywood Casino. There is logic to this assertion, since everyone acknowledges that "Planet Hollywood" is a famous mark. But the Court does not find Mr. Epstein's opinion testimony any more persuasive than the contrary opinion testimony of Messrs. Leonard and Thompson. Mr. Epstein also failed to conduct any survey studies or consumer interviews in an attempt to test or support his opinion—a telling shortcoming given that he also opined that an expert could not express any valid opinion on the issue of confusion or association without knowing what a Planet Hollywood Casino would eventually look like, and without doing surveys or other inquiries to test customer reaction. Like Mr. Epstein, Ms. Harrington (another Planet Hollywood expert) stated that "a consumer confusion study would certainly be the most valid way to determine if confusion existed or it didn't" (PH App. Vol. 6, Ex. 42, at 43).

terclaim concerning past and current conduct by the parties. Personal jurisdiction and venue are conceded by the parties. Moreover, in view of the order of the bankruptcy court lifting the automatic stay that became effective after Planet Hollywood International, Inc. and Planet Hollywood (Regional IV), Inc. filed their Chapter 11 bankruptcy petitions on October 12, 1999, the pendency of those bankruptcy proceedings does not affect this Court's authority to address the claims raised by or against Planet Hollywood in this case.

2. The competing declaratory judgment claims in Count VI of the Amended Complaint and Count IX of the Amended Counterclaim, however, present a threshold question regarding the Court's subject matter jurisdiction. After completion of the testimonial proceedings and the submission of proposed findings, Hollywood Casino moved to dismiss all declaratory judgment claims on the ground that any plans by Planet Hollywood to enter into the casino business (or to license its name for such a use) are insufficiently concrete to create the "actual controversy" required for subject matter jurisdiction under Article III to the Constitution.

3. While Hollywood Casino's motion comes very late in the day, that of course is not a bar to considering the question. Subject matter jurisdiction may not be conferred by agreement of the parties, and objections to lack of subject matter jurisdiction may not be waived. *Shaw v. Dow Brands, Inc.*, 994 F.2d 364, 371–72 (7th Cir.1993). Thus, even if the matter is not raised by the parties, it is a court's duty to dismiss a case on its own motion if subject matter jurisdiction does not exist at any point during the review of a case. *See O'Brien v. R.J. O'Brien & Assocs.*, 998 F.2d 1394, 1399 (7th Cir.1993). For the reasons that follow, the Court is constrained to agree that it lacks subject matter jurisdiction over the declaratory judgment claims, and therefore dismisses Count VI of the Amended Complaint and Count IX of the Amended Counterclaim, pursuant to Fed.R.Civ.P. 12(b)(1).

### A.

4. The Declaratory Judgment Act ("DJA"), 28 U.S.C. § 2201(a), provides that:

> in *a case of actual controversy* within its jurisdiction ... any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought. Any such declaration shall have the force and effect of a final judgment or decree and shall be reviewable as such

(emphasis added). The prerequisite of an "actual controversy" tracks the limitation of Article III, which extends federal jurisdiction only to "actual controversies" which arise "under the Constitution, laws or treaties of the United States." U.S. Const. Art. III, § 2. It is well-settled that the DJA does not expand this jurisdiction. *Aetna Life Ins. Co. v. Haworth*, 300 U.S. 227, 239–240, 57 S.Ct. 461, 81 L.Ed. 617 (1937) (explaining that the term "controversies" is distinguishable from "cases" only in that it is less comprehensive than the latter, but that the DJA is limited to "cases of actual controversy" and that the word "actual" is one of "emphasis" rather than "definition"). *See also International Harvester Co. v. Deere & Co.*, 623 F.2d 1207, 1210 (7th Cir.1980); *Starter Corp. v. Converse, Inc.* 84 F.3d 592, 594–595 (2d Cir.1996); *Spectronics Corp. v. H.B. Fuller Co., Inc.*, 940 F.2d 631, 635 (Fed.Cir. 1991); *Joint Stock Soc'y v. UDV North America, Inc.*, 53 F.Supp.2d 692 701 (D.Del.1999).

5. The constitutional imperative against issuance of advisory opinions is unmistakable. Such opinions are prohibited because they "undermine the basic tenants of the Article III case or controversy requirement," *Joint Stock Soc'y*, 53 F.Supp.2d at 706, and would be "beyond our constitutional power" to render. *Starter*, 84 F.3d at 595 (*citing Aetna Life Ins.*, 300 U.S. at 241, 57 S.Ct. 461, 81

L.Ed. 617); *see also Joint Stock Soc'y*, 53 F.Supp.2d at 701 (noting that Congress imposed the Article III limitation on the exercise of jurisdiction under the DJA "to prevent the federal judiciary from impermissibly expanding the scope of its mandate through the issuance of advisory opinions on hypothetical or abstract issues"). Advisory opinions "fly in the face of the clear constitutional mandate governing the functioning of the federal judiciary," namely, that of resolving actual rather than hypothetical disputes. *Joint Stock Soc'y*, 53 F.Supp.2d at 706. *See also Windsurfing Int'l, Inc. v. AMF Inc.*, 828 F.2d 755, 758 (Fed.Cir.1987) (an advisory opinion is "something a federal court may not give").

6. One district court recently articulated the relevant concern in words strikingly appropriate here: a federal court is not allowed to express an advisory opinion about "the implications of some *possible* future course of action undertaken pursuant to a hypothetical business plan," because if it did "[t]he door would open to unlimited efforts" by companies who want "to obtain an advisory opinion from a federal court in an effort to limit their potential liability" before incurring any costs which might prove to have been wastefully expended should the court find against them. *Joint Stock Soc'y*, 53 F.Supp.2d at 705–706 (emphasis added).

### B.

7. Planet Hollywood seeks a declaratory judgment, pursuant to Fed.R.Civ.P. 57 and 28 U.S.C. §§ 2201 and 2202, that it "may lawfully market casino services, hotel services, and other entertainment-related services under the mark PLANET HOLLYWOOD" (Am.Complt.¶ 38). For its part, Hollywood Casino seeks a declaration that its word mark "Hollywood Casino" is valid and neither generic nor descriptive, and that Planet Hollywood's use of its name for a casino operation would infringe that mark (Am. Counterclaim ¶ 75).

8. In determining whether subject matter jurisdiction exists for these declaratory judgment claims, there are two inqui-

ries that must be made: (1) whether a federal question exists; and (2) if so, whether there exists an "actual controversy." In the trial court, the party seeking the declaratory judgment (which at this point is only Planet Hollywood) has the burden of establishing an actual controversy by a preponderance of the evidence. *Cardinal Chem. Co. v. Morton Int'l, Inc.*, 508 U.S. 83, 95, 113 S.Ct. 1967, 124 L.Ed.2d 1 (1993); *see also Circuit City Stores, Inc. v. Speedy Car-X, Inc.*, 35 U.S.P.Q.2d 1703, 1705 (E.D.Va.1995).

9. Moreover, in a declaratory judgment action, subject matter jurisdiction must exist not only at the time the case is filed, but it must continue to exist as of the date judgment is rendered. *See Steffel v. Thompson*, 415 U.S. 452, 460 n. 10, 94 S.Ct. 1209, 39 L.Ed.2d 505 (1974). In order to ensure that jurisdiction still exists before entering a judgment, "[i]t is proper to consider post-filing events in the evaluation of continuing jurisdiction." *Thomas & Betts Corp. v. Panduit Corp.*, 48 F.Supp.2d 1088, 1094 (N.D.Ill.1999) (*citing Spectronics Corp. v. H.B. Fuller Co.*, 940 F.2d 631, 636 (Fed.Cir.1991)).

10. Although the declaratory judgment claim and counterclaim in this case surely present federal questions, they do not present an "actual controversy." The Court will assume, without deciding, that an "actual controversy" existed at the time this case was filed by Planet Hollywood in July 1996. Subject matter jurisdiction, however, can be lost by post-filing events, and this is a case where that is precisely what has occurred. The evidence establishes that in light of Planet Hollywood's lack of any concrete plans for a casino endeavor, the declaratory judgment claims presently are nothing more than a "theoretical dispute between two companies that may, one day, find themselves competing with one another." *Joint Stock Soc'y*, 53 F.Supp.2d at 705.

### C.

11. In *Maryland Cas. Co. v. Pacific Coal & Oil Co.*, 312 U.S. 270, 61 S.Ct.

510, 85 L.Ed. 826 (1941), the Supreme Court explained that:

> [t]he difference between an abstract question and a "controversy" contemplated by the Declaratory Judgment Act is necessarily one of degree ... [but][b]asically, the question in each case is whether the facts alleged, under all the circumstances, show that there is a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment.

*Id.* at 273, 61 S.Ct. 510. A declaratory judgment action is not justiciable under Article III when the claim involves "contingent future events that may not occur as anticipated, or indeed may not occur at all." *Thomas v. Union Carbide Agric. Prods. Co.*, 473 U.S. 568, 580–81, 105 S.Ct. 3325, 87 L.Ed.2d 409 (1985); *see also Chicago and North Western Transp. Co. v. Soo Line Railroad Co.*, 739 F.Supp. 447, 449 (N.D.Ill.1990). Thus, "ripeness is peculiarly a question of timing." *Thomas*, 473 U.S. at 580, 105 S.Ct. 3325.

■ 12. In a declaratory judgment action involving trademarks, the Seventh Circuit has applied a two-pronged test for determining whether an actual case or controversy exists: (1) whether the defendant's conduct has created a real and reasonable apprehension of liability on the part of the plaintiff; and (2) whether the plaintiff has engaged in a course of conduct which has brought it into adversarial conflict with the defendant. *International Harvester*, 623 F.2d at 1210 (applying test in a patent infringement declaratory action); *G. Heileman Brewing Co., Inc. v. Anheuser–Busch, Inc.*, 873 F.2d 985, 990 (7th Cir.1989) (applying test in trademark case). *See also Starter*, 84 F.3d at 595 (trademark case); *Windsurfing Int'l*, 828 F.2d at 757 (trademark case); *Joint Stock Soc'y*, 53 F.Supp.2d at 702 (trademark case). If either prong of this test is not satisfied, a federal court may not exercise jurisdiction, *Starter*, 84 F.3d at 595, and any opinion the Court might offer would be advisory and beyond its constitutional powers to issue. *Infinitech, Inc. v. Vitrophage, Inc.*, 842 F.Supp. 332 (N.D.Ill.1994).

■ 13. In *International Harvester*, 623 F.2d at 1215, and *G. Heileman*, 873 F.2d at 990, the Seventh Circuit held that to establish an adversarial course of conduct, "the plaintiff must possess the 'apparent ability and definite intention ... to manufacture and sell a product similar to ... defendant's ....'" *Accord Starter*, 84 F.3d at 595–96. The "apparent ability and definite intention" test does not require actual use of the trademark by the plaintiff, but it does require that the plaintiff's interest or desire to use the mark be "sufficiently real." *G. Heileman*, 873 F.2d at 990. What this means is that the plaintiff must be actively preparing to use the mark in such a way that the plaintiff has reached "the last point before the point of no return." *Id.* at 990–91 (*quoting* 6A J. Moore, Moore's Federal Practice ¶ 57.20, at 57–217); *see also Starter*, 84 F.3d at 596. Or, as one appellate court put it, the plaintiff must have engaged in "present activity which could constitute infringement or taken concrete steps with the intent to conduct such activity." *B.P. Chems. Ltd. v. Union Carbide Corp.*, 4 F.3d 975, 978 (Fed.Cir.1993). This requirement is intended to ensure that jurisdiction extends only to those cases where the plaintiff has "a true interest to be protected, rather than a desire for an advisory opinion on whether it would be liable if it initiated some merely contemplated activity." *Infinitech*, 842 F.Supp. at 336 (internal quotations and citations omitted).

■ 14. Applying this standard, the Court concludes that it lacks subject matter jurisdiction over the declaratory judgment claim and counterclaim because Planet Hollywood cannot presently meet the "apparent ability and definite intention prong" of the actual controversy test.[22]

---

22. Although seeking to dismiss all declaratory judgment claims for lack of any actual controversy, Hollywood Casino seemingly concedes

## D.

15. Any concrete plans that Planet Hollywood had in 1996 for a casino in conjunction with ITT have long since fallen by the wayside. The evidence at trial established that Planet Hollywood has not currently taken even the first step (much less the last step) before the "point of no return" for a casino project. Mr. Earl's trial testimony established that Planet Hollywood not only does not know what it would call a casino (Trial Tr. 962), but in truth does not know whether there ever will be one: Mr. Earl conceded that Planet Hollywood is not approved by any regulatory authority to open a casino, and that Planet Hollywood currently has no plans to open a casino "on the drawing board" (Trial Tr. 825). While Planet Hollywood asserts that it recently has charged one of its employees with the responsibility of finding a licensee to use the Planet Hollywood name for a casino, Planet Hollywood has not offered any evidence that it in fact has entered into any licensing agreements with any entity which has the ability or the definite intent to use the "Planet Hollywood" trademark in conjunction with casino businesses—or that Planet Hollywood even has located an entity willing to do so.

16. Nor is Planet Hollywood sufficiently far along in concrete plans for a casino that the Court can answer the basic question of how Planet Hollywood intends to use its mark in the casino business. The Court must be able to determine how the proposed trademark user will utilize its mark before any trademark analysis can begin. In *International Harvester*, 623 F.2d at 1216–17, the Seventh Circuit held that there was no justifiable controversy, and thus vacated a trial court ruling. With respect to "immediate intention and apparent ability" prong, the Seventh Circuit explained that "[o]ur concern is not that the [product] will never be produced, but rather that because of the relatively early stage of its development, the design

that the other element of the two-pronged test ("reasonable apprehension") was satisfied at the time Planet Hollywood filed its declaratory judgment action on July 29, 1996, and "likely still remains satisfied." *See* Hollywood Casino's Motion to Dismiss Declaratory Judgment Claims at 6. However, in its Answer to the Amended Complaint, Hollywood Casino denied that it had "communicated" any demand that Planet Hollywood "abandon their intended expansion to casino and hotel services under its well known PLANET HOLLYWOOD marks" (Answer ¶ 41). The Court interprets this denial to mean that Hollywood Casino claimed, at the time suit was filed, that it had not threatened Planet Hollywood with litigation. It therefore seems odd that Hollywood Casino did not seek to dismiss the Planet Hollywood declaratory judgment action at the time.

While a "reasonable apprehension" may be established by facts other than a specific threat to sue, *International Harvester Co.*, 623 F.2d at 1211, no other such facts were alleged. For instance, an opposition proceeding in the Patent and Trademark Office in response to an application for trademark registration is not sufficient to create a "reasonable apprehension" of suit. *See, e.g., Circuit City Stores, Inc. v. Speedy Car–X, Inc.*, 35 U.S.P.Q.2d 1703, 1705 (E.D.Va.1995). Moreover, the filing of a counterclaim by the declaratory judgment defendant (as Hollywood Casino did here) is not sufficient to create a

"reasonable apprehension," since the question of "whether a justiciable controversy exists is measured by examining the state of affairs at the time the complaint is filed." *G. Heileman*, 873 F.2d at 990. In other words, "[a] plaintiff may not file a complaint, wait for the defendant to respond and then use that response as proof of reasonable apprehension." *Kosmeo Cosmetics, Inc. v. Lancome Parfums et Beaute & Cie.*, 44 U.S.P.Q.2d 1472, 1475 (E.D.Tx.1996) (*citing Spectronics Corp. v. H.B. Fuller Co., Inc.*, 940 F.2d 631, 635 (Fed.Cir.1991) ("later events may not create jurisdiction where none existed at the time of filing")).

The Court thus is puzzled by Hollywood Casino's current assertion that Planet Hollywood had a reasonable apprehension of liability at the time it filed suit. Perhaps despite Hollywood Casino's denial in its answer, in fact there always was an intent by Hollywood Casino to seek to impose liability on Planet Hollywood if it opened a casino—as the last three years of extensive and expensive litigation might suggest. In any event, as with certain other issues in this case, this apparent puzzle need not be resolved: the failure of Planet Hollywood to establish that it currently has an apparent ability and present intention to proceed with a casino operation, without more, divests this Court of jurisdiction over all declaratory judgment claims.

which is before us now may not be the design which is ultimately produced and marketed." 623 F.2d at 1216. The Seventh Circuit reasoned that "[f]or a decision in a case such as this to be anything other than an advisory opinion, the plaintiff must establish that the product presented to the Court is the same product which will be produced if a declaration of non-infringement is obtained." *Id. See also Starter*, 84 F.3d at 597.

17. While *International Harvester* involved a requested declaration of patent non-infringement, we believe this reasoning applies as well to this trademark case. Here, Planet Hollywood cannot tell the Court how the mark would be used in identifying or promoting a casino: or, for that matter, the name of the casino or where it would be located (although Planet Hollywood's vision is to locate a casino in Las Vegas or Atlantic City, we cannot be certain of either venue). Instead, Planet Hollywood asks the Court to "assume" that the name would be "Planet Hollywood Casino" even though Planet Hollywood says that name might not be used—which only further underscores the hypothetical nature of the ruling that Planet Hollywood seeks.

18. Planet Hollywood's post-trial filing for bankruptcy and the reorganization plan proposed by Planet Hollywood further highlight the speculative nature of the declaratory judgment claims. The history of these parties' casino endeavors demonstrates that any effort to establish casinos is fraught with uncertainty—witness the failed efforts of the Sands to establish a casino in Atlantic City (Findings Nos. 75–79), and Planet Hollywood's failure to establish a casino with ITT even after concrete plans had been made and a groundbreaking had occurred (Finding No. 126). The pendency of Planet Hollywood's bankruptcy proceedings only further complicates any efforts by Planet Hollywood to use its name for a casino, and further attenuates the likelihood that will ever occur. As the Court has found, while Planet Hollywood's current condition does not preclude the possibility of a casino in its future, the failure of the reorganization plan to mention any concrete plans for a casino business indicates (at a minimum) that a casino is not on the immediate horizon for Planet Hollywood. Whether Planet Hollywood will emerge from this bankruptcy rejuvenated and successful, whether it will extend into the casino business, and if so, when that might occur, where a casino would be located, and what it would be called, all are questions that cannot be answered now, and that uncertainty renders this case unsuitable for declaratory relief.

19. The Court accepts that Planet Hollywood would like to use its name for casinos, and even assumes that the present uncertainty about its right to do so might complicate matters. But, the Court has not been persuaded by Planet Hollywood that the so-called "cloud" created by this litigation precludes it from entering into the casino business. This same "cloud" existed when Planet Hollywood filed this declaratory judgment action in 1996 (presumably, that is why Planet Hollywood sought declaratory relief at the time), but it did not keep ITT from entering into an arrangement with Planet Hollywood to open a casino. And Planet Hollywood has not claimed that the ITT deal failed due to the so-called cloud. This history suggests that Planet Hollywood's recent inability to find a partner or licensee to forge ahead with a casino is a product of circumstances other than this dispute with Hollywood Casino—such as, for example, Planet Hollywood's precarious financial condition (Findings Nos. 131–33).

20. In so finding, the Court is mindful of recent statements attributed to Mr. Earl that Planet Hollywood does not plan to extend into the casino business "in the near term," as well as Mr. Earl's explanation that while there is no imminent plan to enter into the casino business "tomorrow," Planet Hollywood is actively seeking to extend into casinos and "could" find a partner or licensee willing to do so by early next year. In view of past history, it

is also highly likely that Planet Hollywood "could not" find a licensee or partner next year or any time soon—or that, even after finding a licensee or partner, a planned casino might not be established due to regulatory or other problems. As much as Planet Hollywood might wish otherwise, its desire and intent to open a casino is not enough to establish its ability to do so. This is not a case like *G. Heilman*, in which the Seventh Circuit found subject matter jurisdiction where one declaratory judgment plaintiff began using its mark the day after it filed suit, and the other was marketing product using the mark within a few months. 873 F.2d at 988–89. Here, more than three years after this suit commenced, Planet Hollywood is not closer to—but, indeed, is much further away from—being in a position to have a casino operate under its name.

21. The Court believes that the observation by the Court in *Windsurfing Int'l*, 828 F.2d at 758, is apt here:

> Rather than use the mark, get sued, and fight it out in court, AMF was saying, "we would like to use the mark, but before we do, we want a court to say we may do so safely." Thus, AMF's complaint and counterclaim sought an advisory opinion, something a federal court may not give.

The province of a federal court is not to issue advisory rulings to eliminate clouds that might affect actions that a party would like to (but may never) take. Planet Hollywood's desire to enter the casino business is, at the present time, just that and nothing more: a desire, without any demonstrated present ability to turn the desire into a reality. "[T]his type of mere desire fails to constitute a justiciable case or controversy." *Joint Stock Soc'y*, 53

F.Supp.2d at 705. Accordingly, the Court grants Hollywood Casino's motion to dismiss the declaratory judgment claims (Count VI of the Amended Complaint, and Count IX of the Amended Counterclaim) for lack of subject matter jurisdiction.[23]

### E.

22. Before turning to the claims over which the Court has jurisdiction, we address Planet Hollywood's contention that if the declaratory judgment claims must be dismissed, then the Court should award Planet Hollywood its reasonable costs and attorneys' fees incurred in litigating those claims. Planet Hollywood makes that request pursuant to 28 U.S.C. § 1927, and claims that Hollywood Casino's actions in forcing those claims to be litigated "amount of nothing more than unreasonable and vexatious litigation tactics." The Court rejects that argument for two reasons.

23. *First*, the statutory standards governing relief under Section 1927 do not support Planet Hollywood's request. In *Kotsilieris v. Chalmers*, 966 F.2d 1181, 1184 (7th Cir.1992), the Seventh Circuit held that to be sanctionable under Section 1927, conduct must be unreasonable and vexatious. The Seventh Circuit found that Congress intended the term "vexatiously" to mean something more than "unreasonably," and to require subjective or objective bad faith. 996 F.2d at 1184. Planet Hollywood can scarcely be heard to complain that Hollywood Casino's declaratory judgment counterclaim rises to the level of bad faith, given that it was filed in response to a mirror image declaratory judgment count filed by Planet Hollywood. Nor does Hollywood Casino's motion to

---

**23.** Any and all substantive issues raised with respect to the declaratory judgment claims made by either party will not be *res judicata* in any future proceeding since, without jurisdiction, the Court can make no judgment on the merits of these issues. There will not be any collateral estoppel effect from the litigation of the declaratory judgment issues either, since we are not making any findings with respect to the protectability, *vel non*, of the

"Hollywood Casino" mark or potential infringement. There is no reason this Court's finding of lack of subject matter jurisdiction would preclude the PTO (which is not limited by Article III constraints) from lifting its stay, and now resolving the issue of Planet Hollywood's applications for registration of its mark for casino use and Hollywood Casino's objections to them.

dismiss rise to the level of bad faith, as the Court has found that the motion to dismiss has a basis both in law and in fact. Consequently, there is no Section 1927 basis for awarding fees and costs.

24. *Second,* the Court cannot ignore that Planet Hollywood initiated a declaratory judgment action against Hollywood Casino, and thus put into issue the same basic questions raised by Hollywood Casino in its declaratory counterclaim. If the declaratory judgment claims remained in the case longer than they should have, the responsibility for that rests just as much with Planet Hollywood as with Hollywood Casino. Planet Hollywood has vigorously asserted at all times in this case that the Court possessed jurisdiction to decide the declaratory judgment claims. Although the timing of Hollywood Casino's motion to dismiss understandably has caused Planet Hollywood to raise an eyebrow, the fact remains that the motion presented an issue of subject matter jurisdiction that the Court was obligated to consider—with or without Hollywood Casino filing a motion. Accordingly, the Court denies Planet Hollywood's request for attorneys' fees and costs under 28 U.S.C. § 1927.

## II. TRADEMARK INFRINGEMENT

25. Planet Hollywood's action under Section 43(a) of the Lanham Act is based on alleged infringement of its globe mark, and not its word mark "Planet Hollywood" (*see* Trial Tr. 903). Planet Hollywood claims that Hollywood Casino's word mark "superimposed over a circular design logo in connection with the sale of entertainment services is likely to cause confusion

... as to the origin ... of defendants' services ... in violation of § 43(a)(1) of the Lanham Act, 15 U.S.C. § 1125(a)(1)" (Am. Complt.¶ 27).[24] By contrast, Hollywood Casino's trademark infringement counterclaim under Section 43(a) is not based on alleged infringement of its film strip mark, but rather its word mark and trade name "Hollywood Casino." Hollywood Casino claims infringement has occurred by virtue of Planet Hollywood's present use of its word mark and trade name "Planet Hollywood" in four restaurants located in hotels which also house casino operations (Am. Counterclaim ¶ 47).[25] Such use, according to Hollywood Casino, "represents" that Planet Hollywood is "operating under the sponsorship of or in affiliation with, or under license from, or with the approval of Hollywood Casino" (*Id.* ¶ 34). This association, according to Hollywood Casino, leads to "both reverse confusion and open (or forward) confusion" (Trial Tr. 905).

26. Before addressing the merits of these respective claims, the Court sets forth the legal principles that govern its analysis.

### A.

27. The Lanham Act, 15 U.S.C. § 1051 *et seq.*, "was intended to make 'actionable the deceptive and misleading use of marks' and 'to protect persons engaged in ... commerce against unfair competition.'" *Two Pesos, Inc. v. Taco Cabana, Inc.,* 505 U.S. 763, 767, 112 S.Ct. 2753, 120 L.Ed.2d 615 (1992) (*quoting* 15 U.S.C. § 1127). "In order to be registered, a mark must be capable of distinguishing the

---

**24.** Section 43(a)(1) provides civil liability for any person who:

uses in commerce any word, term, name [or] symbol ... which (A) is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person, or (B) in commercial advertising or promotion, misrepresents the nature, characteristics, qualities, or geographic origin of

his or her ... goods, services, or commercial activities, ....

**25.** To the extent Hollywood Casino's claims incorporate any reference to Planet Hollywood's *future* plans regarding the use of its mark in the casino industry, the Court lacks jurisdiction to reach those claims for the reasons set forth above. Thus, the Court's rulings on the Hollywood Casino infringement claim for past or present conduct are not intended to (and do not) express any views by the Court on possible future uses of the mark by Planet Hollywood in the casino business.

applicant's goods from those of others." *Two Pesos,* 505 U.S. at 768, 112 S.Ct. 2753 (*citing* 15 U.S.C. § 1052). In other words, a mark must be "inherently distinctive" or identify a particular source of origin. *Id.* at 768–69, 112 S.Ct. 2753.

28. "In general, the level of trademark protection available corresponds to the distinctiveness of the mark." *Platinum Home Mortgage Corp. v. Platinum Financial Group, Inc.,* 149 F.3d 722, 727 (7th Cir.1998). "Marks are classified into five categories of increasing distinctiveness: (1) generic, (2) descriptive, (3) suggestive, (4) arbitrary, and (5) fanciful." *Platinum Home Mortgage Corp.,* 149 F.3d at 727 (*citing Two Pesos,* 505 U.S. 763, 767–68, 112 S.Ct. 2753, 120 L.Ed.2d 615 (1992)). At one end of this spectrum lies the generic term, which "is one that is commonly used and does not identify any particular source and, therefore, is not entitled to any trademark protection." *Id.* (*citing Liquid Controls Corp. v. Liquid Control Corp.,* 802 F.2d 934, 936 (7th Cir. 1986)). At the other end of the spectrum lies "terms that are either suggestive, arbitrary, or fanciful[, which] are automatically entitled to trademark protection because they are inherently distinctive." *Id.* (*citing Two Pesos,* 505 U.S. at 767–68, 112 S.Ct. 2753).

29. Resting on this spectrum between automatic protection and non-protection are descriptive marks. "A descriptive mark is one that 'describes the ingredients, qualities, or characteristics of an article of trade or a service' and, generally, it is not protected as a trademark because a merely descriptive mark is a 'poor means of distinguishing one source of services from another.'" *Platinum Home,* 149 F.3d at 727. Although descriptive marks are not inherently distinctive, Section 2 of the Lanham Act provides that a descriptive mark may be registered if it "has become distinctive of the applicant's goods in commerce." *Two Pesos,* 505 U.S. at 769, 112 S.Ct. 2753 (*quoting* 15 U.S.C. §§ 1052(e), (f)). *See also Park 'N Fly, Inc. v. Dollar Park and Fly, Inc.,* 469 U.S.

189, 207, 105 S.Ct. 658, 83 L.Ed.2d 582 (1985). This acquired distinctiveness is referred to as "secondary meaning." *Park 'N Fly,* 469 U.S. at 200, 105 S.Ct. 658 ("a merely descriptive mark cannot be registered unless the Commissioner finds that it has secondary meaning") and 206 ("Section 2 of the Lanham Act plainly prohibits the registration of … a mark unless the applicant proves to the Commissioner of the Patent and Trademark Office that the mark 'has become distinctive of the applicant's goods in commerce,' or … has acquired a 'secondary meaning'"). "[A] descriptive mark may receive trademark protection if it acquires secondary meaning 'in the collective consciousness of the relevant community.'" *Platinum Home,* 149 F.3d at 727 (*citing Mil–Mar Shoe Co., Inc. v. Shonac Corp.,* 75 F.3d 1153, 1157 (7th Cir.1996)) (*citing Gimix, Inc. v. JS & A Group, Inc.,* 699 F.2d 901, 907 (7th Cir.1983)).

30. Secondary meaning is used generally to indicate that a mark or dress "has come through use to be uniquely associated with a specific source.... To establish secondary meaning, a manufacturer must show that, in the minds of the public, the primary significance of a product feature or term is to identify the source of the product rather than the product itself." *Two Pesos,* 505 U.S. at 766 n. 4, 112 S.Ct. 2753 (internal citations omitted). *See also Walt–West Enterprises, Inc. v. Gannett Co., Inc.,* 695 F.2d 1050, 1055–56 (7th Cir.1982). Factors to consider in determining the existence (or not) of secondary meaning include: (1) the amount and manner of advertising; (2) the volume of sales; (3) the length and manner of use; (4) direct consumer testimony; and (5) consumer surveys. *See Gimix,* 699 F.2d at 907. Consumer testimony and consumer surveys are the only direct evidence on this question; the other factors constitute circumstantial evidence. *Id.*

31. Distinctiveness is only one element necessary to establish the right to trademark protection. A trademark own-

er must also show that the mark has been in public use. *See S Indus., Inc. v. Diamond Multimedia Sys., Inc.*, 991 F.Supp. 1012, 1018 (N.D.Ill.1998) ("[t]rademark rights are acquired by adoption and use, not by registration"); *S Indus., Inc. v. Stone Age Equip., Inc.*, 12 F.Supp.2d 796, 805 (N.D.Ill.1998) ("Although registration establishes a rebuttable presumption that the mark was first used on the filing date, ... [s]imply filing an application is not sufficient to create rights in the mark"). Thus, to gain protection under the Lanham Act, one must establish rights "under the common law, which confers ownership on the person who employs the 'first actual use of a mark in a genuine commercial transaction.'" *S Indus.*, 12 F.Supp.2d at 805 (*quoting Allard Enterprises, Inc. v. Advanced Programming Resources, Inc.*, 146 F.3d 350 (6th Cir.1998)). "In short, 'one must win the race to the marketplace.'" *Id.* (*quoting Zazu Designs v. L'Oreal, S.A.*, 979 F.2d 499, 503 (7th Cir. 1992)).

32. "Use" under the common law means that the mark was attached to the product or service sold to the public. *S. Indus.*, 12 F.Supp.2d at 805 (citing cases). "The use must be continuous and bona fide to impart ownership ...." *Id.* (*citing Zazu*, 979 F.2d at 503, 505). "Likewise, the mere intent to use a mark is insufficient." *Id.* The amount of activity sufficient to constitute use is a factual question determined on a case by case basis. *Id.* "The guiding principle is that the activity be 'sufficiently public to identify or distinguish the marked goods in an appropriate segment of the public mind as those of the adopter of the mark.'" *S. Indus.*, 12 F.Supp.2d at 805 (*quoting Blue Bell, Inc. v. Farah Mfg. Co.*, 508 F.2d 1260, 1266 (5th Cir.1975)).

33. If a registered trademark is distinctive and in "use," a party seeking to hold another person liable for infringement of that mark may do so by showing that the other party's mark creates a "likelihood of confusion" in the minds of consumers. Indeed, "the 'keystone' of trademark infringement is likelihood of confusion as to source, affiliation, connection or sponsorship of goods or services among the relevant class of customers and potential customers." *Sands, Taylor & Wood Co. v. Quaker Oats Co. (Sands I)*, 978 F.2d 947, 957 (7th Cir.1992). The Seventh Circuit has determined that the following seven factors are typically important in evaluating the likelihood of confusion in trademark infringement cases: (1) similarity of the marks; (2) similarity of the products or services in issue; (3) area and manner of concurrent use; (4) sophistication of consumers; (5) strength of complainant's mark; (6) actual confusion; and (7) intent of the defendant to palm off its product as that of another. *Forum Corp. of N. Am. v. Forum, Ltd.*, 903 F.2d 434, 439 (7th Cir.1990).

34. Although none of those seven factors alone is dispositive, and the weight accorded to each factor will vary from case to case, *Rust Env. & Infrastructure, Inc. v. Teunissen*, 131 F.3d 1210, 1217 (7th Cir.1997), the Seventh Circuit has indicated that the most important of these factors (in making a likelihood of confusion determination) commonly are similarity of the marks, intent of the claimed infringers and evidence of actual confusion. *G. Heileman*, 873 F.2d at 999. A determination concerning likelihood of confusion is a question of fact, which will be reversed only if clearly erroneous. *Smith Fiberglass Prods., Inc. v. Ameron, Inc.*, 7 F.3d 1327, 1329 (7th Cir.1993). The party claiming infringement bears the burden of proof by a preponderance of the evidence on the elements necessary to establish likelihood of confusion. *Reed–Union Corp. v. Turtle Wax, Inc.*, 77 F.3d 909, 912 (7th Cir.1996); *Hewlett-Packard Co. v. Repeat–O–Type Stencil Mfg. Corp.*, 34 U.S.P.Q.2d 1450, 1453 (N.D.Cal.1995); *Pfizer, Inc. v. Astra Pharm. Prod., Inc.*, 858 F.Supp. 1305, 1328 (S.D.N.Y.1994).

35. Both Planet Hollywood's claim that its design mark is being infringed by Hollywood Casino, and Hollywood Casino's

claim that its word mark "Hollywood Casino" is being infringed by Planet Hollywood, turn on whether there is a likelihood of confusion between the relevant marks. The Court has utilized the seven factors outlined by the Seventh Circuit in determining whether there is likely to be confusion in the minds of consumers when they see the parties' respective marks in the marketplace. Because the Court finds that there is no likelihood of confusion as to the design marks (which are part of the trade mark and the trade dress) or the word marks of the parties, the Court finds that there can be no infringement by either party as a matter of law, and thus the infringement claims of Planet Hollywood and Hollywood Casino both must fail. The Court addresses, in turn, its conclusions with respect to the parties' trademark infringement claims.

## B. PLANET HOLLYWOOD'S CLAIM.

36. The Court finds that upon consideration of the relevant factors, Planet Hollywood has failed to establish any likelihood of confusion stemming from Hollywood Casino's use of its film strip mark.

### 1. *Similarity of the Marks.*

37. Two trademarks may be confusingly similar if they are similar in sound, appearance, meaning or connotation. *Knaack,* 955 F.Supp. at 1000; *Henri's Food Products, Inc. v. Kraft, Inc.,* 717 F.2d 352, 354 (7th Cir.1983). Any memorable feature of the marks should be considered in analyzing likelihood of confusion. *Forum,* 903 F.2d at 440. In determining similarity between the marks, courts must consider the trademark as a whole in light of what occurs in the real world, recognizing that the marks will be confronted separately by consumers in the marketplace, rather than compared sitting side by side on a podium in the courtroom. *Knaack,* 955 F.Supp. at 1000 (*citing James Burrough Ltd. v. Sign of Beefeater, Inc.,* 540 F.2d 266, 275 (7th Cir.1976)).

38. For the reasons explained above (Findings Nos. 38–41), the Court finds that Planet Hollywood's globe mark and Hollywood Casino's film strip mark are not confusingly similar. The marks both share the word "Hollywood," but that word appears in a different sequence and in a different type style on each mark. Although "the dominant portion of the mark is entitled to greater weight in evaluating likelihood of confusion," *Quill Natural Spring Water, Ltd. v. Quill Corp.,* 1994 WL 559237, * 4 (N.D.Ill.), the Court has found that the word "Planet" is not dominant in Planet Hollywood's mark (Findings Nos. 10–11). Moreover, the word combinations in the respective marks do not rhyme or look or sound the same. And, while there are similarities in certain of the graphic aspects of the marks, those similarities are far outweighed by the differences: for example, the circle in the background of the Planet Hollywood mark is clearly a globe of the earth, whereas the Hollywood Casino circular background is more of a disk and not three dimensional; the words are arranged differently across the background in the two marks (the Hollywood Casino words are centered, whereas the Planet Hollywood words are set off and justified at the left); there is a strip of movie film on the Hollywood Casino mark that does not appear in any form on the Planet Hollywood mark; and there is a shooting star on the Planet Hollywood mark that does not appear on the Hollywood Casino mark. The Court finds that the significant differences between the marks make it unlikely that consumers confronting one would mistake it for (or associate it with) the other.

### 2. *Similarity of Products.*

39. The factor of product similarity requires consideration of whether the products or services are of a kind that the public likely would attribute to a single source. *Knaack,* 955 F.Supp. at 1000. There are three potential levels of product similarity: (1) competitive; (2) non-competitive, but related; (3) non-competitive and non-related. *Id.*

40. If companies are not in direct competition, it is harder to show that consumers are likely to be confused by similar terms or marks. *See Knaack*, 955 F.Supp. at 1000 (*citing Exxon Corp. v. Exxene Corp.*, 696 F.2d 544, 548 (7th Cir.1982)). However, even if products or services are not competitive, this factor still may auger in favor of a finding of likely confusion if the products or services are closely "related." *Sands I*, 978 F.2d at 958 (7th Cir. 1992). A closely related product is "one which would reasonably be thought by the buying public to come from the same source, or thought to be affiliated with, connected with, or sponsored by, the trademark owner." *Id.* '(citing 2 J. McCarthy, TRADEMARKS AND UNFAIR COMPETITION § 24:3 (2d ed.1984)). This factor weighs against a finding of likely confusion where the products or services are neither competitive nor related, for the evident reason that consumers would not be likely to believe that the source of one product or service is also the source of the other.

41. Planet Hollywood and Hollywood Casino currently are not direct competitors (*see* Findings Nos. 49–56). The Court rejects the proposition that the parties compete merely because both restaurants and casinos fall under the wide umbrella of the "hospitality" industry. If parties were deemed competitors simply because they are both "entertainment" outlets vying for the discretionary income of consumers, then Planet Hollywood also would be in "competition" with the opera, golf and every other form of entertainment. To accept such a broad definition of "competition" for purposes of trademark infringement analysis would render this factor useless in attempting to determine likelihood of confusion.

42. Nor does the Court find that the parties are competitors merely because Hollywood Casino offers restaurant and bar services as part of its casino operations. As the Court has found, the restaurant services at Hollywood Casino are ancillary to the primary offering there: casino services. Moreover, the restaurants at Hollywood Casino are different from Planet Hollywood in names, price ranges, types of dining offered, and/or themes. And, Planet Hollywood has offered no survey or other consumer evidence that restaurant patrons consider the Hollywood Casino restaurants to be a competitive alternative to dining at a Planet Hollywood restaurant (none of which, as of the time of trial, was closer than 43 miles to a Hollywood Casino).

43. While the parties are not direct competitors, the question remains as to whether consumers would consider the services they offer as "related." Answering this question requires a determination as to whether the buying public would reasonably think that a casino and a restaurant located at least 43 miles apart would be sponsored by the same source or, put another way, whether someone in the restaurant business might be reasonably expected to enter into the casino business. *Carnival Brand Seafood Co. v. Carnival Brands, Inc.*, 187 F.3d 1307, 1310 (11th Cir.1999); *Rodeo Collection, Ltd. v. West Seventh*, 812 F.2d 1215, 1219 (9th Cir. 1987).

44. Planet Hollywood has offered no survey or other consumer evidence as to whether consumers would reasonably expect a theme restaurant to also be in the casino business. There is evidence of at least one "eatertainment" business (Hard Rock Café) going into the casino business, so it would not be unprecedented to think that Planet Hollywood might do so. However, Hard Rock Café is the exception and not the rule: the vast majority of theme restaurants do not later expand into the casino business. So, this one example does not show it would be common or expected for an entity like Planet Hollywood to expand its restaurant chain into the casino business. Although Planet Hollywood has pointed to testimony from Mr. Earl that by late 1991 or early 1992, Planet Hollywood intended to go into the casino business, the subjective intent of Planet

Hollywood does not necessarily equate with what the public would perceive or expect.

45. Based on the evidentiary record before it, the Court finds that the restaurant services offered by Planet Hollywood are not closely related to the casino services offered by Hollywood Casino. Accordingly, the Court concludes that the factor of product similarity does not support a finding of likelihood of confusion.

### 3. Area and Manner of Concurrent Use.

46. The area and manner of concurrent use factor requires the Court to consider whether there is a relationship in use, promotion, distribution or sales between the goods and services of the parties. *Forum Corp.*, 903 F.2d at 442 (7th Cir.1990). The parties' respective lines of business need not be the same, so long as their products or services are the kind the public is likely to attribute to a single source. *Id.* (*citing Int'l Kennel*, 846 F.2d at 1089). It is not necessary that the parties be in direct competition or that their goods and services be identical. *Id.*

47. As of the time of trial and for a number of preceding years, the parties operated in a common geographic market: the Hollywood Casino in Aurora operates in the greater Chicagoland market, where Planet Hollywood also operated two restaurants until both were closed when Planet Hollywood recently filed a petition in bankruptcy. However, there is little relationship between the manner in which Planet Hollywood and Hollywood Casino promote or distribute their respective products and services. One example is the use of merchandise as promotion, which is a substantial part of Planet Hollywood's business but a minor part of Hollywood Casino's business (*e.g.*, Finding No. 114(e)). And, as the Court already has found, Planet Hollywood's current use of its mark is neither competitive nor closely related to Hollywood Casino's use of its mark. Thus, this factor does not support a finding of likelihood of confusion.

### 4. Sophistication of Consumers.

48. Since the likelihood of confusion inquiry considers the likelihood of confusion by the consuming public, courts must consider the level of sophistication of potential purchasers of the products and services in issue. *Forum*, 903 F.2d at 442. Where consumers are sophisticated, deliberate buyers, confusion is less likely than where the consumers are prone to make uninformed, impulse purchases. *Smith Fiberglass Prods., Inc. v. Ameron, Inc.*, 7 F.3d 1327, 1330 (7th Cir.1993); *Rust*, 131 F.3d at 1217.

49. In this case, the people whom Planet Hollywood claims would likely be confused are those who would confront the Hollywood Casino mark and believe it to be connected in some way to Planet Hollywood. Thus, the question of the sophistication of the consumer factor really goes to the degree of care likely to be exercised by consumers in making a decision to frequent a casino. In that regard, the question of "sophistication" is not about the consumers' level of savviness about the ins and outs of gambling, but rather about whether their decision to go spend their money at a particular operation is a deliberate one as opposed to one based on a mere impulse. As the Court has found (Findings Nos. 46–48), people who patronize a casino have made a purposeful decision to do so. Therefore, the Court concludes that this factor does not support a finding of likelihood of confusion between Planet Hollywood's globe mark and the Hollywood Casino film strip mark.

### 5. Strength of the Mark.

50. The strength of a trademark refers to its "distinctiveness ..., or more precisely, its tendency to identify the goods sold under the mark as emanating from a particular ... source." *See Sands I*, 978 F.2d at 959 (*quoting McGregor-Doniger, Inc. v. Drizzle, Inc.*, 599 F.2d 1126, 1131 (2d Cir.1979)). As the Court has found, and as Hollywood Casino has admitted, the Planet Hollywood globe

mark is "extremely famous" and is thus a very strong mark (Finding No. 9).

51. The strength of Planet Hollywood's mark typically would tend to weigh in favor of likelihood of confusion. But it strikes the Court that the extraordinary notoriety of the Planet Hollywood mark in fact may make it less likely that someone would see the Hollywood Casino mark and associate it with Planet Hollywood. That is particularly so in light of the fact that the Hollywood Casino mark is not highly similar to the Planet Hollywood mark, and that the parties are not in competitive or closely related businesses. Just as the weakness of the mark "is of little importance when the conflicting mark is identical and the goods are closely related," *Sands I*, 978 F.2d at 959 (*quoting* 1 J. McCarthy § 11.24 at 505–06), the strength of the mark does not weigh heavily in favor of a finding of likely confusion where (as here) the conflicting mark is not identical and the services are not competitive or closely related. *See generally* 1 J. McCarthy, § 11:24, at 503–506 (strength of mark tends to make confusion more likely only where the marks are similar and/or competitive). The Court therefore finds that this factor weighs only mildly (if at all) in favor of a finding of likely confusion.

### 6. *Actual Confusion.*

52. The Seventh Circuit has identified actual confusion as one of the most significant elements to be considered in determining likelihood of confusion. And understandably so: what better evidence that confusion is likely than proof that it actually has occurred? Thus, while likelihood of confusion "can be proven without any evidence of actual confusion, such evidence, if available, is entitled to substantial weight." *Helene Curtis Indus., Inc. v. Church & Dwight Co., Inc.,* 560 F.2d 1325, 1330 (7th Cir.1977). Actual confusion can be shown by either direct or survey evidence. *Rust,* 131 F.3d at 1218. And, very little proof of actual confusion is necessary to prove likelihood of confusion. *McGraw,* 787 F.2d at 1172.

53. In this case, Planet Hollywood has offered absolutely no evidence of actual confusion. Planet Hollywood has offered no direct evidence that any consumers actually have been confused when confronting the Hollywood Casino 'film strip mark (or, for that matter, any other Hollywood Casino marks). The Court recognizes that it often may be difficult to locate incidents of actual confusion. Thus, one might argue that the Court should not infer that there is no actual confusion from the absence of such evidence, since one could also draw the inference that actual confusion exists but has simply been difficult to ferret out.

54. But here, as the Court has found, Planet Hollywood and Hollywood Casino have coexisted in the greater Chicago area for more than six years without there being a single identified instance of confusion. The Court deems it very significant that over this extended period, Planet Hollywood has been unable to muster any evidence of actual confusion. "[W]here both parties have extensively marketed their products, the absence of actual confusion is highly persuasive evidence that confusion is not likely." *Ohio Art Co. v. Lewis Galoob Toys, Inc.,* 799 F.Supp. 870, 884 (N.D.Ill.1992); *see also Pampered Chef, Ltd. v. Magic Kitchen, Inc.,* 12 F.Supp.2d 785, 795 (N.D.Ill.1998); *FS Services, Inc. v. Custom Farm Services, Inc.,* 325 F.Supp. 153, 162 (N.D.Ill.1970), *aff'd,* 471 F.2d 671 (7th Cir.1972). The significance of the absence of evidence of actual confusion is further heightened here because the parties have actively been litigating these infringement issues for the last three years, thus giving Planet Hollywood ample incentive to uncover evidence of actual confusion.

55. Survey evidence can provide a way of overcoming the failure to prove instances of actual confusion, by taking statistically valid samples and determining whether people would be confused when confronted with the marks. But Planet Hollywood has not offered any survey evidence to

support its claim of likely confusion. Neither has Hollywood Casino and, in this respect, the case resembles *Gimix, Inc. v. JS & A Group, Inc.*, 213 U.S.P.Q. 1005, 1006 (N.D.Ill.1982), *aff'd*, 699 F.2d 901 (7th Cir.1983), where the district court stated that "[n]either side in this case has produced any consumer surveys or other similar evidence. Both sides are at fault for such laxness." *Id.* But because Planet Hollywood has the burden of proof on its infringement claim, that failure of proof must count against Planet Hollywood on this part of the case.

56. Planet Hollywood protests that survey evidence is not invariably needed to establish a claim of infringement. True enough: but courts frequently have recognized that in the absence of proof of actual instances of confusion it can be difficult to prove likelihood of confusion without survey evidence. *See, e.g., Hubbard Feeds, Inc. v. Animal Feed Supplement, Inc.*, 182 F.3d 598, 603 (8th Cir.1999) (plaintiff's "failure to present evidence of consumer confusion owing to [defendant's] allegedly infringing conduct is telling"); *Mushroom Makers, Inc. v. R.G. Barry Corp.*, 441 F.Supp. 1220, 1231 (S.D.N.Y.1977) (same). This Court does not go so far, as have some courts, as to draw the negative inference that the trademark holder failed to offer survey evidence because such evidence would have been unfavorable to its claim. *E.g., Eagle Snacks, Inc. v. Nabisco Brands, Inc.*, 625 F.Supp. 571, 583 (D.N.J. 1985) ("[f]ailure of a trademark owner to run a survey to support its claims of brand significance and/or likelihood of confusion, where it has the financial means of doing so, may give rise to the inference that the contents of the survey would be unfavorable, and may result in the court denying relief"). However, the Court finds that Planet Hollywood's failure to offer evidence of actual confusion—either directly or through a survey—demonstrates a failure of proof by Planet Hollywood on the important element of actual confusion. *Badger Meter*, 13 F.3d at 1153. The complete absence of proof of any actual confusion (especially when coupled with marks

that are not dead-on similar and, as we will see below, a failure to prove intent to copy) is a serious blow to Planet Hollywood's infringement claim.

### 7. *Intent.*

 57. Intent to "palm off" requires a determination that the alleged infringer intentionally appropriated the goodwill of the trademark owner for its own use. If a court finds intent (*i.e.*, deliberate imitation of a mark), this factor weighs heavily in favor of finding likelihood of confusion. *See, e.g., Rust*, 131 F.3d at 1219; *Computer Care v. Service Systems Enter., Inc.*, 982 F.2d 1063, 1070 (7th Cir.1992).

 58. Planet Hollywood makes a claim of "encroaching infringement," alleging that Hollywood Casino has progressively made its mark look more and more like the Planet Hollywood mark over time. The Court has carefully considered this and other evidence offered by Planet Hollywood on the issue of intent. While the Court agrees that this evidence raises some questions, the Court finds that Hollywood Casino has adequately answered those questions (*see* Findings Nos. 42–43). In particular, the Court finds credible the testimony of Mr. Bocchicchio, who designed the film strip mark, that the genesis of his idea for trademark did not come from Planet Hollywood. The Court finds Planet Hollywood has not established intent to copy by Hollywood Casino, and this factor therefore does not support a finding of likelihood of confusion.

\* \* \* \* \* \*

 59. In sum, taking all of these factors together, the Court finds that Planet Hollywood has failed to prove likelihood of confusion from Hollywood Casino's use of its film strip mark. None of the three factors the Seventh Circuit has frequently singled out as most important supports a finding of likely confusion: the marks are not highly similar, there is no actual confusion, and Planet Hollywood has not established intent. Likewise, other factors also

fail to support Planet Hollywood's claim: Hollywood Casino is not in a competitive or closely related business, and the casino customers are sophisticated (at least in the way that matters for this analysis). While there is some overlap in the area and manner of use, it is not extensive. And, while the Planet Hollywood mark is strong, for the reasons explained above, that factor does not materially assist Planet Hollywood's claim given the other facts of this case.

60. Having failed to prove the essential element of likelihood of confusion, Planet Hollywood has failed to prove its claim of infringement. Accordingly, the Court hereby enters judgment for defendants and against plaintiffs on Count I of the Amended Complaint.[26]

## C. HOLLYWOOD CASINO'S CLAIM.

■ 61. We now turn to Hollywood Casino's claim that Planet Hollywood has infringed Hollywood Casino's word mark "Hollywood Casino" by using the Planet Hollywood word mark in four restaurants located in hotels that also house casino operations. Before doing so, however, the Court addresses Hollywood Casino's request that the Court allow it to drop this claim from the case without reaching the merits.

62. After trial and the submission of proposed findings of fact, Hollywood Casino filed a motion (doc. # 181–1) styled as a request to conform the pleadings to the evidence under Federal Rule of Civil Procedure 15(b). What Hollywood Casino seeks by that motion is to have the Court excise from the pleadings the infringement claim in Counts I and II of the Amended Counterclaim, as well as the other claims filed by Hollywood Casino in Counts III through VIII, which are based on Planet Hollywood's past and current uses of its word mark "Planet Hollywood." Planet Hollywood resists the motion, asserting that the Court should not let Hollywood Casino off the hook by declining to reach the merits (but that any withdrawal of those claims should be sanctioned with an award under 28 U.S.C. § 1927 for fees and costs incurred in defending those claims).

63. The Court will not speculate as to Hollywood Casino's motivation in filing this belated motion to eliminate the non-declaratory claims from its Amended Counterclaim (and thus, effectively, to eliminate its Amended Counterclaim from the case), or about Planet Hollywood's motivation in opposing this motion.[27] What matters is that at this advanced stage of the proceedings, fairness dictates that a judgment be entered on the merits of Counts I through VIII of the Amended Counterclaim.

64. Federal Rule of Civil Procedure 15(b) provides, in relevant part, as follows:

When issues not raised by the pleadings are tried by express or implied consent of the parties, they shall be treated in all respects as if they had been raised in the pleadings. Such amendment of the pleadings as may be necessary to cause them to conform to the evidence and to raise these issues may be made upon motion of any party at any time, even after judgment; ...

---

**26.** Because the Court's findings and conclusions concerning likely confusion resolve the claim in Count I, the Court need not—and does not—reach other defenses raised by Hollywood Casino to those claims.

**27.** On the surface, the reason for Planet Hollywood's opposition might appear obvious: Planet Hollywood thinks that Hollywood Casino has utterly failed to prove these claims, and would rather have a binding judgment entered than an involuntary dismissal. But if that were the case, Planet Hollywood would continue to resist Hollywood Casino's motion whatever the outcome of the separate motion to dismiss all the declaratory judgment claims—but that is not the case. During a hearing on October 25, 1999, Planet Hollywood indicated that it would not oppose Hollywood Casino's motion to drop Counts I through VIII from Hollywood Casino's Amended Counterclaim if the Court were to find that it had subject matter jurisdiction over Count IX (the declaratory judgment claim) of the Amended Counterclaim and Planet Hollywood's declaratory judgment claim in Count VI of the Amended Complaint (10/25/99 Tr. 14–15).

"It is well-settled that '[i]n determining whether to permit any amendment under Fed.R.Civ.P. 15(b), the district court has broad discretion and will not be reversed except upon a showing of abuse.'" *Sunstream Jet Express, Inc. v. International Air Serv. Co., Ltd.*, 734 F.2d 1258, 1272 (7th Cir.1984) *(quoting Nielson v. Armstrong Rubber Co.*, 570 F.2d 272, 276 (8th Cir.1978)).

65. Rule 15 contemplates that amendments to conform to the evidence will typically seek to *add* issues to the pleadings, not delete them. In *Sunstream Jet Express*, the Seventh Circuit observed that "the most common reason for amending a complaint after the evidence has been presented at trial is to add issues and thereby conform the pleadings to the evidence." 734 F.2d at 1271. The Seventh Circuit made clear that "only on a rare occasion would a plaintiff fail to introduce any evidence in support of his requested relief, and then wait until all the evidence had been submitted before moving to delete the requested relief from the complaint to conform the pleadings to the evidence." *Id.* It is even more rare for such a belated request to be granted.

66. Hollywood Casino seeks to remove Counts I through VIII from its Amended Counterclaim on the sole stated basis that there is no evidence to support its claims based on Planet Hollywood's operation of four restaurants in hotels that also house casinos. However, if Hollywood Casino lacked evidence to support those claims, then it should have moved before trial to delete those claims by a motion to amend under Federal Rule of Civil Procedure 15(a). *Sunstream Jet Express*, 734 F.2d at 1271 and n. 11. Hollywood Casino had plenty of time to do so: Hollywood Casino's motion asserts that Hollywood Casino knew of the weakness of those claims by at least May 1998 (Hollywood Casino's Mem., 10/21/99, at 4).[28] Because Hollywood Casino failed to act sooner, Planet Hollywood was required to prepare to defend those claims, and in fact submitted several proposed findings after trial relevant to those claims (*see* Planet Hollywood's Proposed Findings of Fact, at 12–13, ¶¶ 56–64). In a similar situation, the court in *Holley v. Outboard Marine Corp.*, 241 F.Supp. 657, 669 (N.D.Ill.1964), denied a motion by defendant to delete certain claims from its defense after trial on the ground that they had not been supported by proof. The district court found that "defendant[s] should not be relieved of the onus of its well-conceived strategy by the simple expedient of making a tardy amendment after trial." *Id.* Having injected those claims into the case and allowing them to remain there for an extended period of time, Hollywood Casino cannot now avoid a ruling on the merits and thereby preserve for itself an opportunity to relitigate those claims from scratch at some time in the future.[29]

67. Accordingly, the Court denies Hollywood Casino's motion to conform the pleadings to the evidence (doc. # 181–1). Having resolved that preliminary matter, the Court now discusses of the merits of

---

**28.** Planet Hollywood says Hollywood Casino knew those counterclaims were meritless even before leave to file them was granted on April 1, 1998, because the testimony of Mr. Leonard admitting the problems of proof in May 1998 was based on his visit to one particular Planet Hollywood in February 1998— before leave to amend the counterclaim was sought or granted (Planet Hollywood's Reply, 11/30/99, at 3–4). However, the Court need not address that question further, as Planet Hollywood's conditional request for fees and costs is moot in light of the Court's decision to deny Hollywood Casino's motion.

**29.** Hollywood Casino suggests that in fact it already waived these claims prior to trial, by stating at a pretrial conference on June 1, 1999, that Hollywood Casino had no "damages" on these counterclaims (6/1/99 Tr. at 46). However, that statement was in response to a question as to whether the bench trial would be bifurcated as to liability and damages issues, and not whether Hollywood Casino was abandoning those claims altogether. Again, the Court emphasizes that if Hollywood Casino wished to formally abandon those claims, it could have sought leave to do so by way of a motion under Fed.R.Civ.P. 15(a) prior to trial—a step that Hollywood Casino did not take.

Hollywood Casino's infringement claims in Counts I and II of the Amended Counterclaim. A brief discussion is all that is required because, as Hollywood Casino's motion concedes, Hollywood Casino has failed to offer evidence sufficient to prove those claims of infringement. The Court's independent review of the evidence convinces the Court that Hollywood Casino's concession is fully warranted:

■ A. As the Court has previously found (Finding No. 38), the word marks "Planet Hollywood" and "Hollywood Casino" are not confusingly similar.

■ B. The products and services offered by the parties are not competitive or closely related. Although the Planet Hollywood restaurants that are the target of the infringement claims in Counts I and II of the Amended Counterclaim are located in hotels that also house casinos, those casinos are not operated under Planet Hollywood's name, and the Planet Hollywood mark has not been used to promote or identify those casino services (Finding No. 125).

■ C. With respect to the area and manner of concurrent use, the Planet Hollywood restaurants that are the subject of the infringement counterclaim are located in Las Vegas, Reno, and Lake Tahoe, Nevada, and in Atlantic City, New Jersey. Those locations all are remote from the Hollywood Casino facilities in Aurora and Tunica, which as the Court has found, appeal principally to a local or regional—and not national—market (Findings Nos. 57–66).

■ D. As the Court has previously found (Findings Nos. 46–48), customers who frequent casinos are likely to have made a deliberative decision to do so. Thus, the individuals who patronize the casinos located in hotels that also house Planet Hollywood restaurants are "sophisticated" for purposes of the likelihood of confusion analysis.

■ E. The Court finds that any strength which the "Hollywood Casino" mark might possess is limited to the locales or (at best) regions in which the Tunica and Aurora facilities operate. The Court finds that any strength that mark might possess does not extend to Nevada and New Jersey, where the Planet Hollywood restaurants that are the subject of the Amended Counterclaim are located (*see, e.g.,* Finding No. 66).

F. Hollywood Casino concedes that there is no evidence of any actual confusion between any Hollywood Casino facilities and the four Planet Hollywood restaurants that are the subject of the amended counterclaim—a fact which the Court finds has somewhat more significance because those restaurants operate in or near a casino environment (Finding No. 120). And, Hollywood Casino concedes that there is no evidence of intent by Planet Hollywood to copy the Hollywood Casino name.

■ 68. Consideration of these factors demonstrates that Hollywood Casino has fallen far short of establishing likelihood of any confusion—whether of the "reverse" or "forward" variety.[30] Based on Hollywood Casino's failure to establish this prerequisite to a claim of infringement, the Court enters judgment in favor of counterdefendants and against counterplaintiffs on Counts I and II of the Amended Counterclaim.[31] As a result, the Court also enters judgment for counterdefendants and

---

**30.** Hollywood Casino argues that the Planet Hollywood mark caused "reverse" confusion in the past (people associating Hollywood Casino with Planet Hollywood) because of the past strength of the Planet Hollywood mark, but currently causes "forward" confusion (people associating Planet Hollywood with Hollywood Casino) because Hollywood Casino has become more ascendant and Planet Hollywood has fallen on hard times. Hollywood Casino's recent assertion of both theo-

ries is a change in position from that taken in the summary judgment papers, in which it asserted only reverse confusion. But whether Hollywood Casino argues forward or reverse confusion or both is of no great moment, since the Court finds that *no* confusion is likely.

**31.** Because the Court has resolved the infringement counterclaims against Hollywood Casino for failure to establish likelihood of

against counterplaintiffs on the other counts in the Amended Counterclaim that also require that Hollywood Casino establish likelihood of confusion: the counts alleging common law unfair competition (Count III) and violation of the Illinois Consumer Fraud and Deceptive Business Practices Act (Count V).[32]

## III. TRADE DRESS INFRINGEMENT

69. Section 43(a)(1) of the Lanham Act, 15 U.S.C. § 1125(a)(1), has been construed to protect not only the trademark of an intellectual property owner, but also the owner's trade dress. Trade dress refers to the "total image of a product, including features such as size, shape, color or color combinations, texture, graphics or even particular sales techniques." *Syndicate Sales, Inc.*, 192 F.3d 633, 52 U.S.P.Q.2d at 1037 (internal quotations omitted). *See also Kohler Co. v. Moen Inc.*, 12 F.3d 632, 641 n. 11 (7th Cir.1993); *Dorr–Oliver, Inc. v. Fluid–Quip, Inc.*, 94 F.3d 376, 379 (7th Cir.1996).

70. To establish protection for trade dress, a plaintiff must show that the dress is "inherently distinctive," that is to say, that the trade dress claimed is a source identifier or has acquired distinctiveness through "secondary meaning." *See Two Pesos*, 505 U.S. at 769, 112 S.Ct. 2753. "In determining whether a trade dress is distinctive, the court considers the product's overall appearance; '[d]issecting a product or package into components can cause a court to miss an overall similarity.'" *August Storck K.G. v. Nabisco, Inc.*, 59 F.3d 616, 620 (7th Cir.1995).

71. Trade dress is inherently distinctive if it is suggestive, arbitrary or fanciful; the intrinsic nature of such trade dress serves to identify the source of the product. *Two Pesos*, 505 U.S. at 768, 112 S.Ct. 2753. Generic trade dress, like a generic trademark, is not protectable. *Id.* Descriptive marks or dress may become protectable if they acquire secondary meaning, or become distinctive of the applicant's goods in commerce. *Id.* at 769, 112 S.Ct. 2753. "Secondary meaning may be established through longstanding, exclusive, and continuous use, coupled with massive sales and advertising." *See Vaughan Mfg. Co. v. Brikam Int'l, Inc.*, 814 F.2d 346, 348 (7th Cir.1987); *Thomas Betts II*, 138 F.3d at 295 (five years of exclusive use of trade dress "weighs strongly in favor of secondary meaning").

72. To establish a claim of trade dress infringement, a plaintiff must establish the following elements: "(1) that its trade dress has either acquired secondary meaning or is inherently distinctive and (2) that the similarity of the defendant's trade dress to that of the plaintiff causes a likelihood of consumer confusion as to the source or affiliation of the products." *Dorr–Oliver, Inc.*, 94 F.3d at 380. Thus, as with a claim of trademark infringement, a *sine qua non* of trade dress infringement is likelihood of confusion. And, the seven considerations outlined by the Seventh Circuit in assessing likelihood of confusion in a trademark claim apply with equal force to a claim of trade dress infringement. *Id.* at 381. The burden of proof is in the party claiming trade dress infringement—here, Planet Hollywood.[33]

confusion, the Court does not address—and expresses no view on—other defenses raised by Planet Hollywood to those counterclaims, including that the Hollywood Casino mark is not protectable at all because it is generic or at best merely descriptive (*see* Finding No. 66 n. 14).

**32.** As for Hollywood Casino's claim asserted under the Nevada Deceptive Trade Practices Act, there is a threshold question of Hollywood Casino's standing to assert it. In *Rebel Oil Co., Inc. v. Atlantic Richfield Co.*, 828 F.Supp. 794, 797 (D.Nev.1991), the district court held that the Nevada Act permitted suits only on behalf of victims of consumer fraud. Hollywood Casino does not fit the description of a "victim" here. Moreover, Hollywood Casino has failed to prove a likelihood of confusion, and has conceded a lack of any damages. For all these reasons, the Court also enters judgment for counterdefendants and against counterplaintiffs on Count VIII of the Amended Counterclaim.

**33.** Hollywood Casino does not allege that Planet Hollywood has infringed Hollywood Casino's trade dress.

In addition, even if the plaintiff meets its burden on these two issues, it cannot prevail if the plaintiff's trade dress is functional. *Id.*

73. Planet Hollywood asserts that its trade dress is not functional, is inherently distinctive and has developed a secondary meaning among the public by reason of its extensive use, promotion and advertising (Am.Complt.¶ 16–17). Planet Hollywood claims that Hollywood Casino uses Hollywood or movie-related memorabilia in an entertainment-related establishment in a fashion that is confusingly similar to Planet Hollywood's trade dress (Am.Complt. ¶¶ 18–21, 24). Planet Hollywood further claims that Hollywood Casino's film strip mark and use of Hollywood memorabilia infringes Planet Hollywood's trade dress (Am.Complt.¶ 16, 18–19, 21, 27).

74. Hollywood Casino asserts three defenses to Planet Hollywood's trade dress claim: (1) Planet Hollywood's trade dress is not protectable because it is "functional" and, under the 1999 Trademark Amendments Act, Planet Hollywood has the burden of proving the nonfunctionality of trade dress elements for which it asserts protection—a burden Hollywood Casino argues has not been satisfied on the present record; (2) even if Planet Hollywood's trade dress is protectable, there cannot be any infringement because Hollywood Casino has priority of use for the allegedly infringing elements of Hollywood Casino's trade dress; and (3) even if Planet Hollywood's trade dress is protectable and there is no priority of use by Hollywood Casino with respect to the allegedly infringing elements, there is no infringement because there is no likelihood of confusion.

75. The Court has considered at length the question of whether Planet Hollywood has a protectable trade dress (and if so, what it is), and has found that certain elements of Planet Hollywood's presentation do combine to create a look and feel that is distinctive to Planet Hollywood

(Findings Nos. 14–22).[34] However, the Court finds that Planet Hollywood has failed to establish a likelihood of confusion with respect to its trade dress, and therefore concludes that Planet Hollywood has failed to establish its claim of trade dress infringement.

### A. *Similarity of Trade Dress.*

76. If customers are likely to be confused as to the source of the products due to similarity in the products' appearance, then the likelihood of confusion factor is satisfied. *Brookfield Communications, Inc. v. West Coast Entertainment Corp.*, 174 F.3d 1036, 1053 (9th Cir.1999). Professor McCarthy, the often-cited commentator on trademark law, indicates that the issue of similarity with respect to trade dress "is not whether defendant's package or trade dress is identical to the plaintiff's in each and every particular. Rather, it is the similarity of the *total,* overall impression that is to be tested." McCarthy On Trademarks And Unfair Competition, at § 8.2 (4th ed.1998) (hereinafter "McCarthy, at ____"). The Seventh Circuit has recently reaffirmed that trade dress refers to the "total image of a product." *Syndicate Sales, Inc.,* 192 F.3d 633, 52 U.S.P.Q.2d at 1037; *see also August Storck K. G.,* 59 F.3d at 620.

77. The trade dress analysis is thus a qualitative rather than a quantitative one. At the same time, while the total image created by a trade dress may be more than the sum of its constituent parts, it remains essential to identify the specific elements of the trade dress with particularity. Only when a list of the specific elements of a trade dress is produced "can the court and the parties coherently define exactly what the trade dress consists of and determine whether that trade dress is valid and if what the accused is doing is an infringement." *See* McCarthy at § 8.3. A general claim of trade dress infringement, without

---

**34.** The Court has specifically found that certain other claimed elements are not part of the trade dress, and that Planet Hollywood

has abandoned its claim that several additional items are part of its trade dress (Finding No. 23 and n.7).

particulars, "may well leave the defendant uncertain as to what to do to avoid a charge of contempt and create dangers of anti-competitive overprotection." *Id.* at § 8–9. Specificity also is necessary because "imprecision and vagueness [in the alleged trade dress] is unfair to the party accused of infringement who is forced to defend against an amorphous claim of exclusivity which is of uncertain and indeterminate dimensions." *Id.* The Court must consider not only the general labels used to identify each element of trade dress, but must also consider the specific manner in which each element is implemented.

78. Before discussing the degree of similarity between Hollywood Casino's appearance and the trade dress of Planet Hollywood, the Court addresses Hollywood Casino's argument that it has established priority of use. Although Hollywood Casino concedes it did not open a casino operation offering a Hollywood theme until the Aurora facility opened in June 1993, Hollywood Casino claims priority by virtue of the activities of the Pratts in the 1980s in displaying the 100 Years of Hollywood and Universal Studios Exhibits at the Sands, and in attempting to establish a Hollywood-themed casino in Atlantic City. As the Court has found (Findings Nos. 81–82), those activities were insufficient to create an association in the public's mind between any particular "Hollywood" trade dress and Hollywood Casino's services.

79. That is fatal to Hollywood Casino's claim of priority. Even accepting that Hollywood Casino would be able to "tack on" to a prior trade dress established by the Sands (since both trace back in ownership to the Pratt family), it remains the case that "ownership of trademark or trade dress rights in the United States is obtained by actual use...." *Buti v. Impressa Perosa, S.R.I.*, 935 F.Supp. 458, 467 (S.D.N.Y.1996)(*quoting* McCarthy, at § 16.01[1] (3d ed.1996)). The short term and temporary displays at the Sands in 1987 and 1988 were not sufficient to establish that use. And, even if proof of adver-

tising and news coverage theoretically could suffice to establish the kind of association necessary for priority, *see T.A.B. Systems v. Pactel Teletrac*, 77 F.3d 1372, 1375 (Fed.Cir.1996), the Court has found that the promotion and coverage concerning the failed effort of the Sands to establish a casino in Atlantic City were not sufficient to create that association. The standard for "tacking on" to an earlier trademark or trade dress is "exceedingly strict." *Brookfield Communications, Inc.*, 174 F.3d at 1048. The marks or trade dress in issue "must create the same continuing commercial impression, and the later mark should not materially differ from or alter the character of the mark attempted to be tacked." *Id.* Here, the Court has found that the prior efforts of the Pratts in the 1980s failed to create a public association between the particulars of any trade dress and casino services they offered or sought to offer; hence, there is no prior trade dress for Hollywood Casino to "tack on" to in order to establish priority. The Court therefore rejects the assertion that Hollywood Casino has priority of trade dress over Planet Hollywood.

80. However, based on the evidence presented and the site visits conducted by the Court, we conclude that there is not a high degree of similarity between the Planet Hollywood trade dress and the look and feel of Hollywood Casino. As the Court has previously found, many of the elements of Planet Hollywood's trade dress are not found at Hollywood Casino: the celebrity ownership emphasis, the dioramas, the celebrity handprints, the use of the three themed areas, and the globe trademark. Other broadly-described elements of the Planet Hollywood trade dress may be found at Hollywood Casino, but implemented in a way that is not confusingly similar to Planet Hollywood. Like Planet Hollywood, Hollywood Casino displays film clips on monitors: but the types of film displayed and the purpose for it are entirely different. Like Planet Hollywood, Hollywood Casino dis-

plays memorabilia: but the mix of memorabilia is different, as is the manner of display.[35] Hollywood Casino has an art deco decor, but not one that is so similar to that of Planet Hollywood as to likely be confusing. The Court finds that the differences in the particular elements (and their implementation) result in Hollywood Casino having a total image that is not confusingly similar to that of Planet Hollywood.

81. The only way that Hollywood Casino's "total image" could be considered confusingly similar to that of Planet Hollywood is if the Court were willing to allow Planet Hollywood to broadly claim a trade dress more generally for a "Hollywood theme," which we decline to do. Planet Hollywood is not entitled to exclusive use of concepts as general as a "Hollywood theme" or "art deco appearance," which may be executed in a myriad of ways. Planet Hollywood is entitled to seek to protect its own distinctive blend and manner of implementing these elements. But focusing on the specifics of the trade dress as well as the "total image," as the Court must do, leads to the conclusion that Hollywood Casino's "total image" is not confusingly similar.

B. *Similarity of Products; Area and Manner of Concurrent Use; Sophistication of Consumers.*

82. The Court's analysis of these factors is the same for Planet Hollywood's trade dress infringement claim as it is for Planet Hollywood's trademark infringement claim (*see* Conclusions Nos. 39–49). These factors do not militate in favor of a finding of likelihood of confusion.

C. *Strength of Trade Dress.*

83. The Court already has found that Planet Hollywood's trade dress is a strong signifier of source (Finding No. 29). The Court is not persuaded by Holly-

wood Casino's argument that the Planet Hollywood trade dress is functional, and thus not protected. The Seventh Circuit has held that a " 'feature is functional if it is one that is costly to design around or to do without, rather than one that is costly to have.' " *Thomas & Betts II,* 138 F.3d at 297 (*quoting Schwinn Bicycle Co. v. Ross Bicycles, Inc.,* 870 F.2d 1176, 1189 (7th Cir.1989)). In explaining that test further, the Seventh Circuit stated that to be functional, the trade dress must be "necessary to afford a competitor the means to compete effectively" ' *id.* (internal quotations omitted); that is to say, the trade dress must be of the type "that would be found in all or most brands of the product even if no producer had any desire to have his brand mistaken for that of another producer." *Id.* at 298.

84. The Court finds that irrespective of who bears the burden of proof on the functionality question, under the standards announced by the Seventh Circuit the evidence here establishes that the Planet Hollywood trade dress—as the Court has found it to be (Findings Nos. 14–22)—is not functional. Hollywood Casino correctly asserts that Planet Hollywood cannot appropriate for its exclusive use something so general as a "Hollywood theme," and thus bar other businesses from using that theme. To use the analogy offered by the Seventh Circuit, "the first company to make an airplane cannot use the characteristic shape of an airplane as its trademark, thereby condemning its rivals to build airplanes that won't fly." *Thomas & Betts II,* 138 F.3d at 298 (internal quotations omitted). But as the we have made clear, the Court finds that Planet Hollywood's trade dress is not simply a general "Hollywood theme," but lies in the specific manner in which that theme is implemented. The specific details of

---

**35.** As the Court has found, the fact Hollywood Casino displays memorabilia from the movies of celebrity owners of Planet Hollywood does not dictate a different conclusion (*e.g.,* Findings Nos. 89–91, 94). Quantitatively, those memorabilia are a relatively small percentage of the memorabilia on display at Hollywood Casino; qualitatively, the memorabilia from movies of the celebrity by owners are dispersed throughout Hollywood Casino in a way that does not emphasize those stars over others.

Planet Hollywood's trade dress are what create the overall image that is distinctive to Planet Hollywood, and those specific details do not fit the definition of functionality. They are not "necessary" in order for Hollywood Casino or others to promote a Hollywood theme, nor "costly to design around or do without": to the contrary, it would require cost and effort to replicate the distinctive details of the Planet Hollywood trade dress.

85. Before moving on, however, we address Hollywood Casino's argument that Planet Hollywood is judicially estopped from asserting that it has any protectable trade dress. The function of judicial estoppel is to protect the integrity of the judicial process and protect the legal system against "chameleonic litigants." *Smith v. Dovenmuehle Mortgage., Inc.,* 859 F.Supp. at 1141 (N.D.Ill.1994). "The principle is that if you prevail in Suit # 1 by representing that A is true, [then] you are stuck with A in all later litigation growing out of the same events." *Astor Chauffeured Limousine Co. v. Runnfeldt Inv. Corp.,* 910 F.2d 1540, 1547 (7th Cir. 1990). Judicial estoppel is to be applied where "intentional self-contradiction is being used as a means of gaining unfair advantage ...." *Medcom Holding Co. v. Baxter Travenol Labs. Inc.,* 106 F.3d 1388, 1396 (7th Cir.1997). At the same time, the doctrine must be applied with caution "to avoid impinging on the truth seeking function of the court ... [and] cannot apply without some decision or admission" as to whether a party actually engaged in alleged misconduct. *Levinson v. U.S.,* 969 F.2d 260, 264–65 (7th Cir.), *cert. denied,* 506 U.S. 989, 113 S.Ct. 505, 121 L.Ed.2d 441 (1992) (*quoting Teledyne Indus., Inc. v. NLRB,* 911 F.2d 1214, 1218–19 (6th Cir.1990)).

86. Courts have recognized that a party asserting judicial estoppel must prove that: (1) the later position is clearly inconsistent with the earlier position; (2) the particular facts at issue are the same in both cases; and (3) the party to be estopped convinced the first court to adopt its position. *Levinson,* 969 F.2d at 264. The Seventh Circuit has just reaffirmed this last point, explaining that judicial estoppel "prevents a party from adopting a position in a legal proceeding contrary to a position successfully argued earlier by that party in a legal proceeding." *Feldman v. American Memorial Life Ins. Co.,* 196 F.3d 783, 789–90 (7th Cir.1999). Thus, the party sought to be estopped must have obtained a favorable result in the earlier litigation on the basis of a contention that the party is repudiating in the current litigation. *See McNamara v. City of Chicago,* 138 F.3d 1219, 1225 (7th Cir. 1998) (*citing Kale v. Obuchowski,* 985 F.2d 360, 361–62 (7th Cir.1993)). That favorable result may be by either litigation to final judgment or by a favorable settlement: "[p]ersons who triumph by inducing their opponents to surrender have 'prevailed' as surely as persons who induce the judge to grant summary judgment." *Kale,* 985 F.2d at 362.

87. Hollywood Casino seeks to apply judicial estoppel here, on the ground that the assertions made by Planet Hollywood in defending the trade dress infringement claim brought by Hard Rock Café are diametrically opposed to the assertions Planet Hollywood now makes in advancing its trade dress claim against Hollywood Casino. The Court agrees that some of the assertions made by Planet Hollywood in defending that lawsuit do not rest comfortably with the positions Planet Hollywood now asserts in prosecuting its trade dress claim in this lawsuit. However, Hollywood Casino has failed to prove that Planet Hollywood prevailed on those trade dress assertions in the Hard Rock Café litigation. Planet Hollywood's motion to dismiss the trade dress claim was denied, and while Hollywood Casino broadly asserts that Planet Hollywood obtained a favorable settlement, neither party has offered into evidence a copy of the settlement agreement or proof of its terms. Thus, the Court does not make any find-

ings (or draw any conclusions) as to whether the settlement agreement contains any admissions which would indicate that either party prevailed on the trade dress argument.

88. Hollywood Casino invites the Court to infer that Planet Hollywood "succeeded" because Planet Hollywood continues to use its trade dress that was being challenged in the Hard Rock litigation. That is one possible inference—but not the only one. Without knowing the details of the settlement (including, for example, what Planet Hollywood gave up, if anything, as a condition of continued use of its trade dress), the Court declines to declare Planet Hollywood the winner of that lawsuit. Therefore, the Court finds that there can be no defense of judicial estoppel to Planet Hollywood's trade dress infringement claim.

### D. *Actual Confusion.*

89. As on the trademark infringement claim, Planet Hollywood has failed to support its trade dress claim with any evidence of actual confusion, either by direct or survey evidence. For the reasons stated in its discussion of the trademark infringement claim (Conclusions Nos. 52–56), the Court finds this lack of evidence of actual confusion is a serious blow to Planet Hollywood's trade dress infringement case against Hollywood Casino.

### E. *Intent.*

90. Planet Hollywood vigorously argues that Hollywood Casino intended to copy Planet Hollywood's distinctive trade dress. The Court has considered the evidence on this point carefully. Based on the Court's factual findings, the Court concludes that Planet Hollywood has not offered sufficient evidence to establish intent.

91. As the Court has found, key elements of Hollywood Casino's "look" that Planet Hollywood claims were copied (such as a Hollywood theme employing use of memorabilia, video monitor displays, and an art deco look) in fact have their roots in efforts by the owning interests of Hollywood Casino to establish these themes in a casino back in the late 1980s—before Planet Hollywood came into existence. Other elements found in Planet Hollywood's trade dress (such as celebrity ownership, the Hollywood Hills diorama, and the celebrity handprints) were never adopted by Hollywood Casino or were implemented differently. Although the Hawaiian shirts used by both parties' employees look similar to the casual observer, the Court has found that Planet Hollywood has not established an intent to copy the shirts (and they are not part of the trade dress anyway). And, Hollywood Casino has offered credible evidence—which the Court accepts—that the design of the Hollywood Casino mark and the decor of Hollywood Casino were created by Mr. Bocchicchio, who derived them from sources other than Planet Hollywood.

92. Planet Hollywood has made much of the evidence of actions by Mr. Cantone in attempting to establish an intent by Hollywood Casino to copy Planet Hollywood's trade dress. However, as the Court has found (*see, e.g.,* Findings Nos. 114–15), this evidence is insufficient to establish that Hollywood Casino intentionally sought to duplicate the specific unique combination of elements implemented by Planet Hollywood in its trade dress.

\* \* \* \* \* \*

93. In sum, the Court's consideration of the relevant factors leads it to find that Planet Hollywood has failed to establish a likelihood of confusion. The "total image" of Planet Hollywood and Hollywood Casino are not confusingly similar, there is no proof of actual confusion, and the Court finds that Planet Hollywood has failed to prove an intent to copy. What's more, virtually all the other relevant factors weigh against a finding of likelihood of confusion. Thus, the fact that Planet Hollywood's trade dress is a strong signifier of source is insufficient to establish a likelihood of confusion.

94. Based on these findings, the Court concludes that Planet Hollywood has failed

to establish its claim of trade dress infringement. Accordingly, the Court enters judgment for the defendants and against plaintiffs on the trade dress infringement claim in Count II of the Amended Complaint. Moreover, since likelihood of confusion with respect to Planet Hollywood's trademark and/or trade dress is also a necessary element of Planet Hollywood's claims in Count IV for unfair competition under Illinois law, *AHP Subsidiary Holding Co. v. Stuart Hale Co.*, 1 F.3d 611, 619 (7th Cir.1993), and in Count V for violation of the Illinois Deceptive Business Practices Act, *see, e.g., S. Indus., Inc.*, 12 F.Supp.2d at 819, the Court also enters judgment for defendants and against plaintiffs on those counts as well.

## IV. DILUTION

95. "Dilution is separate and distinct from trademark infringement. Infringement depends on a likelihood of consumer confusion over the source of a product, while dilution by blurring concerns 'the lessening of the capacity of a famous mark to identify and distinguish goods or services.'" *See Luigino's, Inc. v. Stouffer Corp.*, 170 F.3d 827, 832 (8th Cir.1999) (*citing* 15 U.S.C. § 1127); *see also* McCarthy, at § 24:70, at 24–117–121 (the dilution doctrine provides trademark protection beyond the "likelihood of confusion" test). In contrast to infringement claims, a dilution claim "shifts the focus away from consumer protection and towards the protection of an owner's quasi-property right in a famous mark, itself." *Ringling Bros.*, 955 F.Supp. at 614 n. 7.

96. "Dilution occurs when consumers associate a famous mark that has traditionally identified the mark holder's goods with a new and different source." *Luigino's, Inc.*, 170 F.3d at 832 (*citing* McCarthy, at § 24:70, at 24–117 to 118). "By causing consumers to connect the famous mark with different products, the subsequent mark weakens, or dilutes, the famous mark's unique and distinctive link to a particular product." *Id.* As Professor McCarthy explains:

For dilution to occur, the relevant public must make some connection between the mark and both parties. But that connection is not the kind of mental link between the parties that triggers the classic likelihood of confusion test. Rather, the assumption is that the relevant public sees the junior user's use, and intuitively knows, because of the context of the junior user's use, that there is no connection between the owners of the respective marks. However, even with those who perceive distinct sources and affiliation, the ability of the senior user's mark to serve as a unique identifier of the plaintiff's goods or services is weakened because the relevant public now also associates that designation with a new and different source.

McCarthy at § 24.70, at 24–117 to 118.

97. In this case, both Planet Hollywood and Hollywood Casino have asserted federal and state law dilution claims, which we examine in turn.

### A. PLANET HOLLYWOOD'S DILUTION CLAIMS.

98. Planet Hollywood asserts both federal and state law dilution claims in Count III of the Amended Complaint: "Hollywood Casino's use of its HOLLYWOOD CASINO design mark diminishes the distinctive quality of plaintiffs' famous PLANET HOLLYWOOD design marks, and blurs, diminishes and dilutes the distinctiveness of plaintiffs' PLANET HOLLYWOOD design marks in violation of the Federal Anti–Dilution Act, codified at Section 43(c)(1) of the Lanham Act, 15 U.S.C. § 1125(c)(1), and the Illinois Anti–Dilution Act, 765 ILCS 1035/15 (Smith–Hurd 1996)" (Am.Complt.¶ 32).

#### 1. FEDERAL TRADEMARK DILUTION CLAIM.

99. We begin with Planet Hollywood's trademark dilution claim under the Federal Trademark Dilution Act ("FTDA"), which was enacted on January 16, 1996. Section 43(c) of the FTDA, provides the owner of a "famous mark" with protection

"against another person's commercial use ... of a mark or trade name, if such use begins after the mark has become famous and causes dilution of the distinctive quality of the mark." 15 U.S.C. § 1125(c)(1).[36]

100. The federal act defines "dilution" as the "lessening of the capacity of a famous mark to identify and distinguish goods or services, regardless of the presence or absence of ... competition between the owner of the famous mark and other parties, or ... likelihood of confusion, mistake or deception." 15 U.S.C. § 1127. Therefore, in certain respects "[a] party asserting a claim of dilution bears a lighter burden than that required under Section 43(a): It is not necessary to demonstrate competition between the parties or a likelihood of confusion." *Clinique Labs., Inc. v. Dep Corp.*, 945 F.Supp. 547, 561 (S.D.N.Y.1996) (*citing* 15 U.S.C. § 1127).

██ 101. In an action for dilution under the FTDA, a plaintiff bears the burden of proving: (a) that it owns a famous mark, (b) that the defendant adopted its mark after the plaintiff's mark became famous, (c) that defendant's mark dilutes the famous mark, and (d) that the defendant's use is commercial and in commerce. *See Syndicate Sales, Inc.*, 192 F.3d 633, 52 U.S.P.Q.2d 1035, 1040 (7th Cir.1999) (*citing Ringling Bros.-Barnum & Bailey Combined Shows, Inc. v. Utah Div. of Travel Dev.*, 170 F.3d 449, 452 (4th Cir.), *cert. denied,* —— U.S. ——, 120 S.Ct. 286, 145 L.Ed.2d 239 (1999)); *I.P. Lund Trading ApS v. Kohler Co.*, 163 F.3d 27, 45–50 (1st Cir.1998); *Panavision Int'l, L.P. v. Toeppen*, 141 F.3d 1316, 1324 (9th Cir. 1998)). We examine each of these elements.

### a.

██ 102. The FTDA only protects "famous" trademarks. *See Intermatic*

*Inc. v. Toeppen*, 947 F.Supp. 1227, 1237 (N.D.Ill.1996) (*citing* H.R.Rep. No. 374, 104th Cong., 1st Sess.1995, 1995 WL 709280, *4 (Leg.Hist.)). *See Syndicate Sales, Inc.*, 192 F.3d 633, 52 U.S.P.Q.2d at 1041. In *Syndicate Sales*, the Seventh Circuit held that "[t]he legislative history of the [FTDA] makes clear that Congress intended that, in order to be 'famous' a mark must be used in a substantial segment of the United States ... However, within that segment, its 'fame' may be limited to those engaged on a regular basis in commercial activity involving this product." 192 F.3d 633, 52 U.S.P.Q.2d at 1041 n. 7. Factors to consider in determining the distinctiveness and fame of the mark are: "(a) the degree of inherent or acquired distinctiveness of the mark; (b) the duration and extent of use of the mark ...; (c) the duration and extent of advertising and publicity of the mark; (d) the geographical extent of the trading area in which the mark is used; (e) the channels of trade for the goods or services with which the mark is used; (f) the degree of recognition of the mark in the trading areas and channels of trade used by the marks' owner and the person against whom the injunction is sought; (g) the nature and extent of use of the same or similar marks by third parties; and (h) whether the mark was [federally registered]." 15 U.S.C. § 1125(c)(1)(A)-(H).

103. This limitation of protection to "famous marks" (*i.e.,* "only famous marks need apply") reflects the need that Congress sought to address when it enacted the anti-dilution law. The FTDA's legislative history reveals that Congress deemed the statute "necessary" because "famous marks ordinarily are used on a nationwide basis and dilution protection is currently only available on a patch-quilt system of

---

**36.** Recently, the Lanham Act was amended again, effective August 5, 1999, by enactment of the "Trademark Amendments Act of 1999," codified at 15 U.S.C. § 1051. Although the parties dispute whether the new amendments are to be applied retroactively, we need not resolve that issue in this case because Congress did not amend Section 43(c) (as we shall see later, however, the amendments do shed light on whether Congress intended in the first place that Section 43(c) would extend to cover trade dress as well as trademarks).

protection, in that only approximately 25 states have laws that prohibit trademark dilution." H.R.Rep. No. 374, 104th Cong., 1st Sess.1995, 1995 WL 709280, * 9 (Leg. Hist.).

■ 104. As the Court has found, the "PLANET HOLLYWOOD" mark is "famous." Planet Hollywood has therefore satisfied this element of its federal trademark dilution claim under Section 43(c).

**b.**

■ 105. A party claiming trademark dilution under federal law must also prove that the defendant had adopted its mark *after* the plaintiff's mark became famous. Planet Hollywood opened its first restaurant in October 1991, and Hollywood Casino opened its first casino in June 1993; thus, it was not until June 1993 that Hollywood Casino first began using the "Hollywood Casino" mark. This establishes that Hollywood Casino adopted its mark after Planet Hollywood began using its mark. However, that fact does not answer the question of whether Hollywood Casino began using its mark *after* the Planet Hollywood mark became *famous.* Planet Hollywood has not pinpointed a specific time frame during which its mark first achieved fame. If the measuring stick is June 1993, when Hollywood Casino first began using the "Hollywood Casino" mark, the Court does not believe the evidence establishes that the Planet Hollywood mark had achieved fame. By June 1993, only four Planet Hollywood restaurants had opened: one in New York, one in Santa Ana, California, one in Cancun, Mexico, and one in London, England. The Court does not believe that the limited scope of the Planet Hollywood business at that time supports a finding that its mark had achieved fame by June 1993.

106. However, while Planet Hollywood's claim could be pled more precisely, it appears that for purposes of the dilution claim, Planet Hollywood alleges that the offending version of the Hollywood Casino mark is the film strip mark. Paragraph 19 of the Amended Complaint defines that film strip mark as the "Hollywood Casino design," and the dilution claim in Count III incorporates that allegation and asserts dilution by Hollywood Casino's use of its "Hollywood Casino design mark" (Am. Complt.¶ 32). The evidence establishes that Hollywood Casino did not begin using the film strip mark in commerce until July 1996, and the Court finds that the evidence establishes that by then the Planet Hollywood mark had in fact achieved fame. The Court therefore finds that Planet Hollywood has satisfied the second element of its trademark dilution claim: that Hollywood Casino first began using its film strip mark after the Planet Hollywood mark already had achieved fame.

**c.**

107. There is no question that Hollywood Casino's use of its mark is in commerce and is commercial in nature—to promote and identify its casinos. The fact that this use does not compete with Planet Hollywood's current use of its mark is of no moment, because the FTDA protects trademarks against dilution by both competing and non-competing uses. *See* 15 U.S.C. § 1127 (definition of dilution indicates that there can be dilution "regardless of the presence or absence of ... competition between the senior and junior user"); *see also Nabisco, Inc. v. PF Brands, Inc.,* 191 F.3d 208, 217, 218 (2d Cir.1999); *Circuit City Stores, Inc. v. OfficeMax, Inc.,* 949 F.Supp. 409, 412 (E.D.Va. 1996) (under the Dilution Act, a mark may "dilute" a famous mark even though the mark is "used in an entirely different market for an entirely different class of products"). *Nike, Inc. v. Nike Securities, L.P.,* 50 U.S.P.Q.2d 1202, 1204 (N.D.Ill.1999) ("The Act was passed to protect 'famous' trademarks against uses that were non-competing but that nevertheless blurred or diluted the distinctiveness of the famous trademarks"). Accordingly, the Court finds that Planet Hollywood has met this element of its trademark dilution claims.[37]

**37.** To the extent Planet Hollywood's dilution claim also seeks to sweep in assertions based

#### d.

108. Planet Hollywood is claiming dilution of its design mark by "blurring" (Trial Tr. 896–97, 903), a theory which is covered by the federal act. See H.R.Rep. No. 374, 104th Cong., 1st Sess.1995, 1995 WL 709280, pg. 3 (Leg.Hist.) (the statute "is designed to encompass all forms of dilution recognized by the courts, including dilution by blurring"); see also H.R.Rep. No. 374, 104th Cong., 1st Sess. (1995) (emphasis added) (Section 43(c) is intended to protect "famous trademarks from subsequent uses that *blur* the distinctiveness of the mark or *tarnish* or disparage it").

109. "Dilution by blurring ... occurs where consumers mistakenly associate the famous mark with goods and services of the junior mark. In this way, the power of the senior mark to identify and distinguish goods and services is diluted." *Ringling Bros.*, 955 F.Supp. at 616. *See also Deere & Co. v. MTD Prods. Inc.*, 41 F.3d 39, 43 (2d Cir.1994) ("Dilution by blurring occurs where the defendant uses or modifies the plaintiff's trademark to identify the defendant's goods and services, raising the possibility that the mark will lose its ability to serve as a unique identifier of the plaintiff's product"); *Clinique*, 945 F.Supp. at 562 (same). An action for dilution by blurring under the FTDA requires proof that: "(1) a defendant has made use of a junior mark sufficiently similar to the famous mark to evoke in a relevant universe of consumers a mental association of the two that (2) has caused (3) actual economic harm to the famous mark's economic value by lessening its former selling power as an advertising agent for its goods or services." *Ringling Bros.*, 170 F.3d at 461.

110. Focusing on the element of trademark similarity, "[t]o support an action for dilution by blurring, 'the marks must at least be similar enough that a significant segment of the target group of customers sees the two marks as essentially the same.'" *Luigino's, Inc.*, 170 F.3d at 832 (*quoting* McCarthy, at § 24:90.1, at 24–145); see also Mead Data Cent., Inc. v. Toyota Motor Sales, U.S.A., Inc., 875 F.2d 1026, 1029 (2d Cir.1989) (holding that marks had to be "very" or "substantially" similar to support a claim of dilution, and finding that "Lexis" and "Lexus" were not substantially similar). The Seventh Circuit has not yet spoken as to the factors to consider in deciding that question, but many courts have started from the framework set forth in *Mead Data Central*, 875 F.2d at 1035 (2d Cir.1989) (concurring opinion), a pre-FTDA decision, in which six relevant factors were identified: (1) similarity of the marks; (2) similarity of the products covered by the marks; (3) sophistication of consumers; (4) predatory intent; (5) renown of the senior mark; and (6) renown of the junior mark. See, e.g., Ringling Bros., 955 F.Supp. at 618; I.P. Lund Trading v. Kohler Co., 11 F.Supp.2d 112, 126 (D.Mass.1998). However, some courts consider only some of these factors, and at least one court has found three

on a possible future expansion by Planet Hollywood into casinos (as may be the case, since Planet Hollywood incorporates by reference Paragraph 10 of its Amended Complaint, which makes allegations about such an expansion), that is a request for declaratory relief which the Court lacks subject matter jurisdiction to address (*e.g.*, Conclusions Nos. 15–21, *supra*). As a result, the Court need not reach the issue of whether—if it opened a casino—Planet Hollywood would be able to establish status as a "senior user" to Hollywood Casino: while Planet Hollywood began using its mark for restaurants and other services before Hollywood Casino began using its mark, Hollywood Casino indisputably would have begun using its mark *for casinos* before Planet Hollywood did so. See *Hormel Foods Corp. v. Jim Henson Prods., Inc.*, 73 F.3d 497, 504 (2d Cir.1996) (recognizing a trademark holder's "interest in preserving avenues of expansion and entering into related fields"); *Sands, Taylor & Wood Co. v. Quaker Oats Co.*, 978 F.2d 947, 958 (7th Cir.1992) (indicating that "use of confusingly similar marks on closely related products" is prohibited, in part, because the trademark laws seek to protect the trademark owner's "ability to enter product markets in which it does not now trade but into which it might reasonably be expected to expand in the future.").

necessary factors. *E.g., Hershey Foods,* 998 F.Supp. at 504.

■■■ 111. In the Court's view, the *Mead Data Central* factors—which substantially overlap with the factors that the Seventh Circuit in *G. Heilman* has endorsed for use in analyzing the likelihood of confusion in the trademark infringement context—provide a useful framework for analysis. However, as with most multifactor tests, the Court believes that not all of the six factors identified by the court in *Mead Data Central, Inc.* invariably command equal weight. While the significance of each factor may vary on the facts of each individual case, this Court believes that the similarity of the marks, similarity of the products covered by the marks, and predatory intent are generally the most significant factors, because they are likely to shed the most light on the key question in the blurring analysis: whether the defendants' mark is "sufficiently similar to the famous mark to evoke in a relevant universe of consumers mental association of the two." *Ringling Bros.,* 170 F.3d at 461.

■■■ 112. In this case, consideration of those six factors leads the Court to conclude that Planet Hollywood has failed to prove that the use by Hollywood Casino of its film strip mark has blurred the distinctive character of the Planet Hollywood mark:

**a. Similarity of the Marks.** The same considerations that led the Court to find that the Hollywood Casino mark is not confusingly similar to the Planet Hollywood mark lead the Court to find that the Hollywood Casino mark also is not sufficiently similar to the Planet Hollywood mark to evoke a mental association between the two. The Court again notes that Planet Hollywood has not offered any consumer testimony or survey evidence to suggest otherwise.

**b. Similarity of the Products/Services.** As the Court has previously found, the Casino services offered by Hollywood Casino are neither competitive nor closely related to the restaurant services offered by Planet Hollywood. The statute does not limit dilution claims to marks covering competing products or services. But the more similar the products or services being offered, the more likely that the use of two similar marks might cause consumers to link the two together. Thus, because the services are non-competitive (and not closely related), this factor does not support a finding that Hollywood Casino's use of the mark would tend to evoke a mental association with Planet Hollywood.

**c. Sophistication Of Consumers.** The Court has found that the relevant consumers are sophisticated, in the sense that "individuals who frequent casinos are likely to have made a rational and purposeful decision to do so." Accordingly, this factor does not support Planet Hollywood's claim of dilution by blurring.

**d. Predatory Intent.** As the Court has already found, Planet Hollywood has failed to establish that Hollywood Casino intended to copy the Planet Hollywood mark. Accordingly, this factor does not support a finding of dilution by blurring.

**e. Renown Of Senior And Junior Marks.** It should go without saying that the Planet Hollywood mark has a very high level of renown: after all, under the federal act it must be famous in order to qualify for protection in the first place. And, as the Court has also found, any renown that attaches to Hollywood Casino's mark is far less than that enjoyed by the Planet Hollywood mark. How those factors cut in the dilution analysis, however, is open to debate. The extraordinary renown of the Planet Hollywood mark arguably makes it less susceptible to being associated with other marks. On the other hand, the Hollywood Casino mark likely has some level of recognition in the areas surrounding Aurora, Illinois and Tunica, Mississippi, where the Hollywood Casinos operate. Thus, on balance, the Court believes that these factors weigh somewhat in favor of a finding of dilution by blurring.

113. In sum, the Court believes that the relevant factors, taken together, lead

to the conclusion that Planet Hollywood has failed to establish that the Hollywood Casino mark evokes a mental association in a relevant universe of consumers with the Planet Hollywood mark. The factors that the Court deems most important do not support a finding of such blurring: the marks are not substantially similar, the products and services offered by the parties are not competitive or closely related, and Planet Hollywood has failed to establish any predatory intent on the part of Hollywood Casino. And, the factor of sophistication of consumers also weighs against a finding of dilution by blurring. The respective levels of renown of the Planet Hollywood and Hollywood Casino marks are insufficient to overcome these other factors.

114. In addition, the Court concludes that Planet Hollywood has failed to establish another element necessary to prove its claim of dilution by blurring: that Hollywood Casino's use of its film strip mark has caused harm to the economic value of Planet Hollywood's mark. Planet Hollywood has offered no consumer or survey evidence to show that there has been economic harm to the value of its mark, or that any such harm has been caused by Hollywood Casino. Indeed, Planet Hollywood consistently has maintained that despite the economic duress being experienced by Planet Hollywood (which it does not attribute to any conduct by Hollywood Casino), the Planet Hollywood mark remains extremely strong—and, as the Court has found, continues to be famous. For this reason as well, the Court concludes that Planet Hollywood has failed to establish a claim of dilution of its trademark under the federal statute.

## 2. FEDERAL TRADE DRESS DILUTION CLAIM.

115. In addition to claiming dilution of its trademark, Planet Hollywood also asserted during closing argument at trial that there has been dilution of its trade dress (Trial Tr. 895–97, 901). There are two threshold problems with this argument, each of which leads to rejection of Planet Hollywood's claim.

### a.

116. *First,* Planet Hollywood did not plead a claim of trade dress dilution in the Amended Complaint. To be sure, in its allegations of "common facts" to all counts, Planet Hollywood made assertions that might suggest a claim of trade dress dilution. For example, Planet Hollywood asserted that Hollywood Casino's display of memorabilia and alleged focus on the celebrity owners of Planet Hollywood are designed "to create an image and association with plaintiffs" (Am.Complt., ¶ 18), and that allegation is incorporated by reference into Count III, which pleads the claim of dilution. However, in the specific articulation of what acts by Hollywood Casino allegedly constitute dilution, Planet Hollywood specifically challenges only use of the "HOLLYWOOD CASINO design mark," and specifically alleges only that Hollywood Casino's use of that mark diminishes the distinctive quality of Planet Hollywood's "design marks" (Am.Complt., ¶ 32). Nothing is said about dilution of Planet Hollywood's trade dress. Planet Hollywood has never sought to amend its complaint prior to trial to add a trade dress dilution claim, and after trial did not seek to amend the complaint to conform to evidence. The Court sees no reason now to permit Planet Hollywood to add a trade dress dilution claim that it could have pled long ago.

### b.

117. *Second,* even had it properly been pled, the Court holds that a trade dress dilution claim does not properly lie under the FTDA. In so holding, the Court has considered that some courts have interpreted the federal act to include a cause of action for trade dress dilution claims. *See, e.g., Clinique Labs.,* 945 F.Supp. at 561. For the reasons that follow, this Court respectfully disagrees.

118. The starting point of our analysis, of course, is with the specific

terms of Section 43(c). Courts are required to give effect to the "clear meaning" of the statutes as written. *Estate of Cowart v. Nicklos Drilling Co.*, 505 U.S. 469, 476, 112 S.Ct. 2589, 120 L.Ed.2d 379 (1992). Thus, "[i]n a statutory construction case, the beginning point must be the language of the statute, and when a statute speaks with clarity to an issue, judicial inquiry into the statute's meaning, in all but the most extraordinary circumstance, is finished." *Id.* at 475, 112 S.Ct. 2589; *see also Sullivan v. Stroop*, 496 U.S. 478, 485, 110 S.Ct. 2499, 110 L.Ed.2d 438 (1990); *Pavelic & LeFlore v. Marvel Entertainment Group*, 493 U.S. 120, 122, 110 S.Ct. 456, 107 L.Ed.2d 438 (1989).

119. Here, the statutory language is very precise and unmistakable: Section 43(c) provides that "[t]he owner of a famous *mark* shall be entitled ... to an injunction against another person's commercial use in commerce of a *mark or trade name,* if such use begins after the *mark* has become famous and causes dilution ..." 15 U.S.C. § 1125(c) (emphasis added). This provision expressly extends a cause of action for dilution of a famous mark and says nothing about trade dress. Indeed, it is not without significance that the popular name for the legislation that added Section 43(c) to the Lanham Act was the "Federal *Trademark* Dilution Act of 1995" (emphasis added). The Court sees no reason to infer that when Congress used the words "mark" or "trade name," it really meant to include, *sub silentio,* trade dress as well.

120. In *Clinique Laboratories, Inc.,* the district court drew that very inference on the ground that to do so was consistent with the case law interpreting Section 43(a) to include trade dress infringement, even though Section 43(a) does not specifically use the term "trade dress." 945 F.Supp. at 561 (*citing Two Pesos,* 505 U.S. at 773, 112 S.Ct. 2753). However, the Court believes that little parallel can be drawn between Section 43(a) and Section 43(c) for purposes of this analysis, because the language of Section 43(a) is significantly different from that of Section 43(c).

121. As it existed at the time of the *Two Pesos* decision, Section 43(a) not only failed to specifically use the term "trade dress," but it also did not use the term "trademark:"

"Any person who ... uses in commerce *any word, term, name, symbol, or device or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact,* which—(A) is likely to cause confusion ... as to the ... origin ... of ... goods, services or commercial activities by another person, or (B) ... misrepresents the ... origin of his or her or another person's goods, services, or commercial activities, shall be liable in a civil action ..."

15 U.S.C. § 1125(a) (emphasis added). It was the very breadth of this language that the Supreme Court cited in holding that Section 43(a) provides protection for both trademarks and trade dress. The Supreme Court reasoned that Section 43(a) "does not mention trademarks or trade dress," and "[w]e see no basis for requiring secondary meaning for inherently distinctive trade dress protection under § 43(a) but not for other distinctive words, symbols or devices capable of identifying a producer's product." *Two Pesos, Inc.,* 505 U.S. at 774, 112 S.Ct. 2753. In short, because Section 43(a) did not specifically use the term trademark or trade dress, there was no reason to infer that Congress intended to provide protection for one but not the other.

122. However, the Supreme Court recognized that "[i]t would be a different matter if there were textual basis in § 43(a) for treating inherently distinctive verbal or symbolic trademarks differently from inherently distinctive trade dress." *Two Pesos,* 505 U.S. at 774, 112 S.Ct. 2753. Section 43(c) presents just that kind of different matter: Congress was more specific in drafting the statutory language, and thus provided a textual basis for distinguishing between trademarks and trade

dress for purposes of dilution protection. Congress unmistakably intended to provide protection against dilution of famous "marks," and specifically used that word. The fact that Congress did not include a specific reference to protection against dilution of trade dress cannot simply be swept under the rug.

123. The recent Trademark Amendments Act of 1999 provides further support for this Court's statutory construction. In that Act, Congress amended Section 43(a) of the Lanham Act to include a new subsection (3), which specifically acknowledges the civil action for trade dress infringement and which specifically uses the term "trade dress":

> In a civil action for *trade dress* infringement under this Act for trade dress not registered on the principal register, the person who asserts *trade dress* protection has the burden of proving that the matter sought to be protected is not functional.

15 U.S.C. § 1125(a)(3) (emphasis added). This same set of amendments also provided new remedies for cases of dilution of famous marks, 15 U.S.C. §§ 1116(a) and 1117(b), but left the language of Section 43(c) unchanged.

124. The fact that Congress added to Section 43(a) a specific reference to "trade dress" shows that Congress was fully capable of including that term in Section 43(c) as well, if Congress intended to extend anti-dilution protection to trade dress. Moreover, the fact that in that same legislation Congress also revised the remedies available for violations of 43(c) shows that the antidilution provision was on Congress's radar screen at the time— hence, the failure to include a specific reference to trade dress in Section 43(c), as Congress did in Section 43(a), takes on added meaning. "[W]here Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposefully in the disparate inclusion or exclusion." *Russello v. United States,* 464 U.S. 16, 23, 104 S.Ct. 296, 78 L.Ed.2d 17 (1983).

125. In adopting this construction, the Court notes that there is nothing bizarre or anomalous about a congressional decision limiting protection under Section 43(c) to trademarks, but extending protection under Section 43(a) more broadly to trademarks and trade dress. Section 43(a) requires proof of likely confusion between two particular marks or trade dress, while it imposes a substantial hurdle to establishing liability for infringement. Section 43(c), by contrast, dispenses with the requirement of proof of source confusion. By eliminating the requirement of proving likely confusion to establish a claim under Section 43(c), Congress has made the FTDA a powerful tool, and it thus is not surprising that Congress limited the scope of its use. One such limitation is that Section 43(c) applies only to famous marks, and not to all marks that are "distinctive" as is the case with Section 43(a). The Court believes that it was no less rational for Congress to decide that given the frequent difficulty of specifically articulating what constitutes a party's trade dress and the potential ambiguity in that description, a party pursuing a federal trade dress claim should not be allowed to do so without proving likely confusion.

126. The Seventh Circuit recently noted that "given the difference in wording between § 43(a) and § 43(c), ... the contention that the statute [FTDA] is inapplicable to trade dress" is not "totally without merit." *Syndicate Sales, Inc.,* 192 F.3d 633, 52 U.S.P.Q.2d at 1040. In that case, the Seventh Circuit was not required to reach the issue because it had been waived. That is not the case here. For the reasons set forth above, the Court concludes that Section 43(c) was not intended to provide a cause of action for trade dress dilution, and Planet Hollywood's FTDA claim for trade dress protection must fail for that reason as well.[38]

---

**38.** Even were the trade dress dilution claim pled and covered by Section 43(c), Planet

### 3. STATE LAW DILUTION CLAIMS.

 127. The version of the Illinois Anti–Dilution Act in effect at the time the original complaint and counterclaim were filed in this case was repealed by 765 ILCS 1036/65, which became effective January 1, 1998. However, by its specific terms, the amended version does not apply to cases "then pending on its effective date." 765 ILCS 1036/90; *see also Medic Alert Foundation United States, Inc. v. Corel Corp.*, 43 F.Supp.2d 933, 940–41 and n. 5 (N.D.Ill.1999). Because this case was pending at the time the new act took effect, the provisions of the former Illinois Anti–Dilution Act, 765 ILCS 1035/15, control resolution of the state law dilution claims asserted in this case.

128. The applicable version of the Illinois Anti–Dilution Act states in relevant part:

> [T]he circuit court shall grant injunctions, to enjoin subsequent use by another of the same or any similar mark, trade name, label or form of advertisement if there exists a likelihood of injury to business reputation or of dilution of the distinctive quality of the mark, trade name, label, or form of advertisement of the prior user, notwithstanding the absence of competition between the parties or of confusion as to the source of goods or services . . . .

765 ILCS 1035/15 (Smith–Hurd 1996) ("IADA"). Thus, as with the FTDA, under Illinois law "dilution is not dependent upon the likelihood of confusion but on a separate likelihood of dilution inquiry." *AHP Subsidiary Holding Co.*, 1 F.3d at 619. Illinois law "grants protection to trademarks beyond that provided by the classic 'likelihood of confusion' test under the Lanham Act," by seeking to "prevent[ ] the gradual whittling away of trademarks' distinctiveness through use by third par-

ties on non-confusing, non-competing products.' " *Ringling Bros.*, 855 F.2d at 482.

129. As with the federal law, while granting this additional protection the Illinois law also placed certain additional constraints on its use. Under applicable Illinois law, the protection of the statute is not available to competitors. *See AHP*, 1 F.3d at 619 (citing cases). However, because Planet Hollywood and Hollywood Casino are not competitors, Planet Hollywood is not barred from attempting to avail itself of the protections of the IADA in this case. Thus, we consider Planet Hollywood's trademark and trade dress dilution claims under Illinois law.

#### a. TRADEMARK DILUTION.

 130. The IADA is designed to protect a strong trade name or mark from use—and dilution—by another. *Kern v. WKQX Radio*, 175 Ill.App.3d 624, 634, 125 Ill.Dec. 73, 529 N.E.2d 1149, 1156 (1988) (*citing Filter Dynamics Int'l, Inc. v. Astron Battery, Inc.*, 19 Ill.App.3d 299, 314, 311 N.E.2d 386 (1974); *Alberto–Culver Co. v. Andrea Dumon, Inc.*, 466 F.2d 705, 709 (7th Cir.1972)). In *Ye Olde Tavern Cheese Products, Inc. v. Planters Peanuts Division, Standard Brands, Inc.*, 261 F.Supp. 200 (N.D.Ill.1966), *aff'd*, 394 F.2d 833 (7th Cir.1967), the Seventh Circuit stated that the Illinois Trademark Act requires that the trademark or name be "distinctive" (rather than "famous"). *Id.* at 208. In *McGraw–Edison Co. v. Walt Disney Prods.*, 787 F.2d 1163, 1174 (7th Cir.1986), the Seventh Circuit held that when determining the distinctiveness of the mark under the Illinois Anti–Dilution Act, the court considers factors such as: (1) whether the mark is "coined" or invented; (2) the length of time the mark has been used; (3) the scope of advertising and promotion of the mark; (4) the nature and extent of the business; and (5) the scope of

---

Hollywood has failed to establish it. Assuming Planet Hollywood's trade dress were famous, the findings made earlier establish that Hollywood Casino's total image is sufficiently distinct that it would not likely create a mental association with Planet Hollywood. And,

as with its trademark dilution claim, Planet Hollywood has not shown any harm to the distinctiveness of its trade dress. Accordingly, the Court finds that Planet Hollywood has failed to establish a claim of trade dress dilution under the federal act.

the first user's reputation. *See also Hyatt Corp. v. Hyatt Legal Servs.*, 736 F.2d 1153, 1158 (7th Cir.), *cert. denied,* 469 U.S. 1019, 105 S.Ct. 434, 83 L.Ed.2d 361 (1984)). Further, Illinois courts have interpreted this requirement to limit relief to situations where the name was original with the plaintiff, where it acquired widespread reputation and good will through the plaintiff's efforts, and where the defendant's name or mark was virtually identical. *Id.; see also Thompson v. Spring–Green Lawn Care Corp.*, 126 Ill.App.3d 99, 112, 81 Ill. Dec. 202, 466 N.E.2d 1004, 1015 (1984) (The Illinois Anti–Dilution Act empowers courts to grant injunctive relief to enjoin the use of the same or any similar mark, trade name, label or form of advertisement if there exists either: a likelihood of injury to business reputation, or dilution of the distinctive quality of the mark).

131. Thus, in any analysis under the IADA, there are two questions that must be answered: (1) is the design mark "distinctive" and, if so, (2) has it been diluted by use of a virtually identical mark. Here, as the Court has found, Planet Hollywood's design mark is not merely distinctive, but famous—a point that Hollywood Casino concedes. The remaining question, then, is whether Hollywood Casino has, by use of its film strip mark, caused a "dilution" of Planet Hollywood's design mark. We find that the answer is no.

132. In *Hyatt Corp.*, 736 F.2d at 1158, the Seventh Circuit held that under Illinois law, the "[i]mportant factors" in determining dilution "are the similarity between the marks used by the parties, and the extent of the marketing effort by the second user." The Seventh Circuit has equated dilution under Illinois law with "a blurring of the mental image of the claimant's mark or product." *Ringling Bros.*, 855 F.2d at 485. We believe that as with federal law, under Illinois law, "[t]o support an action for dilution by blurring, 'the marks must at least be similar enough that a significant segment of the target group of customers sees the two marks as essen-

tially the same.'" *Luigino's, Inc.*, 170 F.3d at 832 (*quoting* McCarthy, *supra,* § 24:90.1, at 24–145). *See also Mead Data Cent.*, 875 F.2d at 1029 (holding that marks had to be "very" or "substantially" similar to support a claim of dilution, and finding that "Lexis" and "Lexus" were not substantially similar).

133. Based on the findings that the Court has made concerning the respective marks, the Court finds that they are not sufficiently similar to sustain a claim of dilution under Illinois law. The Court emphasizes that Planet Hollywood has not offered any evidence of how consumers actually view these marks in the marketplace, and the Court has not been supplied with any direct testimony by consumers or with any survey evidence. Planet Hollywood has failed to offer evidence to establish that reasonable consumers would likely find these marks so similar as to blur the mental image of the Planet Hollywood mark. Accordingly, the Court concludes that Planet Hollywood has failed to prove its claim of trademark dilution under Illinois law.

### b. TRADE DRESS DILUTION.

134. The IADA extends trade dilution protection to a "mark, trade name, label or *form of advertisement* ..." Section 1035/15 (emphasis added). The thrust of the statutory language seems directed to trademarks; as with Section 43(c) of the Lanham Act, no mention is made of trade dress. However, the use of the phrase "form of advertisement" might arguably be broad enough to encompass trade dress. One federal district court decision interpreting a predecessor version of the IADA extended it to cover trade dress dilution, reasoning that trade dress constituted a trademark. *Soft Sheen Products, Inc. v. Revlon, Inc.*, 675 F.Supp. 408, 416 (N.D.Ill. 1987). The Court has found no Illinois state court decisions addressing whether the IADA covers trade dress. However, a number of Illinois state court decisions have recognized that the purpose of the IADA was to protect "a strong trade *name*

or mark." *Kern v. WKQX Radio*, 175 Ill.App.3d 624, 634, 125 Ill.Dec. 73, 529 N.E.2d 1149, 1156 (1988) (emphasis added); *see also Filter Dynamics International v. Astron Battery, Inc.*, 19 Ill. App.3d 299, 314, 311 N.E.2d 386, 398 (1974).

135. The Court believes that the better reading of the IADA is that it does not extend to trade dress. Under Illinois law, "[i]t is a fundamental principle of statutory construction that the express mention of one thing in a statute excludes all other things not mentioned." *City of Chicago v. Air Auto Leasing Co.*, 297 Ill.App.3d 873, 232 Ill.Dec. 46, 697 N.E.2d 788, 791 (1st Dist.1998) (*quoting Welch v. Johnson*, 147 Ill.2d 40, 167 Ill.Dec. 989, 588 N.E.2d 1119, 1124 (1992)). We see no reason to stretch the interpretation of trademark to include trade dress; had the Illinois legislature intended to extend the statute to cover trade dress, it readily could have said so.

136. In any event, even if Planet Hollywood had asserted a trade dress dilution claim under Illinois law, and Illinois law recognized such a claim, the claim would fail for lack of proof (*see* Conclusion No. 126, *supra*). As a result of this conclusion, and the previous conclusions that Planet Hollywood has failed on its other anti-dilution claims under federal and state law, the Court hereby enters judgment for defendants and against plaintiffs on Count III of the Amended Complaint.

## B. HOLLYWOOD CASINO'S DILUTION CLAIMS.

137. We now turn to Hollywood Casino's counterclaims alleging dilution of its trademark, "Hollywood Casino," by Planet Hollywood's use of its word trademark "Planet Hollywood" in four particular restaurants located in hotels that also house casino operations. As does Planet Hollywood, Hollywood Casino alleges dilution and violation both of the FTDA and the IADA (Am. Counterclaim, Count IV). However, unlike Planet Hollywood, Hollywood Casino's theory of dilution is not based on "blurring" but on tarnishment: Hollywood Casino alleges that Planet Hol-

lywood's "infringing acts denigrate and tarnish [Hollywood Casino's] reputation with the users of [casino] services." (Am.Counterclaim, ¶ 40).

138. For the reasons discussed in Conclusions Nos. 62–66 above, the Court rejects Hollywood Casino's attempt to avoid the merits of this claim by deleting it from the Amended Counterclaim. As Hollywood Casino's motion to amend the Amended Counterclaim anticipates, the dilution claims fail on the merits both under federal and state law.

### 1. FEDERAL DILUTION CLAIM.

139. With respect to the allegation of dilution under federal law, Hollywood Casino's claim fails at the threshold because its trademark is not "famous." The Court has not deemed it necessary to find whether Hollywood Casino's trade name and trademark are generic or merely descriptive, and thus not protectable at all. What the Court has found is that even assuming protectability, the Hollywood Casino trademark does not have a nationwide presence, but rather has recognition principally in the geographic areas surrounding its locations in Aurora, Illinois and Tunica, Mississippi. For the reasons already set forth at some length (*see, e.g.,* Findings Nos. 57–66), the Court finds that Hollywood Casino fails to meet that threshold standard of "famousness."

140. Moreover, Hollywood Casino has failed to establish either a mental association between its name trademark and that of Planet Hollywood, or any actual economic harm that has fallen to Hollywood Casino because of Planet Hollywood's use of its mark. "The *sine qua non* of tarnishment is a finding that plaintiff's mark will suffer negative associations through defendant's use." *Hormel Foods Corp.*, 73 F.3d at 507. Cases in which tarnishment have been found generally arise "where a distinctive mark is depicted in a context of sexual activity, obscenity or illegal activity." *Elvis Presley*, 950 F.Supp. at 799 (citing cases). Although some courts have gone farther and recog-

nized tarnishment where "a plaintiff's trademark is linked to products of shoddy quality, or is portrayed in an unwholesome or unsavory context likely to evoke unflattering thoughts about the owner's product," *id.* (*quoting Deere & Co. v. MTD Products, Inc.*, 41 F.3d 39, 43 (2nd Cir. 1994)), in such cases the trade names either were found "identical or almost identical, or there was proof of an intent by the defendant to dilute the mark of a plaintiff to its own advantage." *Id.* (citing cases).

141. As the Court has found, the word marks here have significant differences (Finding No. 38), which would not make them appear highly similar to the consuming public. Moreover, as the Court has found, these parties are not competitors, which the Court finds makes it less likely that a consumer in the marketplace confronting the Planet Hollywood name would mentally associate it with Hollywood Casino. Finally, Hollywood Casino has failed to offer evidence sufficient to establish that any such association would invariably be a negative one. Hollywood Casino has offered no consumer or other survey evidence that the Planet Hollywood name is currently viewed in a pervasive, negative fashion, or that people confronting that name would associate it with Hollywood Casino in a way detrimental to Hollywood Casino. Indeed, Hollywood Casino has admitted that it has failed to uncover any damage suffered by Hollywood Casino from Planet Hollywood's use of its trademark name in restaurants located in casinos (6/1/99 Tr. 46–47). For the foregoing reasons, Hollywood Casino's claim of dilution under the FTDA fails.

## 2. STATE LAW DILUTION CLAIM.

142. While the applicable version of the Illinois Anti–Dilution Act does not require proof that a mark is famous, that does not advance Hollywood Casino's claim of dilution under Illinois law. Even assuming that Hollywood Casino's mark is distinctive and thus qualifies for protection under the IADA, Hollywood Casino's claim under state law must fail because—as under federal law—the two name trademarks are not sufficiently similar to sustain a claim of dilution. As a result of this finding and the finding that Hollywood Casino has failed to establish dilution under federal law, the Court hereby enters judgment in favor of the counterclaim defendants and against the counterclaim plaintiffs on the dilution claims in Count IV of the Amended Counterclaim.[39]

## CONCLUSION

For all the foregoing reasons, the Court hereby enters final judgment as follows:

1. The Court grants Hollywood Casino's motion to dismiss the declaratory judgment counts (doc. # 179–1), and thus hereby dismisses without prejudice Count VI of the Amended Complaint and Count IX of the Amended Counterclaim, pursuant to Federal Rule of Civil Procedure 12(b)(1), for lack of subject matter jurisdiction. The Court denies Planet Hollywood's request for an assessment of fees against Hollywood Casino under 28 U.S.C. § 1927, in connection with the litigation of the declaratory judgment claims.

2. The Court hereby enters final judgment for defendants, and against plaintiffs, on Counts I through V of the Amended Complaint, which are all remaining claims in the Amended Complaint.

3. The Court denies the counterplaintiffs' motion under Federal Rule of Civil Procedure 15(b) to conform the pleadings

---

**39.** As a result of the Court's conclusions that Hollywood Casino has failed to establish substantive violations of trademark infringement, dilution, common law unfair competition or violation of the Illinois Consumer Fraud and Deceptive Business Practice Act or the Nevada Deceptive Business Trade Practices Act, Hollywood Casino has failed to establish the predicate for its other remaining counts of unjust enrichment (Count VI) and damages (Count VII), each of which is based on Hollywood Casino having established one of the substantive violations alleged in Counts I through V or VIII. Accordingly, the Court hereby enters judgment for counterclaim defendants and against counterclaim plaintiffs on Counts VI and VII of the Amended Counterclaim.

to the proof by deleting Counts I through VIII of the Amended Counterclaim (doc. # 181–1). The Court hereby enters final judgment for counterdefendants, and against counterplaintiffs, on Counts I through VIII of the Amended Counterclaim, which are all remaining counts in the Amended Counterclaim.

4. All parties are to bear their own attorneys' fees and costs. This case is hereby terminated.